# WEST, WEBB, ALLBRITTON & GENTRY
## A PROFESSIONAL CORPORATION

### — Established in 1982 —

ATTORNEYS:

ROY D. BRANTLEY * +
KYLE T. CARNEY
DONALD DELGADO +
TERRANCE D. DILL, JR. +
PATRICK W. FOGARTY ++
MICHAEL H. GENTRY ** +
TYLER J. GRANGER
BRYAN T. HANNA **** +
ANGELA J. HINDMAN
PADON D. HOLT
BAILI B. RHODES  +
JOHN "JAY" RUDINGER, JR.
WELDON RUSSELL *** +
MELISSA SPINN
JOHN C. WEBB, JR. +
GAINES WEST +

OF COUNSEL:

STEVEN N. ALLBRITTON
LESLIE A. PALMER, JR.
RANDAL L. PAYNE *****

Writer's e-mail:  gaines.west@westwebb.law

www.westwebb.law

+ Partner
++ Senior Counsel

*BOARD CERTIFIED
PERSONAL INJURY TRIAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

**BOARD CERTIFIED
COMMERCIAL REAL ESTATE LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

*** BOARD CERTIFIED
ESTATE PLANNING AND PROBATE LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

**** REGISTERED PATENT ATTORNEY
U.S. PATENT & TRADEMARK OFFICE

***** BOARD CERTIFIED
CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

November 4, 2019

The Honorable Keith Ellison                    *Via e-File*
United States District Court
Southern District of Texas – Houston Division
515 Rusk Avenue, Room 3716
Houston, Texas 77002

> Re:     Cause No. 4:18-CV-02011; *Austin Van Overdam v Texas A&M University, et al.;* In the United States District Court for the Southern District of Texas, Houston Division.

Dear Judge Ellison:

Enclosed please find a courtesy copy of four cases upon which Plaintiff Austin Van Overdam intends to rely during the November 5, 2019 hearing regarding Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint filed in this matter.

Since our own Fifth Circuit is silent on the mootness issue regarding injunctive relief, these cases are offered to demonstrate how other circuits have dealt with a request for expunction of student records that were created as a result of a past due process violation. These circuits have concluded that such requests are claims for prospective injunctive relief. *E.g., Doe v. Purdue Univ.*, 928 F.3d 652, 666 (7th Cir. 2019) (explaining "marred record is a continuing harm for which [plaintiff] can seek redress") (citing *Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) (an "F" grade and a plagiarism conviction "constitute[d] a continuing injury to the plaintiff" and an action to remove them was "prospective in nature"); *see also Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007); *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 598 (S.D.

PRINCIPAL OFFICE: 1515 EMERALD PLAZA , COLLEGE STATION, TEXAS 77845-1515
TELEPHONE:  (979) 694-7000  FACSIMILE:  (979) 694-8000

1012 RIO GRANDE STREET, AUSTIN, TEXAS 78701-2020
TELEPHONE:  (512) 501-3617

28248: 2019.11.4_Ltr Brief to Judge Ellison.doc

November 4, 2019
Page 2

Ohio 2016). In accordance with these authorities, Van Overdam's prayer that the Court order Defendants to retract, or expunge, the erroneous and void sanctions against Van Overdam is prospective in nature and, therefore, not moot.

I hope that these authorities are helpful to the Court in resolving the matters currently before it. Please let us know if the Court requires further briefing on this matter.

Sincerely,

Gaines West

GW/bsh
Enclosures

Cc:    CRISTINA MORENO                              *Via Email and e-File*
       Assistant Attorney General
       Texas Bar No. 24105023
       Southern District No. 3195054
       Office of the Attorney General
       General Litigation Division
       P.O. Box 12548, Capitol Station
       Austin, TX 78711-2548
       Cristina.moreno@oag.texas.gov
       (512) 463-2120 PHONE
       (512) 320-0667 FAX
       **COUNSEL FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed the foregoing document in accordance with the protocols for e-filing through the CM/ECF system in the United States District Court for the Southern District of Texas, Houston Division on November 4, 2019, and therefore has been served upon all counsel of record in accordance with such e-filing protocols.

By: _____
       GAINES WEST



KeyCite Yellow Flag - Negative Treatment

Distinguished by Doe v. Columbia College Chicago, 7th Cir.(Ill.), August 13, 2019

928 F.3d 652
United States Court of Appeals, Seventh Circuit.

John DOE, Plaintiff-Appellant,

v.

PURDUE UNIVERSITY, et
al., Defendants-Appellees.

No. 17-3565
|
Argued September 18, 2018
|
Decided June 28, 2019

**Synopsis**

**Background:** Student filed § 1983 action against state university and university officials alleging that his expulsion after he was found guilty of sexual violence violated Due Process Clause and Title IX. The United States District Court for the Northern District of Indiana, No. 2:17-cv-00033-PRC, Paul R. Cherry, United States Magistrate Judge, 281 F.Supp.3d 754, dismissed complaint, and student appealed.

**Holdings:** The Court of Appeals, Barrett, Circuit Judge, held that:

[1] student adequately alleged protected liberty interest in pursuing his occupation of choice;

[2] student adequately pled that procedures employed by university in disciplinary proceeding were fundamentally unfair;

[3] university's president was not subject to liability under § 1983;

[4] officials were entitled to qualified immunity for due process violations;

[5] student lacked standing to seek injunction prohibiting officials from violating Due Process Clause in process of investigating and adjudicating sexual misconduct complaints;

[6] student lacked standing to seek injunction requiring officials to remove conditions of re-entry;

[7] student had standing to seek injunction requiring officials to expunge finding of guilt from his disciplinary record; and

[8] student pled plausible Title IX discrimination claim.

Reversed and remanded.

West Headnotes (23)

**[1]** **Constitutional Law**
👉 **Students**

In context of higher education, any due process property interest is matter of contract between student and university. U.S. Const. Amend. 14.

**[2]** **Constitutional Law**
👉 **Discipline, suspension, or expulsion**

To demonstrate that he possesses due process property interest in continued education at state university, student must do more than show that he has contract with university; he must establish that contract entitled him to specific right that university allegedly took, such as right to continuing education or right not to be suspended without good cause. U.S. Const. Amend. 14.

**[3]** **Constitutional Law**
👉 **Particular claims**

In order for student to establish protected due process property interest in continued education at state university, generalities will not do; student's complaint must be specific about source of implied contract, exact promises that university made to student, and promises that student made in return. U.S. Const. Amend. 14.

**[4]** **Constitutional Law**
👉 **Reputation; defamation**

To succeed on claim that state deprived him of due process liberty interest, plaintiff must satisfy "stigma plus" test, which requires him to show that state inflicted reputational damage accompanied by alteration in legal status that deprived him of right he previously held. U.S. Const. Amend. 14.

1 Cases that cite this headnote

**[5]** **Constitutional Law**
🔑 Reputation; defamation

Loss of reputation is not itself loss of liberty protected by Due Process Clause, even when it causes serious impairment of one's future employment. U.S. Const. Amend. 14.

**[6]** **Constitutional Law**
🔑 Discipline, suspension, or expulsion
**Education**
🔑 Proceedings and review

State university student adequately alleged protected liberty interest in pursuing his occupation of choice under "stigma plus" test, as required to state procedural due process claim against university officials, arising from his suspension after officials found him guilty of sexual offense, where finding of guilty changed student's status from full-time student in good standing to one suspended for academic year, and caused his expulsion from Navy ROTC program, with accompanying loss of scholarship and foreclosed possibility of his re-enrollment in it. U.S. Const. Amend. 14.

1 Cases that cite this headnote

**[7]** **Constitutional Law**
🔑 Procedural due process in general

When right is protected by Due Process Clause, state may not withdraw it on grounds of misconduct absent fundamentally fair procedures to determine whether misconduct has occurred. U.S. Const. Amend. 14.

**[8]** **Constitutional Law**

🔑 Discipline, suspension, or expulsion

Process due in university disciplinary context depends on number of factors, including severity of consequence and level of education. U.S. Const. Amend. 14.

**[9]** **Constitutional Law**
🔑 Disciplinary proceedings

Due process requires, in connection with suspension from state university of 10 days or less, that student be given oral or written notice of charges against him and, if he denies them, explanation of evidence that authorities have an opportunity to present his side of story. U.S. Const. Amend. 14.

**[10]** **Constitutional Law**
🔑 Disciplinary proceedings
**Education**
🔑 Proceedings and review

State university student adequately pled that procedures employed by university in disciplinary proceeding arising from accusation of sexual violence were fundamentally unfair, in violation of his due process rights, by alleging that university did not disclose its evidence to him, that two of three panel members admitted that they had not read investigative report, that panel never spoke to accuser and never received sworn statement from her, and that he was not given opportunity to present impeachment evidence. U.S. Const. Amend. 14.

2 Cases that cite this headnote

**[11]** **Constitutional Law**
🔑 Notice and Hearing

To satisfy Due Process Clause, hearing must be a real one, not sham or pretense. U.S. Const. Amend. 14.

**[12]** **Education**
🔑 Proceedings and review

Blending investigation and adjudication functions in university student disciplinary context does not necessarily render process unfair.

**[13]** **Constitutional Law**
 Notice and Hearing; Proceedings and Review

To rebut presumption that university administrators are honest and impartial, plaintiff asserting due process claim against administrators must lay specific foundation of prejudice or prejudgment, such that probability of actual bias is too high to be constitutionally tolerable, typically requiring evidence that adjudicator had pecuniary interest in case's outcome, or that he was previously target of plaintiff's abuse or criticism. U.S. Const. Amend. 14.

**[14]** **Civil Rights**
 Education

State university's president was not subject to liability in student's § 1983 action alleging that disciplinary proceeding against him violated his due process rights, absent allegation that president knew about disciplinary committee's conduct and facilitated, approved, or condoned it. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[15]** **Civil Rights**
 Vicarious liability and respondeat superior in general; supervisory liability in general

Section 1983 does not allow actions against individuals merely for their supervisory role of others. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[16]** **Civil Rights**
 Vicarious liability and respondeat superior in general; supervisory liability in general

To be liable under § 1983 for his subordinates' constitutional violation, supervisor must know

about conduct and facilitate it, approve it, condone it, or turn blind eye. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[17]** **Federal Civil Procedure**
 Fact issues

If it is clear on face of complaint that constitutional right invoked was not clearly articulated in case law, existence of qualified immunity is purely legal question that district court can address on motion to dismiss.

1 Cases that cite this headnote

**[18]** **Civil Rights**
 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Qualified immunity protects government officials from liability for civil damages as long as their actions do not violate clearly established statutory or constitutional rights of which reasonable person would have known.

1 Cases that cite this headnote

**[19]** **Civil Rights**
 Schools

It was not clearly established that university discipline could deprive student of due process liberty interest, and thus state university officials were entitled to qualified immunity from liability in student's § 1983 action alleging that his disciplinary suspension—which resulted in his expulsion from Navy ROTC program, with accompanying loss of scholarship—violated his due process rights. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[20]** **Civil Rights**
 Education

State university student who was suspended for one-year for sexual misconduct lacked standing to seek injunction prohibiting university officials from violating Due Process Clause in process of investigating and adjudicating sexual misconduct complaints, absent allegation that

he intended to re-enroll at university, that he faced real and immediate threat that it would again investigate him for sexual misconduct, or that any such investigation would violate due process. U.S. Const. Amend. 14.

1 Cases that cite this headnote

**[21]    Injunction**
👉 **Persons entitled to apply;  standing**

State university student who was suspended for one year for sexual misconduct lacked standing to seek injunction requiring university officials to remove conditions of re-entry imposed by university as part of his discipline, absent allegation that he intended to re-enroll at university.

**[22]    Injunction**
👉 **Persons entitled to apply;  standing**

State university student who was suspended for one year for sexual misconduct had standing to seek injunction requiring university officials to expunge finding of guilt from his disciplinary record, where his disciplinary suspension resulted in his expulsion from Navy ROTC program, with accompanying loss of scholarship, and career in Navy might once again be open to him if guilty finding were expunged.

**[23]    Civil Rights**
👉 **Discrimination against males**

Male student who was suspended from state university for sexual misconduct pled plausible Title IX discrimination claim by alleging that university's federal funding was at risk if it could not show that it was vigorously investigating and punishing sexual misconduct, that university's dean of students chose to credit accuser's account without hearing directly from her, that majority of disciplinary panel members appeared to credit accuser based on her unsworn accusation alone, that they refused to hear any impeachment evidence, and that university center dedicated to supporting victims of sexual violence believed that men as a class were responsible for

problem of campus sexual assault. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a).

4 Cases that cite this headnote

**\*655**  Appeal from the United States District Court for the Northern District of Indiana, Hammond Division. No. 2:17-cv-00033-PRC—**Paul R. Cherry**, *Magistrate Judge.*

**Attorneys and Law Firms**

Philip A. Byler, Attorney, NESENOFF & MILTENBERG, LLP, New York, NY, Damon M. Cheronis, Attorney, LAW OFFICES OF DAMON M. CHERONIS, Chicago, IL, for Plaintiff-Appellant.

William Peter Kealey, James Francis Olds, Attorneys, STUART & BRANIGIN LLP, Lafayette, IN, for Defendants-Appellees.

Before Sykes, Barrett, and St. Eve, Circuit Judges.

**Opinion**

Barrett, Circuit Judge.

**\*656**  After finding John Doe guilty of sexual violence against Jane Doe, Purdue University suspended him for an academic year and imposed conditions on his readmission. As a result of that decision, John was expelled from the Navy ROTC program, which terminated both his ROTC scholarship and plan to pursue a career in the Navy.

John sued the university and several of its officials, asserting two basic claims. First, he argued that they had violated the Fourteenth Amendment by using constitutionally flawed procedures to determine his guilt or innocence. Second, he argued that Purdue had violated Title IX by imposing a punishment infected by sex bias. A magistrate judge dismissed John's suit on the ground that he had failed to state a claim under either theory. We disagree. John has adequately alleged violations of both the Fourteenth Amendment and Title IX.

I.

We are reviewing the magistrate judge's decision to dismiss John's complaint for failing to state a claim. That means that we must recount the facts as he describes them, drawing every inference in his favor. *See D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 682 (7th Cir. 2013). In other words, the story that follows is one-sided because the posture of the case requires it to be. Our task is not to determine what allegations are supported by the evidence but to determine whether John is entitled to relief if everything that he says is true. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

John and Jane were both students in Purdue's Navy ROTC program. They began dating in the fall of 2015, and between October and December, they had consensual sexual intercourse fifteen to twenty times. Jane's behavior became increasingly erratic over the course of that semester, and she told John that she felt hopeless, hated her life, and was contemplating running away. In December, Jane attempted suicide in front of John, and after that incident, they stopped having sex. They continued dating, however, until January, when John tried to get Jane help by reporting her suicide attempt to two resident assistants and an advisor. Jane was upset at John for reporting her, and she distanced herself from him. Soon thereafter, she began dating someone else.

For a few months, things were quiet between John and Jane. That changed in April 2016, which was Sexual Assault Awareness Month. During that month, Purdue hosted over a dozen events to promote the reporting of sexual assaults. Many of the events were sponsored by the Center for Advocacy, Response, and Education (CARE), a university center dedicated to supporting victims of sexual violence. CARE promoted the events on its Facebook page, along with posts containing information about sexual assault. One of its posts was an article from *The Washington Post* titled "Alcohol isn't the cause of campus sexual assault. Men are."

During the first ten days of April, five students reported sexual assault to the university. Jane was one of them. She alleged that in November 2015, she was sleeping with John in his room when she woke to him groping her over her clothes **\*657** without her consent. According to Jane, she told John that this was not okay, and John then confessed that he had digitally penetrated her while the two were sleeping in Jane's room earlier that month. Jane told the university that John had engaged in other misconduct as well: she asserted that he had gone through her underwear drawer without her permission, chased her through a hallway while joking about tasering her,

gone to her room unannounced after they broke up, and lost his temper in front of her.

John learned about Jane's accusations in a letter from Katherine Sermersheim, Purdue's Dean of Students and a Title IX coordinator. Sermersheim informed John that the university had elected to pursue Jane's allegations even though Jane had not filed a formal complaint. She outlined the school's disciplinary procedures and explained that two employees who reported to her, Erin Oliver and Jacob Amberger, would investigate the case. She also instructed John not to have any contact with Jane. After he received the letter, John was suspended from the Navy ROTC, banned from all buildings where Jane had classes, and barred from eating in his usual dining hall because Jane also used it.

John submitted a written response denying all of Jane's allegations. He asserted that he never had sexual contact with Jane while she was sleeping, through digital penetration or otherwise. He said that there was one night in December, after Jane's suicide attempt, when he touched Jane's knee while she was sleeping on a futon and he was on the floor next to her. But he denied groping her or engaging in any of the harassing behavior of which she had accused him. John also recounted evidence that he thought inconsistent with Jane's claim of sexual assault: she texted and talked to him over the holidays, sent his family a package of homemade Christmas cookies, and invited him to her room when they returned to school in January. He also provided details suggesting that Jane was troubled and emotionally unstable, which he thought might explain her false accusations.

Under Purdue's procedures, John was allowed the assistance of a "supporter" at any meeting with investigators. In late April, John and his supporter met with Oliver and Amberger. As he had in his written response, John steadfastly denied Jane's allegations. He provided the investigators with some of the friendly texts that he thought belied her story, as well as a list of over thirty people who could speak to his integrity.

When the investigators' report was complete, Sermersheim sent it to a three-person panel of Purdue's Advisory Committee on Equity, which was tasked with making a recommendation to her after reviewing the report and hearing from the parties. Sermersheim called John to appear before the panel, but consistent with Purdue's then-applicable procedures, she neither gave him a copy of the report nor shared its contents with him. Moments before his committee appearance, however, a Navy ROTC representative gave John

a few minutes to review a redacted version of the report. To John's distress, he learned that it falsely claimed that he had confessed to Jane's allegations. The investigators' summary of John's testimony also failed to include John's description of Jane's suicide attempt.

John and his supporter met with the Advisory Committee and Sermersheim, who chaired the meeting, for about thirty minutes. Jane neither appeared before the panel nor submitted a written statement. Instead, Monica Soto Bloom, the director of CARE, wrote the Advisory Committee **\*658** and Sermersheim a letter summarizing Jane's accusations.

The meeting did not go well for John. Two members of the panel candidly stated that they had not read the investigative report. The one who apparently had read it asked John accusatory questions that assumed his guilt. Because John had not seen the evidence, he could not address it. He reiterated his innocence and told the panel about some of the friendly texts that Jane had sent him after the alleged assaults. The panel refused John permission to present witnesses, including character witnesses and a roommate who would state that he was present in the room at the time of the alleged assault and that Jane's rendition of events was false.

A week later, Sermersheim sent John a perfunctory letter informing him that she had found him guilty by a preponderance of the evidence of sexual violence. She suspended John from Purdue for one academic year. In addition, she conditioned John's reentry on his completion of a university-sponsored "bystander intervention training" and his agreement to meet with the Assistant Director of CARE during the first semester of his return.

John appealed this decision to Alysa Rollock, Purdue's Vice President for Ethics and Compliance, who instructed Sermersheim to identify the factual basis of her determination. Sermersheim sent a revised letter to John adding the following:

Specifically, a preponderance of the evidence supports that:

1. [Jane Doe] had fallen asleep on a futon with you on the floor beside her. She woke up and found that you inappropriately touched her over her clothing and without her consent by placing your hand above her knee, between her legs, and moved it up to her "crotch" areas; and

2. On another occasion, while she was sleeping and without her consent, you inappropriately touched [Jane Doe] by digitally penetrating her vagina.

As the basis for these findings, Sermersheim offered: "I find by a preponderance of the evidence that [John Doe] is not a credible witness. I find by a preponderance of the evidence that [Jane Doe] is a credible witness." John appealed to Rollock again, but this time, Rollock upheld Sermersheim's determination of guilt and accompanying sanctions. A few weeks after his second appeal was denied, John involuntarily resigned from the Navy ROTC, which has a "zero tolerance" policy for sexual harassment.

John sued Mitch Daniels, the President of Purdue University; Rollock, the Vice President for Ethics and Compliance; Sermersheim, the Dean and a Title IX coordinator; and Oliver and Amberger, the investigators, in their individual capacities, seeking monetary relief under 42 U.S.C. § 1983. [1] He sued these same defendants, along with the members of Purdue's Board of Trustees, in their official capacities, seeking injunctive relief under *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), to remedy the Fourteenth Amendment violation. And he sued Purdue University for discriminating against him on the basis of sex in violation of Title IX.

The magistrate judge dismissed John's § 1983 claims with prejudice, holding that the disciplinary proceedings did not deprive John of either liberty or property, so **\*659** the Due Process Clause did not apply. He offered an additional reason for dismissing John's § 1983 claim against Daniels: John's theory of liability was based on Daniels's role as supervisor, and there is no supervisory liability under § 1983. As for John's claims for injunctive relief, the magistrate judge dismissed them without prejudice for lack of standing because John had not alleged that the violations posed any threat of future harm. And he dismissed John's claims under Title IX with prejudice on the ground that John had not alleged facts sufficient to show that Purdue discriminated against him on the basis of sex. John appeals each of these rulings.

## II.

We begin with procedural due process. According to John, he was punished pursuant to a process that failed to satisfy the minimum standards of fairness required by the Due

Process Clause. He alleges the following deficiencies: he was not provided with the investigative report or any of the evidence on which the decisionmakers relied in determining his guilt and punishment; Jane did not appear before the Advisory Committee; he had no opportunity to cross-examine Jane; Sermersheim found Jane credible even though neither Sermersheim nor the Advisory Committee talked to her in person; Jane did not write her own statement for the panel, much less a sworn one; Sermersheim was in charge of both the investigation and the adjudication of his case; the Advisory Committee was blatantly biased against him; and the Advisory Committee refused to allow him to present any evidence, including witnesses.

Yet John cannot recover simply because the procedures were unfair, even if they were. The Due Process Clause is not a general fairness guarantee; its protection kicks in only when a state actor deprives someone of "life, liberty, or property." U.S. CONST. amend. XIV, § 1. The threshold question, then, is whether John lost a liberty or property interest when he was found guilty of sexual violence and punished. We address whether the procedures satisfied minimum constitutional requirements of fairness only if the answer to that question is yes.


A.

Our precedent involving due process claims in the context of university discipline has focused on whether a student has a protected property interest in his education at a state university. We have explained that "[a] college education—any education—is not 'property' in the usual sense of the word." *Williams v. Wendler*, 530 F.3d 584, 589 (7th Cir. 2008); *see also Charleston v. Bd. of Trs. of Univ. of Ill. at Chi.*, 741 F.3d 769, 772 (7th Cir. 2013) ("[O]ur circuit has rejected the proposition that an individual has a stand-alone property interest in an education at a state university, including a graduate education."). [2] Instead, "we ask whether the student has shown that he has a *legally protected entitlement* to his **660** continued education at the university." *Charleston*, 741 F.3d at 773 (emphasis in original). High school students (and, for that matter, elementary school students) have a property interest in their public education because state law entitles them to receive one. *Goss v. Lopez*, 419 U.S. 565, 573–74, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). The same is not true, however, of students at public universities—certainly, John has not contended that Indiana guarantees its residents a college education.

[1]  [2]  [3]  In the context of higher education, any property interest is a matter of contract between the student and the university. *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 601 (7th Cir. 2009) (explaining that the "basic legal relation between a student and a private university or college is contractual in nature" (citation omitted)). And to demonstrate that he possesses the requisite property interest, a university student must do more than show that he has a contract with the university; he must establish that the contract entitled him to the specific right that the university allegedly took, "such as the right to a continuing education or the right not to be suspended without good cause." *Id.* at 601. Generalities won't do; "the student's complaint must be specific about the source of this implied contract, the exact promises the university made to the student, and the promises the student made in return." *Charleston*, 741 F.3d at 773.

John has not adequately alleged that Purdue deprived him of property because his complaint does not point to any specific contractual promise that Purdue allegedly broke. [3] To be sure, John asserts that he had a property interest in his continued enrollment at Purdue. But as support for that proposition, his complaint states only that the right arose "from the express and implied contractual relationship" between John and the university. It points to no "identifiable contractual promise that the [university] failed to honor." *Bissessur*, 581 F.3d at 602 (alteration in original) (citation omitted).

His brief does only slightly better. In it, John insists that the Indiana state courts have held that a student enrolled in a public institution has a property interest in continuing his education. He cites *Reilly v. Daly*, in which an Indiana court said: "It is without question that a student's interest in pursuing an education is included within the Fourteenth Amendment's protection of liberty and property and that a student facing expulsion or suspension from a public educational institution is therefore entitled to the protections of due process." 666 N.E.2d 439, 444 (Ind. Ct. App. 1996). But John's reliance on *Reilly* is misplaced. To begin with, this cryptic sentence—the sum of what the case says on the topic—does not specify whether university disciplinary proceedings implicate liberty or property interests. And to the extent that *Reilly* refers to property, it does not purport to identify a state-granted property right to pursue higher education. Instead, it appears to express a view about federal law that we have already rejected: that the Due Process Clause protects a generalized property interest in higher education, irrespective of any specific state entitlement. While Indiana

is free to align itself with courts taking that view, *see supra* note 2, our position is clear and to the contrary, *see Williams*, 530 F.3d at 589 (rejecting "the bald assertion that any student who is suspended from college has suffered a deprivation of constitutional property").

**\*661 [4]** John's failure to establish a property interest does not doom his claim, however, because he also maintains that Purdue deprived him of a protected liberty interest: his freedom to pursue naval service, his occupation of choice. To succeed on this theory, John must satisfy the "stigma plus" test, which requires him to show that the state inflicted reputational damage accompanied by an alteration in legal status that deprived him of a right he previously held. *See Mann v. Vogel*, 707 F.3d 872, 878 (7th Cir. 2013); *see also Paul v. Davis*, 424 U.S. 693, 708–09, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Hinkle v. White*, 793 F.3d 764, 767– 68 (7th Cir. 2015). John argues that he has satisfied this test because he alleges that Purdue inflicted reputational harm by wrongfully branding him as a sex offender; that Purdue changed his legal status by suspending him, subjecting him to readmission requirements, and causing the loss of his Navy ROTC scholarship; and that these actions impaired his right to occupational liberty by making it virtually impossible for him to seek employment in his field of choice, the Navy. *See Lawson v. Sheriff of Tippecanoe Cty., Ind.*, 725 F.2d 1136, 1138 (7th Cir. 1984) ("The concept of liberty in Fourteenth Amendment jurisprudence has long included the liberty to follow a trade, profession, or other calling."); *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001) (Liberty interests are impinged when someone's "good name, reputation, honor or integrity [are] called into question in a manner that makes it virtually impossible for ... [him] to find new employment in his chosen field.").

Purdue insists that John has not adequately alleged "stigma," much less the necessary "plus." The university maintains that it has not and will not divulge John's disciplinary record without his permission. The Navy knows about it only because John signed a form authorizing the disclosure after the investigation began. Because John permitted the disclosure, Purdue says, he cannot complain that Purdue stigmatized him.

Purdue cites no cases in support of its position, but it is presumably trying to draw an analogy between John and a plaintiff who publishes damaging information about himself —because it is true that a plaintiff can't himself spill the beans and then blame the defendant for ruining his reputation.

*Olivieri v. Rodriguez* illustrates the point. 122 F.3d 406 (7th Cir. 1997). There, a probationary police officer asserted a procedural due process claim against his superintendent after he was fired for sexually harassing other probationers. *Id.* at 407. We observed that "the defendant [had not] disclosed to anyone the grounds of the plaintiff's discharge." *Id.* at 408. The plaintiff, however, insisted that the defendant's silence didn't matter because the plaintiff would have to tell potential employers why he was fired—and "[i]f he answers truthfully, he will reveal the ground of the termination as effectively as (actually more effectively than) if the Department had taken out a full-page ad in every newspaper in the nation announcing the termination of Felix A. Olivieri for sexually harassing female probationary officers at the Chicago police training academy." *Id.*

We rejected Olivieri's claim, holding that a plaintiff who publicizes negative information about himself cannot establish that the *defendant* deprived him of a liberty interest. *Id.* As an initial matter, we noted that it was uncertain whether Olivieri's prospective employers would ever find out why he was discharged. *Id.* at 408–09 ("A prospective employer might not ask him—might ask only the Chicago Police Department, which for all we know might refuse to disclose the grounds of Olivieri's discharge; many former employers refuse to answer such inquiries, because of fear of **\*662** being sued for defamation."). In addition, we explained that "[t]he principle of self-defamation, applied in a case such as this, would encourage [the plaintiff] to apply for a job to every police force in the nation, in order to magnify his damages; and to blurt out to each of the them the ground of his discharge in the most lurid terms, to the same end." *Id.* at 409.

John's case is different. He does not claim simply that he might someday have to self-publish the guilty finding to future employers. Instead, John says that he had an obligation to authorize Purdue to disclose the proceedings to the Navy. That makes John's case more like *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005), than *Olivieri*. In *Dupuy*, we held that the publication requirement of the stigma-plus test was satisfied when the plaintiffs were obligated to authorize a state agency to disclose its finding that they were child abusers to the plaintiffs' current and prospective employers. 397 F.3d at 510. In contrast to *Olivieri*, where disclosure was voluntary and speculative, it was compelled and certain in *Dupuy*. And in *Dupuy*, unlike in *Olivieri*, the disclosure was not self-published—it came from the defendant, even if the plaintiff had been obligated to authorize it. So too here: Purdue, not John, revealed to the Navy that it had found him guilty of

sexual violence, and John had a legal obligation to authorize the disclosure.

**[5]** Thus, if what John says is true, the university has stigmatized him by telling the Navy about the guilty finding. But the loss of reputation is not itself a loss of liberty, "even when it causes 'serious impairment of one's future employment.' " *Hojnacki v. Klein–Acosta,* 285 F.3d 544, 548 (7th Cir. 2002) (alteration and citation omitted). John must also show that the stigma was accompanied by a change in legal status. In *Paul v. Davis,* for example, the Supreme Court held that the police did not trigger the Due Process Clause by posting flyers falsely asserting that the plaintiff was an active shoplifter. 424 U.S. at 712, 96 S.Ct. 1155. The flyers undoubtedly harmed the plaintiff's professional reputation, but their posting did not alter his legal status. *Id.* at 708–12, 96 S.Ct. 1155. Similarly, in *Hinkle v. White,* loose-lipped state police officers spread word that they were investigating the plaintiff for child molestation and that he might be guilty of arson to boot. 793 F.3d at 767. But the gossip did not alter his legal status—the plaintiff was not prosecuted, much less found guilty; nor did the county impose a consequence like firing him from his job as county sheriff. *Id.* at 768–69. Even though the rumors made it "virtually impossible" for him to change to a new job in his chosen field, the lack of a status change meant that he could not state a due process claim. *Id.* at 768–70.

**[6]** John's situation is unlike that of the plaintiffs in *Paul v. Davis* and *Hinkle v. White* because it is not a matter of state-spread rumors or an investigation that was ultimately dropped. After conducting an adjudicatory proceeding, Purdue formally determined that John was guilty of a sexual offense. That determination changed John's status: he went from a full-time student in good standing to one suspended for an academic year. *Cf. Mann,* 707 F.3d at 878 (holding that the state deprived the plaintiff of occupational liberty when, after an investigation, it found that she had violated child-safety laws and suspended her ability to operate her daycare center); *Doyle v. Camelot Care Ctrs.,* 305 F.3d 603, 617 (7th Cir. 2002) (holding that the state deprived the plaintiffs of occupational liberty when, after an investigation, it found that they had neglected a minor and informed their respective employers, who fired them). And it was this official determination of guilt, not the preceding **\*663** charges or any accompanying rumors, that allegedly deprived John of occupational liberty. It caused his expulsion from the Navy ROTC program (with the accompanying loss of scholarship) and foreclosed the

possibility of his re-enrollment in it. John has satisfied the "stigma plus" test.

**B.**

Having determined that John has adequately alleged that Purdue deprived him of a liberty interest, we turn to whether he has adequately claimed that Purdue used fundamentally unfair procedures in determining his guilt.

**[7]** **[8]** When a right is protected by the Due Process Clause, a state "may not withdraw [it] on grounds of misconduct absent[ ] fundamentally fair procedures to determine whether the misconduct has occurred." *Goss,* 419 U.S. at 574, 95 S.Ct. 729. Determining what is fundamentally fair is always a context-specific inquiry. *See Bd. of Curators of Univ. of Mo. v. Horowitz,* 435 U.S. 78, 86, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) ("[W]e have frequently emphasized that '[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.' " (citation omitted)). Thus, for example, a university has much more flexibility in administering academic standards than its code of conduct. *See id.* ("[T]here are distinct differences between decisions to suspend or dismiss a student for disciplinary purposes and similar actions taken for academic reasons which may call for hearings in connection with the former but not the latter."). And even in the disciplinary context, the process due depends on a number of factors, including the severity of the consequence and the value of education. A 10-day suspension warrants fewer procedural safeguards than a longer one, *Goss,* 419 U.S. at 584, 95 S.Ct. 729, and universities are subject to more rigorous requirements than high schools, *Pugel v. Bd. of Trs. of Univ. of Ill.,* 378 F.3d 659, 663–64 (7th Cir. 2004).

**[9]** **[10]** John's circumstances entitled him to relatively formal procedures: he was suspended by a university rather than a high school, for sexual violence rather than academic failure, and for an academic year rather than a few days. Yet Purdue's process fell short of what even a high school must provide to a student facing a days-long suspension. "[D]ue process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss,* 419 U.S. at 581, 95 S.Ct. 729. John received notice of Jane's allegations and denied them, but Purdue did not disclose its evidence to John. And

withholding the evidence on which it relied in adjudicating his guilt was itself sufficient to render the process fundamentally unfair. *See id. at 580, 95 S.Ct. 729* ("[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights...." (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 170, 71 S.Ct. 624, 95 L.Ed. 817 (1951)* (Frankfurter, J., concurring))).

**[11]** John has adequately alleged that the process was deficient in other respects as well. To satisfy the Due Process Clause, "a hearing must be a real one, not a sham or pretense." *Dietchweiler by Dietchweiler v. Lucas, 827 F.3d 622, 629 (7th Cir. 2016)* (citation omitted). At John's meeting with the Advisory Committee, two of the three panel members candidly admitted that they had not read the investigative report, which suggests that they decided that John was guilty based on the accusation rather than the evidence. *See id. at 630* **\*664** (stating that a hearing would be a sham if "members of the school board came to the hearing having predetermined [the plaintiff's] guilt"). And in a case that boiled down to a "he said/she said," it is particularly concerning that Sermersheim and the committee concluded that Jane was the more credible witness—in fact, that she was credible at all—without ever speaking to her in person. Indeed, they did not even receive a statement written by Jane herself, much less a sworn statement. [4] It is unclear, to say the least, how Sermersheim and the committee could have evaluated Jane's credibility.

Sermersheim and the Advisory Committee's failure to make any attempt to examine Jane's credibility is all the more troubling because John identified specific impeachment evidence. He said that Jane was depressed, had attempted suicide, and was angry at him for reporting the attempt. His roommate—with whom Sermersheim and the Advisory Committee refused to speak—maintained that he was present at the time of the alleged assault and that Jane's rendition of events was false. And John insisted that Jane's behavior after the alleged assault—including her texts, gifts, and continued romantic relationship with him—was inconsistent with her claim that he had committed sexual violence against her. Sermersheim and the Advisory Committee may have concluded in the end that John's impeachment evidence did not undercut Jane's credibility. But their failure to even question Jane or John's roommate to probe whether this evidence was reason to disbelieve Jane was fundamentally unfair to John.

**[12]** **[13]** John also faults Sermersheim for being in charge of both the investigation and adjudication of his case. We

have held, however, that blending these two functions in the university context does not necessarily render a process unfair. *Hess v. Bd. of Trs. of S. Ill. Univ., 839 F.3d 668, 675 (7th Cir. 2016)*. To rebut the presumption that university administrators are "honest and impartial," a plaintiff must "lay a specific foundation of prejudice or prejudgment, such that the probability of actual bias is too high to be constitutionally tolerable." *Id.* This burden is "heavy indeed," typically requiring evidence that "the adjudicator had a pecuniary interest in the outcome of the case, or that he was previously the target of the plaintiff's abuse or criticism." *Id.* (citations omitted). John has made no such allegation here.

C.

To this point, we have analyzed the due process claim without distinguishing between defendants. Now, however, we separate them.

(1)

**[14]** **[15]** **[16]** We begin with John's individual-capacity claim against Mitch Daniels, the president of Purdue. The magistrate judge was right to dismiss this claim. Section 1983 "does not allow actions against individuals merely for their supervisory role of others." *Zimmerman v. Tribble, 226 F.3d 568, 574 (7th Cir. 2000)*. To be liable, a supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Zentmyer v. Kendall Cty., Ill., 220 F.3d 805, 812 (7th Cir. 2000)* (quoting *Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995)*). John's **\*665** complaint asserts nothing more about Daniels than that " 'The Buck Stops Here' with him." There is no allegation that Daniels knew about the conduct, much less that he facilitated, approved, or condoned it.

(2)

The individual-capacity claims against Rollock, Sermersheim, Oliver, and Amberger present a different obstacle for John: qualified immunity. For the reasons that we have already explained, John has alleged facts that amount to a constitutional violation. But because the defendants have asserted qualified immunity, John can recover damages from them only if his right to receive procedural due process in the disciplinary proceeding was clearly established. *See*

*Rainsberger v. Benner*, 913 F.3d 640, 647 (7th Cir. 2019). The magistrate judge did not address qualified immunity because he concluded that John had failed to state a due process claim. The defendants raised it below, however, and they press it again here as an alternative ground for affirmance.

John insists that it would be premature for us to address the issue because we are reviewing the magistrate judge's dismissal of his claims under Rule 12(b)(6). As he points out, qualified immunity is generally addressed at summary judgment rather than on the pleadings. *See Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) ("[A] complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds."); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000) ("[T]he dismissal of a § 1983 suit under Rule 12(b)(6) is a delicate matter."). Thus, John argues, we should send the case back to the district court for discovery.

[17] There is no hard-and-fast rule, however, against resolving qualified immunity on the pleadings. The reason for deferring it to summary judgment is that an officer's entitlement to qualified immunity often "depend[s] on the particular facts of a given case," *Jacobs*, 215 F.3d at 765 n.3, and the Federal Rules of Civil Procedure do not require a plaintiff to include much factual detail in a complaint, *see* FED. R. CIV. P. 8 (providing that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief"). *See also Pearson v. Callahan*, 555 U.S. 223, 238–39, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) ("When qualified immunity is asserted at the pleading stage, the precise factual basis for the plaintiff's claim or claims may be hard to identify."). That said, the existence of qualified immunity is not always dependent on factual development —it is sometimes clear on the face of the complaint that the constitutional right invoked was not clearly articulated in the case law. In that circumstance, the existence of qualified immunity is a "purely legal question" that the court can address on a motion to dismiss. *Jacobs*, 215 F.3d at 765 n.3.

[18]   [19]   That is the situation here. Qualified immunity is a high standard. It protects government officials from liability for civil damages as long as their actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) (citation omitted). While the general stigma-plus test is well-settled in our law, *see Hinkle*, 793 F.3d at 768, we have never applied it specifically in the university setting. Instead, our cases in this area have

considered only whether students have a *property* interest in their public university education—and to this point, no student has successfully shown the requisite interest. Because this is our first case addressing whether university discipline deprives a student of a *liberty* interest, the relevant legal rule was not "clearly established," **\*666** and a reasonable university officer would not have known at the time of John's proceeding that her actions violated the Fourteenth Amendment. We therefore affirm the dismissal of John's individual-capacity claims against Rollock, Sermersheim, Oliver, and Amberger.

(3)

[20]   That leaves John's claims for injunctive relief, which he seeks to obtain by suing Daniels, Rollock, Sermersheim, Oliver, and Amberger in their official capacities. *See Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The magistrate judge dismissed this claim without prejudice on the ground that John lacked standing to bring it. In his complaint, John asked for "an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints." But John doesn't have standing to claim such relief. He has not alleged that he intends to re-enroll at Purdue, much less that he faces a "real and immediate threat" that Purdue would again investigate him for sexual misconduct, much less that any such investigation would violate due process. *See City of L.A. v. Lyons*, 461 U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) ("That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part."). What John really seeks to do is champion the rights of other men at Purdue who might be investigated for sexual misconduct using the flawed procedures that he describes in his complaint. That is a no-go: John plainly lacks standing to assert the Fourteenth Amendment rights of other students, even if he had alleged (which he didn't) that the threat of injury to any one of them was "real and immediate." *Id.*

[21]   John also seeks to remove the conditions of re-entry imposed by Purdue as part of his discipline. John lacks standing here too. As we already noted, he has not alleged

that he intends to return to Purdue—a necessary fact to demonstrate a cognizable injury from the barriers to re-entry. That said, the magistrate judge dismissed this claim without prejudice, so on remand John can seek to remedy his lack of standing by pleading the necessary facts, if he has them.

 [22]  In his response to the defendants' motion to dismiss, and then again in his brief and at oral argument, John argued that he is also entitled to an injunction ordering university officials to expunge the finding of guilt from his disciplinary record. For this relief, John has standing: John's marred record is a continuing harm for which he can seek redress. *See, e.g., Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (pursuing expungement of university records "serve[s] the purpose of preventing present and future harm"); *Doe v. Cummins*, 662 F. App'x 437, 444 (6th Cir. 2016) (seeking to "remove the negative notation from appellants' disciplinary records" is "nothing more than prospective remedial action"); *Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) (an "F" grade and a plagiarism conviction "constitute[d] a continuing injury to the plaintiff" and an action to remove them was "prospective in nature"). And he claims that if the guilty finding is expunged, a career in the Navy may once again be open to him.

Because John did not specifically request this relief in his complaint, the university **\*667** officials object that it is too late for him to raise it now. But Federal Rule of Civil Procedure 54(c) states that "[e]very [ ] final judgment [other than default judgments] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." That means that even though John may not have asked specifically for expungement, he may still be entitled to it. In *Felce v. Fiedler*, for example, the plaintiff did not request injunctive relief but instead—using language similar to that in John's complaint—asked for "other and further relief as the court may deem to be just and equitable." 974 F.2d 1484, 1501 (7th Cir. 1992). The district court in *Felce* had not reached the question of injunctive relief because it had held—as the magistrate judge did in John's case—that the plaintiff had not alleged the necessary liberty interest. On appeal, we concluded that the plaintiff did have a liberty interest and instructed the district court to address the issue of injunctive relief on remand. *Id.* at 1502. We do the same here: having determined that John has pleaded a liberty interest, we instruct the court to address the issue of expungement on remand.

### III.

John also asserts a claim against Purdue under Title IX, which provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a); *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (explaining that Title IX is enforceable through an implied private right of action). It is undisputed that Purdue receives federal funding and that John was "excluded from participation in [or] denied the benefits of ... [an] education program" when Purdue suspended him. 20 U.S.C. § 1681(a). The success of John's claim depends on whether Purdue discriminated against him "on the basis of sex." *Id.*

Some circuits use formal doctrinal tests to identify general bias in the context of university discipline. For example, the Second Circuit channels such claims into two general categories. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). In what has come to be called the "erroneous outcome" category, the plaintiff must show that he "was innocent and wrongly found to have committed the offense." *Id.* The other category, "selective enforcement," requires a plaintiff to prove that "regardless of [his] guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.*; *see also Plummer v. Univ. of Hous.*, 860 F.3d 767, 777–78 (5th Cir. 2017) (resolving the case by reference to the *Yusuf* framework); *Doe v. Valencia Coll.*, 903 F.3d 1220, 1236 (11th Cir. 2018) ("[W]e will assume for present purposes that a student can show a violation of Title IX by satisfying the 'erroneous outcome' test applied by the Second Circuit in *Yusuf.*"). The Sixth Circuit has added two more categories to the mix: "deliberate indifference" and "archaic assumptions." *See Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (recognizing "at least four different theories of liability" in this context: "(1) 'erroneous outcome,' (2) 'selective enforcement,' (3) 'deliberate indifference,' and (4) 'archaic assumptions' " (citations omitted)).

We see no need to superimpose doctrinal tests on the statute. All of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student. We prefer to ask the question more directly: do the alleged **\*668** facts, if true,

raise a plausible inference that the university discriminated against John "on the basis of sex"?

John casts his Title IX claim against the backdrop of a 2011 "Dear Colleague" letter from the U.S. Department of Education to colleges and universities. *See* United States Department of Education, Office of the Assistant Secretary for Civil Rights, Dear Colleague Letter (2011), https://www2.ed.gov/print/about/offices/list/ocr/letters/colleague-201104.html. That letter ushered in a more rigorous approach to campus sexual misconduct allegations by, among other things, defining "sexual harassment" more broadly than comparable contexts, *id.* at 3, mandating that schools prioritize the investigation and resolution of harassment claims, *id.* at 4, and requiring them to adopt a lenient "more likely than not" burden of proof when adjudicating claims against alleged perpetrators, *id.* at 11. The Department of Education made clear that it took the letter and its enforcement very seriously. *See* Examining Sexual Assault on Campus, Focusing on Working to Ensure Student Safety, Hearing Before the S. Comm. on Health, Educ., Labor, and Pensions, 113th Cong. 7 (2014) (statement of Catherine Lhamon, Assistant Secretary for Civil Rights, U.S. Dep't of Educ.) ("[S]ome schools still are failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over."). And it warned schools that "[t]his Administration is committed to using all its tools to ensure that all schools comply with [T]itle IX so campuses will be safer for students across the country." *Id.* In other words, a school's federal funding was at risk if it could not show that it was vigorously investigating and punishing sexual misconduct.

According to John, this letter reveals that Purdue had a financial motive for discriminating against males in sexual assault investigations. To protect its federal funds, John says, the university tilted the process against men accused of sexual assault so that it could elevate the number of punishments imposed. The resulting track record of enforcement would permit Purdue to signal its commitment to cracking down on campus sexual assault, thereby fending off any suggestion that it was not complying with the Department of Education's directive. *Cf. Doe v. Columbia Univ.*, 831 F.3d 46, 58 n.11 (2d Cir. 2016) ("A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the motive for the discrimination did

not come from ingrained or permanent bias against that particular sex."). And because the Office of Civil Rights—a sub-agency of the Department of Education—had opened two investigations into Purdue during 2016, the pressure on the university to demonstrate compliance was far from abstract. That pressure may have been particularly acute for Sermersheim, who, as a Title IX coordinator, bore some responsibility for Purdue's compliance.

Other circuits have treated the Dear Colleague letter as relevant in evaluating the plausibility of a Title IX claim. For example, in *Doe v. Miami University*, the plaintiff alleged that "pressure from the government to combat vigorously sexual assault on college campuses and the severe potential punishment—loss of all federal funds—if it failed to comply, led Miami University to discriminate against men in its sexual-assault adjudication process." 882 F.3d at 594. The Sixth Circuit held that this allegation, combined with others, "support[ed] a reasonable inference of gender discrimination." *Id.*; *see also Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) **\*669** (explaining that the pressure of a Department of Education investigation and the resulting negative publicity "provides a backdrop, that, when combined with other circumstantial evidence of bias in Doe's specific proceeding, gives rise to a plausible claim."); *Columbia Univ.*, 831 F.3d at 58 ("There is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults.").

That said, the letter, standing alone, is obviously not enough to get John over the plausibility line. *See Baum*, 903 F.3d at 586 (pressure from the Dear Colleague letter "alone is not enough to state a claim that the university acted with bias in this particular case"). The letter and accompanying pressure gives John a story about why Purdue might have been motivated to discriminate against males accused of sexual assault. But to state a claim, he must allege facts raising the inference that Purdue acted at least partly on the basis of sex in his particular case. *See id.* (the Dear Colleague letter "provides a backdrop, that, when combined with other circumstantial evidence of bias in [a] specific proceeding, gives rise to a plausible claim").

[23] John has alleged such facts here, the strongest one being that Sermersheim chose to credit Jane's account without hearing directly from her. The case against him boiled down

to a "he said/she said"—Purdue had to decide whether to believe John or Jane. Sermersheim's explanation for her decision (offered only after her supervisor required her to give a reason) was a cursory statement that she found Jane credible and John not credible. Her basis for believing Jane is perplexing, given that she never talked to Jane. Indeed, Jane did not even submit a statement in her own words to the Advisory Committee. Her side of the story was relayed in a letter submitted by Bloom, a Title IX coordinator and the director of CARE.

For their part, the three panelists on Purdue's Advisory Committee on Equity were similarly biased in favor of Jane and against John. As John tells it—and again, we must accept his account as true—the majority of the panel members appeared to credit Jane based on her accusation alone, given that they took no other evidence into account. They made up their minds without reading the investigative report and before even talking to John. They refused to hear from John's witnesses, including his male roommate who maintained that he was in the room at the time of the alleged assault and that Jane's rendition of events was false. And the panel members' hostility toward John from the start of the brief meeting despite their lack of familiarity with the details of the case—including Jane's depression, suicide attempt, and anger at John for reporting the attempt—further supports the conclusion that Jane's allegation was all they needed to hear to make their decision.

It is plausible that Sermersheim and her advisors chose to believe Jane because she is a woman and to disbelieve John because he is a man. The plausibility of that inference is strengthened by a post that CARE put up on its Facebook page during the same month that John was disciplined: an article from *The Washington Post* titled "Alcohol isn't the cause of campus sexual assault. Men are." Construing reasonable inferences in John's favor, this statement, which CARE advertised to the campus community, could be understood to blame men as a class for the problem of campus sexual assault rather than the individuals who commit sexual assault. And it is pertinent here that Bloom, CARE's director, wrote the letter regarding Jane to which **\*670** Sermersheim apparently gave significant weight.

Taken together, John's allegations raise a plausible inference that he was denied an educational benefit on the basis of his sex. To be sure, John may face problems of proof, and the factfinder might not buy the inferences that he's selling. But his claim should have made it past the pleading stage, so we reverse the magistrate judge's premature dismissal of it.

A final note: John seeks both money damages and injunctive relief for his claim under Title IX. Our earlier discussion of his entitlement to injunctive relief for his due process claim applies equally here.

\* \* \*

John has pleaded facts sufficient to state a claim under both the Fourteenth Amendment and Title IX. We therefore REVERSE and REMAND this case to the district court for proceedings consistent with this opinion.

**All Citations**

928 F.3d 652, 367 Ed. Law Rep. 697

Footnotes

1    John's complaint also asserted § 1983 claims against Purdue and all other defendants in their official capacities. Before us, he concedes that § 1983 does not permit him either to assert official-capacity claims or to sue Purdue itself. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

2    The First, Sixth, and Tenth Circuits have recognized a generalized property interest in higher education. *See* Dalton Mott, Comment, *The Due Process Clause and Students: The Road to A Single Approach of Determining Property Interests in Education,* 65 U. KAN. L. REV. 651, 659–60 (2017); *see also, e.g., Flaim v. Med. Coll. of Ohio,* 418 F.3d 629, 633 (6th Cir. 2005) (asserting that "the Due Process Clause is implicated by university disciplinary decisions"). The Fifth and Eighth Circuits have assumed without deciding that such a property interest exists. *See* Mott, *supra,* at 663. The Second, Third, Fourth, Ninth, and Eleventh Circuits join us in making a state-specific inquiry to determine whether a property interest exists. *See id.* at 658.

3    For simplicity's sake, we will refer to the university and its officers collectively as "Purdue" or "the university."

4    Citing a recent case from the Sixth Circuit, John also argues that he was entitled to cross-examine Jane. *See Doe v. Baum,* 903 F.3d 575, 581 (6th Cir. 2018). Because John has otherwise alleged procedural deficiencies sufficient to survive a motion to dismiss, we need not address this issue.

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

77 Fed.Appx. 615
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Fourth
Circuit Rule 32.1 (Find CTA4 Rule 32.1)
United States Court of Appeals,
Fourth Circuit.

Amy SHEPARD, Plaintiff–Appellant,
United States of America, Intervenor,

v.

Katrina IRVING, Dr., in her individual capacity;
Girard Mulherin, Dr., in his individual and official
capacities; Alan Merten, Dr., in his official capacity
as President of George Mason University; The
Rectors and Visitors of George Mason University;
Lisa Stidham, in her individual capacity; Leigh
Ann Murtha, in her individual capacity; Chrissy
Forbes, in her individual capacity; Joe Boatwright,
in his individual capacity; Nikkia Anderson, in
her individual capacity, Defendants–Appellees.

No. 02–1712.
|
Argued May 7, 2003.
|
Decided Aug. 20, 2003.

**Synopsis**

Student brought action against state university and university
officials, claiming violation of her constitutional and federal
statutory rights in disciplinary proceeding. Upon defendants'
motion to dismiss, the United States District Court for
the Eastern District of Virginia, Gerald Bruce Lee, J.,
204 F.Supp.2d 902, granted the motions. Student appealed.
The Court of Appeals, Shedd, Circuit Judge, held that:
(1) congress failed to validly abrogate a State's sovereign
immunity for claims brought under Title II of Americans
with Disabilities Act (ADA); (2) university waived its
sovereign immunity by accepting federal assistance under the
Rehabilitation Act; (3) officials did not have immunity for
claim under ADA for expungement of an "f" student received
in a class and expungement of a plagiarism conviction; (4)
officials did not have immunity for claim under ADA for an
injunction permitting student a new trial; (5) student stated a

claim that instructor retaliated against her in violation of her
First Amendment right to free speech; and (6) student stated
a claim of disability discrimination under the ADA and the
Rehabilitation Act against university and officials.

Affirmed in part, reversed in part, and remanded.

West Headnotes (6)

**[1]** **Federal Courts**
👉 Civil rights and discrimination in general

Congress failed to validly abrogate a state's
sovereign immunity for claims brought under
Title II of Americans with Disabilities Act
(ADA). U.S.C.A. Const.Amends. 11; Americans
with Disabilities Act of 1990, § 2 et seq., 42
U.S.C.A. § 12101 et seq.

2 Cases that cite this headnote

**[2]** **Federal Courts**
👉 Participation in federal programs

State university waived its sovereign
immunity by accepting federal assistance
under the Rehabilitation Act; university's
waiver was knowing and waiver was not
impermissibly coercive. U.S.C.A. Const.Amend.
11; Rehabilitation Act of 1973, § 504, as
amended, 29 U.S.C.A. § 794.

**[3]** **Federal Courts**
👉 Higher education; colleges and universities
**Federal Courts**
👉 Suits for injunctive or other prospective or
equitable relief; Ex parte Young doctrine

Under *Ex parte Young* doctrine, state university
officials did not have immunity for student's
claim against them in their official capacities
under Americans with Disabilities Act (ADA)
for expungement of an "f" student received
in a class and expungement of a plagiarism
conviction; assuming student prevailed on
substantive claims, requests for expungement
related to an ongoing violation of federal law and
relief would be prospective in nature. U.S.C.A.

Const.Amend. 11; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

10 Cases that cite this headnote

**[4]    Federal Courts**
  👈 Higher education; colleges and universities
**Federal Courts**
  👈 Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

Under *Ex parte Young* doctrine, state university officials did not have immunity for student's claim against them in their official capacities under Americans with Disabilities Act (ADA) for an injunction permitting her a new trial before honor council where she would be allowed representation since such request qualified as one for prospective injunctive relief. U.S.C.A. Const.Amend. 11; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

5 Cases that cite this headnote

**[5]    Constitutional Law**
  👈 Discipline in general
**Education**
  👈 Proceedings and review

Student stated a claim that instructor retaliated against her in violation of her First Amendment right to free speech for charging student with plagiarism after student reported that instructor did not accommodate her disability by alleging that instructor gave her an "F" grade and concocted a plagiarism charge in response to student's exercising of her protected right to make a complaint. U.S.C.A. Const.Amend. 1.

2 Cases that cite this headnote

**[6]    Civil Rights**
  👈 Education

Student stated a claim of disability discrimination under the Americans with Disabilities Act (ADA) and the Rehabilitation Act against state university and university officials for refusing to allow her to have

a representative at honor council hearing which confirmed plagiarism charge by alleging that she had a disability, she was otherwise qualified to have a representative at the honor council hearing, and the council disallowed her from having a representative because she was disabled. Rehabilitation Act of 1973, § 2 et seq., as amended, 29 U.S.C.A. § 701 et seq.; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

5 Cases that cite this headnote

**\*616**  Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Gerald Bruce Lee, District Judge. (CA–01–1093–A).

**Attorneys and Law Firms**

**ARGUED:** Lawrence David Rosenberg, Jones Day, Washington, D.C., for Appellant. Kevin Kendrick Russell, Civil Rights Division, United States Department of Justice, Washington, D.C., for Intervenor. William Eugene Thro, Deputy State Solicitor, Richmond, Virginia, for Appellees. **ON BRIEF:** Michael Jackson Beattie, Beattie & Associates, P.L.L.C., Fairfax, Virginia, for Appellant. Ralph F. Boyd, Jr., Assistant Attorney General, Jessica Dunsay Silver, Civil Rights Division, United States Department of Justice, Washington, D.C., for Intervenor. Jerry W. Kilgore, Attorney General of Virginia, William H. Hurd, State Solicitor, Maureen R. Matsen, Deputy State Solicitor, Alison P. Landry, Assistant Attorney General, Richmond, Virginia, for Appellees.

Before KING and SHEDD, Circuit Judges, and Frank W. BULLOCK, Jr., United States District Judge for the Middle District of North Carolina, sitting by designation.

Affirmed in part, reversed in part, and remanded by unpublished opinion. Judge SHEDD wrote the opinion, in which Judge KING and Judge BULLOCK joined.

**OPINION**

SHEDD, Circuit Judge.

182 Ed. Law Rep. 92, 26 NDLR P 204

**\*\*1** Plaintiff Amy Shepard appeals the district court's grant of the defendants' motion to dismiss her complaint. We affirm in part, reverse in part, and remand for further proceedings.

## I.

In her complaint, the plaintiff alleges she has a disability that limits her ability to concentrate and learn. While a student at George Mason University ("GMU"), the **\*617** plaintiff requested and received extra time to do her assignments to accommodate her disability. During the summer of 2000, she took her final course, an English class. She asked her instructor, defendant Katrina Irving, for extra time to do her work because of her disability. Irving initially agreed to accommodate the plaintiff but later refused.

The plaintiff complained to the GMU Disability Resource Center about Irving's failure to accommodate her disability. The plaintiff asserts that Irving gave her an "F" and concocted a plagiarism charge against her in retaliation for making this complaint.

The plaintiff asked the GMU dean, defendant Girard Mulherin, if she could appeal the grade without fear of being prosecuted before the Honor Committee for plagiarism. Mulherin told the plaintiff the time for Irving to file the plagiarism charge had expired, so she could appeal her grade without fear of reprisal. The plaintiff appealed, but Irving then filed the plagiarism charge with the Honor Committee.

The plaintiff filed her first lawsuit in the district court to enjoin the Honor Committee from reviewing the plagiarism charge. The district court dismissed her case for lack of ripeness. The plaintiff did not appeal.

After the first lawsuit was dismissed, the Honor Committee heard the plagiarism charge against the plaintiff but disallowed her from having either her lawyer or her mother represent her. The Honor Committee found her guilty of plagiarism, affirmed the "F," issued a written reprimand, and ordered her to perform community service.

The plaintiff had a job lined up contingent upon her graduation. Because of the "F," the plaintiff did not graduate on time, and she lost the job she had lined up. She eventually completed her degree at GMU several months later in May 2001.

## II.

The plaintiff filed this second lawsuit, seeking both injunctive relief and damages against GMU; Alan Merten (GMU's president), in his official capacity; Mulherin, in his individual and official capacities; Irving, in her individual capacity; and the student members of the Honor Committee, in their individual capacities.

The plaintiff's complaint contains six counts. The first four allege violations of the plaintiff's due process rights under the Fourteenth Amendment. In count V, the plaintiff alleges a violation of her First Amendment right to free speech. In VI, the plaintiff asserts various claims under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and § 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794(a).

**\*\*2** The defendants filed their motion to dismiss, raising such defenses as Eleventh Amendment immunity, absolute immunity, qualified immunity, and failure to state a claim. Although the district court did not rule in favor of the defendants on all of their alternative grounds, the district court ultimately dismissed the plaintiff's complaint in its entirety.

On appeal, the plaintiff has failed to raise several of the district court's rulings against her. In particular, the plaintiff does not appeal the dismissal of the first four counts of her complaint, all of which claim a violation of her due process rights. Also, the plaintiff does not appeal the following three legal issues:

1. The Honor Committee members are entitled to absolute immunity. Thus, all five members of the Committee are immune from all claims for damages arising **\*618** out of the Honor Committee proceeding.

2. All defendants in their individual capacities are not subject to suit under the ADA and the Rehabilitation Act.

3. All defendants are entitled to qualified immunity as to claims for damages arising under the First Amendment.

Because the plaintiff did not raise these matters on appeal, we deem them abandoned. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 241 (4th Cir.1999). Moreover, because we remand this case for further proceedings, the district court's rulings on these unappealed matters remain the law of the case. *See United States v. Aramony,* 166 F.3d 655, 661 (4th Cir.1999) ( "[W]hen a court decides upon a rule of law, that decision

182 Ed. Law Rep. 92, 26 NDLR P 204

should continue to govern the same issues in subsequent stages in the same case.").

Thus, on appeal we are faced with the following issues:

1. whether GMU and Merten and Mulherin, in their official capacities, are immune under the Eleventh Amendment from suit for damages under Title II of the ADA and § 504 of the Rehabilitation Act;

2. whether the plaintiff's requests for prospective relief satisfy the requirements of the *Ex parte Young* doctrine; and

3. whether the plaintiff properly states claims upon which relief can be granted in counts V and VI.

We address each of these issues in turn.

### III.

The district court issued two rulings involving Eleventh Amendment immunity, the first as to Title II of the ADA and the second as to § 504 of the Rehabilitation Act. Because these rulings are jurisdictional, *Edelman v. Jordan,* 415 U.S. 651, 678, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), we review them before we reach the merits of the plaintiff's claims. *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). We review the district court's Eleventh Amendment immunity determinations *de novo. Antrican v. Odom,* 290 F.3d 178, 184 (4th Cir.2002).

### A.

**[1]** The district court ruled that Congress did not validly abrogate the Eleventh Amendment immunity of the States when it enacted Title II of the ADA. Therefore, the court ruled that GMU is immune from suit and Merten and Mulherin, in their official capacities, are immune from suit for damages under Title II of the ADA.

**\*\*3** After the parties filed their initial appellate briefs, we decided *Wessel v. Glendening,* 306 F.3d 203 (4th Cir.2002). We held in *Wessel* that Congress failed to validly abrogate a State's Eleventh Amendment immunity for claims brought under Title II of the ADA. *Id.* at 215. Accordingly, we affirm the district court's judgment that GMU is immune from suit and Merten and Mulherin, in their official capacities, are immune from suit for damages under Title II of the ADA.

### B.

**[2]** The district court also ruled that GMU waived its Eleventh Amendment immunity under § 504 of the Rehabilitation Act by accepting approximately $44 million in federal funds in the year in question. [1] We agree.

**\*619** A State may constructively waive its Eleventh Amendment immunity by voluntarily accepting federal funds when Congress expresses a clear intent to condition receipt of those funds on a State's consent to waive its Eleventh Amendment immunity. *Booth v. Maryland,* 112 F.3d 139, 145 (4th Cir.1997). Congress clearly expressed its intent to require a State to waive its Eleventh Amendment immunity for § 504 claims as a condition of receiving federal funds. Section 2000d–7(a)(1) states in relevant part:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of *section 504* of the Rehabilitation Act of 1973, *title IX* of the Education Amendments of 1972 ... or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d–7(a)(1) (emphasis added).

In *Litman v. George Mason University,* 186 F.3d 544 (4th Cir.1999), we ruled that Congress permissibly conditioned GMU's receipt of federal funds on its consent to be sued in Title IX discrimination claims. As such, we held that GMU waived its Eleventh Amendment immunity. *Id.* at 555.

Although *Litman* involved a Title IX claim rather than a § 504 claim, we nevertheless find the analysis in *Litman* persuasive. Both Title IX and § 504 of the Rehabilitation Act are specifically listed in § 2000d–7(a)(1) as statutes under which a State defendant must waive its Eleventh Amendment immunity.

182 Ed. Law Rep. 92, 26 NDLR P 204

In support of its position that it did not waive its immunity for § 504 claims, GMU raises three issues not addressed in *Litman.* It contends that: (1) the waiver requirement is coercive; (2) its waiver was not knowing; [2] and (3) there is no reasonable nexus between the required waiver and the purpose of the federal funding that GMU accepted. We reject the first two arguments based on the reasoning of the district court. As for GMU's third argument, we hold that there is a sufficient relationship between the condition imposed by Congress—GMU's consent to be sued for disability discrimination claims—and the purpose of the federal funding—providing a broad range of educational opportunities in an environment free of unlawful discrimination based on disability.

**\*\*4** We affirm the district court's ruling that GMU waived its Eleventh Amendment immunity for claims brought under § 504 of the Rehabilitation Act. Therefore, the plaintiff may seek damages and injunctive relief against GMU and Merten and Mulherin, in their official capacities, [3] under § 504 of the Rehabilitation Act.

## **\*620** IV.

**[3]** Defendants Merten and Mulherin next argue that the plaintiff's claims for prospective relief against them in their official capacities under Title II of the ADA do not satisfy the requirements of the *Ex parte Young* doctrine. We disagree.

We review *de novo* a district court's legal determination whether *Ex parte Young* relief is available. *CSX Transp., Inc. v. Board of Public Works,* 138 F.3d 537, 541 (4th Cir.1998). The *Ex parte Young* doctrine

"allows private citizens, in proper cases, to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute." *Antrican v. Odom,* 290 F.3d 178, 184 (4th Cir.2002). Specifically, *Ex parte Young* authorizes "suits against state officers for prospective equitable relief from ongoing violations of federal law." *Lytle v. Griffith,* 240 F.3d 404, 408 (4th Cir.2001). To determine whether the *Ex parte Young* doctrine is applicable, as the Supreme Court recently observed, a court "need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub.*

*Serv. Comm'n of Md.,* 535 U.S. 635, 122 S.Ct. 1753, 1760, 152 L.Ed.2d 871 (2002).

*Franks v. Ross,* 313 F.3d 184, 197 (4th Cir.2002).

At oral argument, plaintiff's counsel clarified that the plaintiff is seeking only the following prospective relief: (1) expungement of the "F" she received in Irving's class; (2) expungement of the plagiarism conviction by the Honor Committee; [4] and (3) in the alternative to expungement, a new Honor Committee hearing in which she is allowed representation. GMU argues that these requests do not seek relief for any ongoing violation of federal law.

Assuming the plaintiff prevails on her substantive claims, the "F" and the plagiarism conviction would constitute a continuing injury to the plaintiff. Thus, the plaintiff's two requests for expungement would relate to an ongoing violation of federal law and the relief granted would be prospective in nature. *See Wolfel v. Morris,* 972 F.2d 712, 719 (6th Cir.1992) (allowing expungement of records); *Elliott v. Hinds,* 786 F.2d 298, 302 (7th Cir.1986).

**[4]** The plaintiff's request, in the alternative, for a new Honor Committee hearing also alleges an ongoing violation of federal law and seeks relief properly characterized as prospective. A new hearing with representation would give the plaintiff an opportunity to be heard, under circumstances in which her disability does not disadvantage her, in hopes of obtaining a favorable ruling as to the "F" and plagiarism conviction on her record.

**\*\*5** Therefore, the plaintiff may seek relief under Title II of the ADA against Merten and Mulherin, in their official capacities, for expungement or, in the alternative, a new Honor Committee hearing with representation under Title II of the ADA.

## V.

Last, the plaintiff argues that the district court erred in dismissing her remaining **\*621** claims for failure to state a claim upon which relief can be granted. [5] We agree.

We review *de novo* the dismissal of a complaint for failure to state a claim upon which relief could be granted. *GE Inv. Private Placement Partners II v. Parker,* 247 F.3d 543, 548 (4th Cir.2001). A motion to dismiss under Rule 12(b)(6) must

not be granted unless it appears certain that the plaintiff can prove no set of facts which would support her claim and would entitle her to relief. *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993). In considering a motion to dismiss for failure to state a claim, the court accepts as true all well-pleaded allegations and views the complaint in the light most favorable to the plaintiff. *Id.*

The plaintiff attempts to allege three types of claims in counts V and VI:(1) retaliation in violation of her First Amendment right to free speech; (2) retaliation in violation of the ADA and the Rehabilitation Act; and (3) disability discrimination in violation of the ADA and the Rehabilitation Act.

### A.

[5]   In count V, the plaintiff claims that Irving [6] violated her First Amendment right to free speech. The plaintiff alleges that she complained to the GMU Disability Resource Center about Irving's failure to accommodate her disability and that, in retaliation, Irving gave her an "F" and concocted a plagiarism charge. The plaintiff claims that she suffered damage to her reputation, was not able to graduate on time, and lost her job and thousands of dollars as a result.

The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right. *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676 (4th Cir.2000). A plaintiff seeking to recover under § 1983 for retaliation must establish three elements: (1) the plaintiff's right to speak was protected; (2) the plaintiff suffered some adverse action in response to her exercise of a protected right; and (3) a causal relationship between the plaintiff's speech and the defendant's retaliatory action. *Id.* at 685–86.

We find that the plaintiff has adequately alleged all three elements of a First Amendment retaliation cause of action. Irving does not contest the first element—that the plaintiff's complaint to the Resource Center constituted protected speech. As for the second element, the plaintiff asserts that Irving gave her an "F" and concocted a plagiarism charge against her in response to her exercising her protected right to make a complaint. As for the third element, the plaintiff sufficiently alleges that Irving retaliated against her because she engaged in protected speech. Accordingly, we reverse the district court's dismissal of the plaintiff's First Amendment retaliation claim.

### B.

**\*\*6**   In count VI, the plaintiff again alleges that Irving retaliated against her for complaining **\*622** to the GMU Disability Resource Center. [7]   The plaintiff contends that she adequately states a claim for retaliation under both the ADA and the Rehabilitation Act.

Title V of the ADA governs claims for retaliation. Title V states in pertinent part:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a). [8]

The district court issued no rulings relating to the plaintiff's purported retaliation claim under Title V of the ADA. In particular, the district court did not decide whether Congress validly abrogated GMU's Eleventh Amendment immunity for Title V claims and did not address the merits of her claim. Because the district court has not yet addressed either the threshold jurisdictional issue or the merits, we remand the plaintiff's purported retaliation claim to the district court for further review as the case merits.

### C.

[6]   In count VI, the plaintiff also claims that the defendants discriminated against her because of her disability. It appears that the plaintiff actually attempts to allege three discrimination claims under Title II and § 504. [9]   First, she claims that the defendants refused to allow her to have a representative at the hearing because she is disabled. Complaint, ¶ 96. Second, she alleges that the defendants failed to reasonably accommodate her by allowing her to have a

lawyer or her mother represent her at the hearing. Complaint, ¶¶ 51, 95. Third, she asserts that the defendants failed to accommodate her by giving her additional time to complete her assignments. ¶ 97. [10]

### 1.

The plaintiff's first claim clearly states a disability discrimination claim. Pursuant to Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the *benefits of the services, programs, or activities of a public entity*." 42 U.S.C. § 12132 (emphasis added). To establish a cause of action under Title II of the ADA and § 504 of the Rehabilitation Act, a plaintiff must show that: (1) she has a disability; (2) she is otherwise qualified for the benefit in question; and (3) her disability was a motivating factor in her exclusion from the benefit (Title II) or the sole reason for her exclusion from the benefit (§ 504). *Baird v. Rose,* 192 F.3d 462, 467, 470 (4th Cir.1999).

**\*623** In her complaint, the plaintiff sufficiently alleges that: (1) she has a disability; (2) she is otherwise qualified to have a representative at an Honor Committee hearing; [11] and (3) the Honor Committee disallowed her from having a representative because she is disabled.

The district court wrongly concluded that the plaintiff failed to allege that she was denied proper representation at the Honor Committee hearing because of her disability. Thus, we reverse the district court's dismissal of the plaintiff's claims under Title II of the ADA and § 504 of the Rehabilitation Act.

### 2. and 3.

**\*\*7** As for the plaintiff's two failure to accommodate claims, the plaintiff asserts that cases "interpreting the Rehabilitation Act have consistently held that disability discrimination can be demonstrated merely by showing an educational institution failed to ... reasonably accommodate a student." Plaintiff's Brief, p. 38. The plaintiff cites no authority for this assertion. [12]

The district court did not address the merits of either of the plaintiff's purported failure to accommodate claims. We decline to consider the merits of these claims for the first time on appeal. Accordingly, we remand these claims to the district court for further consideration as the case merits.

### VI.

For the foregoing reasons, we

*AFFIRM IN PART, REVERSE IN PART, AND REMAND FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.*

### All Citations

77 Fed.Appx. 615, 2003 WL 21977963, 182 Ed. Law Rep. 92, 26 NDLR P 204

### Footnotes

1   The district court ruled that a private right of action exists under § 504 of the Rehabilitation Act. Although the defendants challenged this ruling at oral argument, they failed to raise this issue in their opening brief. Accordingly, this issue is not properly presented and we deem it abandoned. *See Edwards,* 178 F.3d at 241.

2   The defendants would have us follow the recent Fifth Circuit case, *Pace v. Bogalusa City School Board,* 325 F.3d 609 (5th Cir.2003), *reh'g en banc granted,* 339 F.3d 348 (5th Cir.2003), in which the panel held that the State defendants did not knowingly waive their immunity. We decline to follow *Pace.*

3   The plaintiff may seek recovery against only GMU and Merten and Mulherin, in their official capacities, because § 504 prohibits discrimination by "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a); *Lollar v. Baker,* 196 F.3d 603, 609 (5th Cir.1999). GMU, a State institution, may be sued because the statutory definition of "program or activity" includes universities. 29 U.S.C. § 794(b)(2)(A). Merten and Mulherin may be sued in their official capacities because a suit for damages against a State official in his official capacity is treated like a suit against the State entity. *Lizzi v. Alexander,* 255 F.3d 128, 136 (4th Cir.2001), *overruled in part on other grounds by Nevada Dep't. of Human Resources v. Hibbs,* 538 U.S. 721, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003).

4    The defendants claim that the plaintiff's plagiarism conviction does not appear on her record. In our review of a motion to dismiss, however, we must accept as true all well-pleaded allegations. *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993). The defendants will have an opportunity to prove their assertion to the district court on remand.

5    At oral argument, counsel clarified that the plaintiff is not claiming in her complaint that she had a right to plagiarize because of her disability. Instead, she alleges that, because Irving did not give her a reasonable accommodation, she was forced to turn her assignments in before she had sufficient time to properly complete them. She asserts that what someone else might construe to be plagiarism was her best effort to finish her assignment without a reasonable accommodation.

6    In her appellate brief, the plaintiff limits her First Amendment claim to the alleged retaliation for complaining to the Resource Center. We deem any other potential First Amendment claims in the plaintiff's complaint to be abandoned. *See Edwards,* 178 F.3d at 241.

7    This allegation appears in count VI only by way of incorporation from count V.

8    The plaintiff cited without discussion § 12203 in the jurisdiction section of her complaint. The plaintiff did not cite any reference to the Rehabilitation Act that contains an antiretaliation provision similar to the one in § 12203.

9    The plaintiff alleges her Title II and § 504 claims against all the defendants. Based on the law of the case and our prior rulings, the plaintiff may seek recovery under Title II against only Merten and Mulherin, in their official capacities, and under § 504 against only GMU and Merten and Mulherin, in their official capacities.

10   The plaintiff abandoned her request for prospective relief relating to this particular claim. See *ante* at 9. However, it does not appear that the plaintiff has abandoned her claim for damages under § 504 of the Rehabilitation Act relating to this alleged discriminatory conduct.

11   Title II prohibits discrimination in all "services, programs, or activities" of a public entity. 42 U.S.C. § 12132. Although Title II does not define this phrase, we have found that a middle school "show choir" qualifies as a "service, program, or activity." *Baird,* 192 F.3d at 467. We likewise find that the Honor Committee is one of the "services, programs, or activities" provided by GMU to its students.

12   The plaintiff cites 29 C.F.R. § 84.4, but no such regulation exists.

---

**End of Document**                                                            © 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Koala v. Khosla, 9th Cir.(Cal.), July 24, 2019

488 F.3d 816
United States Court of Appeals,
Ninth Circuit.

Aaron FLINT, Plaintiff–Appellant,

v.

George DENNISON, in his official capacity as President of the University of Montana–Missoula (UMT); Associated Students of the University of Montana (ASUM); Kyle Engelson, in his official capacity as the ASUM Elections Committee Chair; Justin Baker; Averiel Wolff; Sophia Alvarez; Anna Green; Kris Monson; Derek Duncan; Katie Boeckx, in their official capacities as Elections Commissioners for the Associated Students of UMT; Jessica Adam, Defendants–Appellees, and

Gale Price, President; Vinnie Pavlish, ASUM Vice President; Cassie Morton, ASUM Business Manager, and ex-officio member of ASUM Senate; Bryce Bennett; Andrew Bissell; Brad Cederberg; Tyler Clairmont; Nezha Haddouch; Shawana Hagen; Chris Healow; Andrea Helling; Derf Johnson; Britta Padgham; Kimberly Pappas; Josh Peters; Rebecca Pettit; Jake Pipinich; Ross Properi; Jon Snodgrass; Leslie Venetz; Nathan Ziegler; Casey Hogue, in their official capacities as ASUM Senators, Defendant.

No. 05–35441.
|
Argued and Submitted Feb. 5, 2007.
|
Filed June 1, 2007.

**Synopsis**

**Background:** Student brought § 1983 action against state university president, student association, and individual association members, all in their official capacities, alleging that association bylaws imposing per-candidate limit on campaign spending for student government offices violated his free speech rights. The United States District Court for the District of Montana, 361 F.Supp.2d 1215, Donald W. Molloy, J., granted defendants' motion for summary judgment, and student appealed.

**Holdings:** The Court of Appeals, Bea, Circuit Judge, held that:

[1] appeal was not moot;

[2] Eleventh Amendment did not bar action;

[3] *Buckley* First Amendment limitation was inapplicable, abrogating *Welker v. Cicerone,* 174 F.Supp.2d 1055;

[4] whether spending limit comported with free speech guarantee depended first on nature of forum;

[5] student government election constituted limited public forum;

[6] spending limit met viewpoint-neutrality criterion; and

[7] spending limit also met reasonableness criterion.

Affirmed.

West Headnotes (21)

**[1]** **Federal Courts**
   👉 Rights and interests at stake
   **Federal Courts**
   👉 Inception and duration of dispute; recurrence;  "capable of repetition yet evading review"

   Cause of action is moot when issues are no longer live, or parties lack legally cognizable interest in outcome of litigation. U.S.C.A. Const. Art. 3, § 2, cl. 1.

   1 Cases that cite this headnote

**[2]** **Federal Courts**
   👉 Available and effective relief

   Court's retaining ability to fashion some form of meaningful relief between parties precludes finding of mootness. U.S.C.A. Const. Art. 3, § 2, cl. 1.

221 Ed. Law Rep. 514, 07 Cal. Daily Op. Serv. 6274, 2007 Daily Journal D.A.R. 8268

2 Cases that cite this headnote

**[3]    Federal Courts**
👈 Particular cases

Student's appeal from adverse decision in his § 1983 action against state university president and others, alleging that student association bylaws imposing per-candidate limit on campaign spending for student government offices violated his free speech rights, was not mooted by his graduation from university; complaint sought order expunging from university's records evidence of student's censure and denial of his student association seat, which had been imposed as penalties for exceeding spending limit. U.S.C.A. Const. Art. 3, § 2, cl. 1; U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

**[4]    Civil Rights**
👈 Liability of Municipalities and Other Governmental Bodies

**Civil Rights**
👈 States and territories and their agencies and instrumentalities, in general

States or governmental entities that are considered arms of state for Eleventh Amendment purposes are not "persons" within meaning of § 1983. U.S.C.A. Const.Amend. 11; 42 U.S.C.A. § 1983.

55 Cases that cite this headnote

**[5]    Civil Rights**
👈 Education

**Civil Rights**
👈 Education

**Federal Courts**
👈 Higher education; colleges and universities

State university and university officials sued in their official capacities are arms of state entitled to Eleventh Amendment immunity, and thus are not "persons" within meaning of § 1983. U.S.C.A. Const.Amend. 11; 42 U.S.C.A. § 1983.

228 Cases that cite this headnote

**[6]    Civil Rights**
👈 Liability of Public Employees and Officials

**Federal Courts**
👈 Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

**Federal Courts**
👈 Agencies, officers, and public employees

As exception to general rule, state official in his official capacity, when sued for prospective injunctive relief, is considered "person" within meaning of § 1983; prospective injunctive relief is outside proscription of Eleventh Amendment. U.S.C.A. Const.Amend. 11; 42 U.S.C.A. § 1983.

180 Cases that cite this headnote

**[7]    Federal Courts**
👈 Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

**Federal Courts**
👈 Higher education; colleges and universities

Eleventh Amendment did not bar student's § 1983 action against state university president and others, alleging that student association bylaws imposing per-candidate limit on campaign spending for student government offices violated his free speech rights; student sought injunctive relief in form of order to expunge disciplinary information in his university records arising from his having exceeded spending limit, and such relief was partly prospective, i.e. sought to prevent future harm to student. U.S.C.A. Const.Amends. 1, 11; 42 U.S.C.A. § 1983.

14 Cases that cite this headnote

**[8]    Constitutional Law**
👈 Student government elections

Subject to constitutional limitations, government has power to control speech in its school election system in order to preserve character of that system. U.S.C.A. Const.Amends. 1, 14.

221 Ed. Law Rep. 514, 07 Cal. Daily Op. Serv. 6274, 2007 Daily Journal D.A.R. 8268

**[9]**  **Constitutional Law**
🔑 **Property and Events**

Forum analysis of claims of free speech infringement is equally applicable to both spatial and metaphysical fora. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

**[10]**  **Constitutional Law**
🔑 **Student government**

**Education**
🔑 **Student organizations and government**

*Buckley* First Amendment free speech limitation on legislated restrictions on political campaign spending was inapplicable in context of state university students' campaigns for student association governing seats; student association was not akin to political government, and association election was not equivalent of congressional race, given, e.g., educational context, specific educational purpose of student government, and numerous other limits placed upon student campaigning; abrogating *Welker v. Cicerone*, 174 F.Supp.2d 1055. U.S.C.A. Const.Amends. 1, 14.

2 Cases that cite this headnote

**[11]**  **Constitutional Law**
🔑 **Student government**

**Education**
🔑 **Student organizations and government**

Whether state university's setting maximum dollar limit on campaign spending for student government offices comported with free speech guarantee depended on nature of forum, and whether limitation on speech was legitimate exercise of state government power in preserving character of that forum. U.S.C.A. Const.Amends. 1, 14.

**[12]**  **Constitutional Law**
🔑 **Post-secondary institutions**

**Constitutional Law**

🔑 **Post-Secondary Institutions**

First Amendment rights of speech and association extend to campuses of state universities. U.S.C.A. Const.Amend. 1.

2 Cases that cite this headnote

**[13]**  **Constitutional Law**
🔑 **Nature and requisites**

Designated public forum cannot exist in absence of specific action on part of government. U.S.C.A. Const.Amend. 1.

5 Cases that cite this headnote

**[14]**  **Constitutional Law**
🔑 **Justification for exclusion or limitation**

**Constitutional Law**
🔑 **Justification for exclusion or limitation**

In public or designated public forum, content-based restriction on speech is subject to strict scrutiny, requiring state to show compelling interest in restriction that is drawn narrowly to meet that interest; content-neutral time, place, and manner restriction is permissible so long as it is narrowly tailored to serve significant government interest, and leaves open ample alternative channels of communication. U.S.C.A. Const.Amend. 1.

13 Cases that cite this headnote

**[15]**  **Constitutional Law**
🔑 **Justification for exclusion or limitation**

In non-public forum, as long as regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose speaker's view, government may preserve forum for its intended purposes. U.S.C.A. Const.Amend. 1.

4 Cases that cite this headnote

**[16]**  **Constitutional Law**
🔑 **Nature and requisites**

**Constitutional Law**
🔑 **Justification for exclusion or limitation**

221 Ed. Law Rep. 514, 07 Cal. Daily Op. Serv. 6274, 2007 Daily Journal D.A.R. 8268

Government may create limited public forum by choosing to open non-public forum for limited purposes; once forum is opened, government must respect lawful boundaries it has set, i.e. may not exclude speech where distinction is not reasonable in light of purpose served by forum, or discriminate against speech on basis of its viewpoint. U.S.C.A. Const.Amend. 1.

14 Cases that cite this headnote

[17]  **Constitutional Law**
👉 Student government

**Education**
👉 Student organizations and government

State university's student government election constituted limited public forum, in student's § 1983 action against university president and others, alleging that student association bylaws imposing per-candidate limit on campaign spending for student government offices violated his free speech rights. U.S.C.A. Const.Amends. 1, 14; 42 U.S.C.A. § 1983.

7 Cases that cite this headnote

[18]  **Constitutional Law**
👉 Justification for exclusion or limitation

Viewpoint discrimination, which infringes free speech when applied in limited public forum, occurs when government denies access to speaker solely to suppress point of view he espouses on otherwise includible subject. U.S.C.A. Const.Amend. 1.

4 Cases that cite this headnote

[19]  **Constitutional Law**
👉 Student government

**Education**
👉 Student organizations and government

State university's student association bylaws imposing per-candidate limit on campaign spending for student government offices met viewpoint-neutrality criterion for speech restrictions in limited public forum; spending limit applied equally to all student candidates, there was no showing that limit arose from desire

to suppress any student's viewpoint or had such effect, and resulting distinction between freedom of speech of candidates and non-candidates arose from their respective statuses, not viewpoints. U.S.C.A. Const.Amends. 1, 14.

[20]  **Constitutional Law**
👉 Justification for exclusion or limitation

As to reasonableness criterion of speech restrictions in limited public forum, there is no requirement that restriction be narrowly tailored, or that government's interest be compelling, in order for restriction to be reasonable; instead, government need only reasonably justify its regulation in light of purposes of forum. U.S.C.A. Const.Amend. 1.

12 Cases that cite this headnote

[21]  **Constitutional Law**
👉 Student government

**Education**
👉 Student organizations and government

State university's student association bylaws imposing per-candidate limit on campaign spending for student government offices met reasonableness criterion for speech restrictions in limited public forum; university regarded student association as existing for essentially educational purposes, and viewed spending limitation as vital to maintain character of association and its election process as educational tool rather than ordinary political exercise, and spending limit reasonably served that pedagogical goal. U.S.C.A. Const.Amends. 1, 14.

2 Cases that cite this headnote

**Attorneys and Law Firms**

*819 James Bopp, Jr., and Jeffrey Gallant, Bopp, Coleson & Bostrom, Terre Haute, IN, for the plaintiff-appellant.

David Aronofsky, Legal Counsel, The University of Montana, Missoula, MT; Catherine M. Swift, Chief Legal

221 Ed. Law Rep. 514, 07 Cal. Daily Op. Serv. 6274, 2007 Daily Journal D.A.R. 8268

Counsel, **\*820** The Montana University System, Helena, MT; and Lisa J. Danetz and Brenda Wright, Demos: A Network for Ideas & Action, Boston, MA, for the defendants-appellees.

Appeal from the United States District Court for the District of Montana; Donald W. Molloy, District Judge, Presiding. D.C. No. CV–04–00085–DWM.

Before: SUSAN P. GRABER, RICHARD A. PAEZ, and CARLOS T. BEA, Circuit Judges.

**Opinion**

Opinion by Judge BEA.

BEA, Circuit Judge.

We are called upon to decide whether the University of Montana may impose a dollar limit on what a student may spend on his campaign for student office. The University's limit did not affect *how* the money could be spent; rather, it directly told a student *how much* he could spend to get elected. The Federal Election Campaign Act of 1971 could not tell James Buckley how much of his money he could spend to be elected a United States Senator. *Buckley v. Valeo,* 424 U.S. 1, 51–54, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Why, then, may a state university tell students how much they may spend to be elected to student office? Because, unlike the exercise of state-wide political self-determination at a national level at issue in *Buckley,* the student election at issue here occurred in a limited public forum, that is, a forum opened by the University to serve viewpoint neutral educational interests but closed to all save enrolled students who carried a minimum course load and maintained a minimum grade-point average. These educational interests outweigh the free speech interests of the students who campaigned within that limited public forum.

When Aaron Flint was a student at the University of Montana, he twice exceeded the $100 campaign expenditure limit imposed on student candidates for positions in the Associated Students of the University of Montana ("ASUM"). Following the second violation, Flint was denied a seat as ASUM Senator. Flint sued ASUM, the University, and ASUM officers, claiming the spending limit, as applied, violated his First Amendment right to freedom of speech. Flint now appeals the district court's order of summary judgment in favor of defendants. The precise question before us is this: Does the Speech Clause of the First Amendment to the United States Constitution prohibit a public university from imposing a $100 expenditure limit on candidates running for a position in student government? U.S. Const. amend. I ("Congress shall make no law ... abridging the freedom of speech...."). We conclude that it does not.

**I.**

**A.**

The University of Montana is a public university under the Montana Constitution; it is administered through a Board of Regents. Mont. Const. art. X, § 2. The Board of Regents requires that the University's student government organization meet certain requirements. For instance, the student government must follow all Board policies, and the student government's constitution must be approved by the president of the University.

ASUM is the student government at the University of Montana. ASUM is a "representative body of the members of the Association, organized exclusively for educational and non-profit purposes." ASUM Const. art. 2, § 1, *available at* http://www.umt.edu/asum/government/constitution.htm. Under its constitution, ASUM's "primary **\*821** responsibility ... is to serve as an advocate for the general welfare of the students." *Id.* ASUM "government and activities" must "comply with Montana State law and the policies of the Montana Board of Regents on Higher Education." *Id.* § 4. All students at the University registered for seven or more credits during the Fall and Spring semesters are assessed an activity fee, and each student who pays this fee is a member of ASUM. *Id.* art. 1, § 2.

ASUM not only serves to represent the students at the University but also provides hands-on, practical educational opportunities for University students. As explained by ASUM's senior faculty advisor,

> ASUM offers students experience in many forms of leadership, through which they develop a variety of skills to handle the responsibilities that arise in student government. ASUM senators and executives learn how to address conflicting interests

221 Ed. Law Rep. 514, 07 Cal. Daily Op. Serv. 6274, 2007 Daily Journal D.A.R. 8268

of diverse constituencies, how to make recommendations about the allocation of budgetary resources, how to negotiate with administrators over matters such as tuition and fee increases, and how to draft policies and priorities for numerous student programs.

Since ASUM's inception in 1906, the University has viewed ASUM as an invaluable educational tool for students of the University. ASUM exists, according to its senior faculty advisor, for "essentially educational purposes."

Consistent with its goals of representing the students at the University and providing students with leadership opportunities, ASUM allows for the election of three student executives and twenty student senators. ASUM Const. art. 4, § 1(a) Article 7 of the ASUM Constitution and Article 4 of the ASUM Bylaws impose several procedures and restrictions on the student election process. For example, only ASUM members, i.e., Student Activity Fee-paying students of the University, who maintain at least a 2.0 cumulative grade point average are eligible to run for elected office. Id. art. 7, § 1. Students must be registered for at least one credit to vote in any ASUM election. Id.

The ASUM Bylaws broadly regulate campaigning, which is defined as "any activity which directly or indirectly promotes the candidacy of one or more individuals for office." ASUM Bylaws art. V, § 2.A, *available at* http://www. umt.edu/asum/ government/bylaws.htm. The Bylaws provide that on campus campaign materials may be displayed only after the official campaigning period begins and only in certain areas. Id. §§ 2.B–C, 2.F.2–4. The Bylaws further prohibit any door-to-door campaigning in University residence halls or family housing and condition campaigning in a classroom on the permission of the professor. Id. § 2.E.

At issue in the case at bar is the Bylaws' campaign expenditure limitation: $100 for individual candidates for office. Id. § 2.G.1–3. The Bylaws require each student candidate to document and make public his expenditures two days prior to the general election. Id. § 2.H. ASUM reimburses candidates for a portion of their expenditures. Id. § 2.G.4. The Bylaws prescribe that all contributions to campaigns come from students; corporate and political action committee contributions are prohibited, as are contributions

from ASUM-sponsored organizations. Id. § 2.G.5, I. As a means of enforcing these campaign regulations, the Bylaws provide that any candidate who violates the election rules may be barred from candidacy or denied office.

**\*822 B.**

With this general background in place, we turn to the facts of this case. Flint ran for and won election on a joint ticket with Gale Price as ASUM President and Vice–President, respectively, for the 2003–2004 academic year. Flint and Price combined to spend about $300 on their campaign and failed fully to disclose these expenditures as required by the ASUM Bylaws. The ASUM Senate censured both Flint and Price for exceeding the campaign expenditure limit but allowed them to retain their offices as ASUM President and Vice–President.

The following year, Flint ran for a term as ASUM Senator and again exceeded ASUM's spending limit. Upon submitting his campaign expenditure form on April 26, 2004, in which Flint reported expenditures of $214.69, Flint was informed by ASUM Elections Chairman Kyle Engelson that Flint's name would be removed from the ballot for the upcoming election. Flint, then ASUM President, responded to Engelson's letter with an email in which he noted ASUM procedures require a two-thirds vote of the Senate approving Engelson's recommendation, which would not be possible until the election was already underway. Flint suggested that Engelson recommend to the Senate that candidates who violated ASUM election laws not be allowed to take office. After the election was underway, the ASUM Senate voted to remove Flint from his Senate seat should he win. Accordingly, after Flint received enough votes to be elected ASUM Senator, he was denied office.

Flint filed a complaint in United States District Court on May 5, 2004, under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution, claiming that the ASUM Bylaws's $100 spending cap on campaign expenditures was an unconstitutional abridgment of free speech. Flint sued George Dennison, in his official capacity as the University president; ASUM; Kyle Engelson, in his official capacity as ASUM Elections Committee Chair; and seven ASUM Elections Committee Members in their official capacities. Flint later filed an amended verified complaint adding Gale Price, then ASUM President, two ASUM Executive Officers in their official capacities, and twenty

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

221 Ed. Law Rep. 514, 07 Cal. Daily Op. Serv. 6274, 2007 Daily Journal D.A.R. 8268

ASUM Senators in their official capacities (collectively referred to hereinafter as "defendants").

Flint also filed a motion for a temporary restraining order, a motion for a preliminary injunction, and a motion to consolidate the preliminary injunction hearing with the trial on the merits. The district court denied Flint's motions. Before the court rendered its judgment as to Flint's motion for preliminary injunction, defendants filed a motion to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 12(b)(7). Following the court's denial of a preliminary injunction, Flint then filed an amended verified complaint to which the defendants again filed a 12(b)(1) and 12(b)(6) motion to dismiss. Thereupon, the district court issued an order to show cause regarding additional briefing and argument. Flint requested further briefing and argument to resolve the issue as to whether strict scrutiny [1] or rational relationship [2] applied to test the constitutionality *823 of the campaign expenditure limitations. Defendants responded that additional briefing or argument was not needed and suggested that if the court chose to refer to matters outside the pleadings to resolve the 12(b) motion, the court should convert it to a Rule 56 motion for summary judgment based on the record developed in connection with the motion for preliminary injunction. The district court accepted defendants' suggestion and, applying a rational relationship standard to the spending cap, issued an order and opinion granting summary judgment to defendants on March 28, 2005.

Flint timely appealed that order. He claims that the district court applied the wrong legal standard in determining the constitutionality of ASUM's regulations. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## II.

Before turning to the merits of Flint's appeal, we first consider two threshold issues: whether Flint's claims are moot as a result of Flint's graduation from the University of Montana and whether the Eleventh Amendment immunizes defendants from Flint's suit.

### A.

[1] [2] "Article III of the Constitution limits federal-court jurisdiction to 'Cases' and 'Controversies.' " *Massachusetts*

*v. EPA,* 549 U.S. 497, 127 S.Ct. 1438, 1452, 167 L.Ed.2d 248 (2007); *see also DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 126 S.Ct. 1854, 1860–61, 164 L.Ed.2d 589 (2006) ("If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing 6633 so."). A case that "has lost its character as a present, live controversy" is moot and no longer presents a case or controversy amenable to federal court adjudication. *Am. Rivers v. Nat'l Marine Fisheries Serv.,* 126 F.3d 1118, 1123 (9th Cir.1997); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (explaining that the mootness doctrine derives from the requirement of an Article III case or controversy). A cause of action is moot when the issues " 'are no longer "live" or the parties lack a legally cognizable interest in the outcome' " of the litigation. *City of Erie v. Pap's A.M.,* 529 U.S. 277, 287, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (quoting *County of L.A. v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979)). Mootness, however, is a flexible justiciability doctrine that allows review "if there are present effects that are legally significant." *Jacobus v. Alaska,* 338 F.3d 1095, 1104 (9th Cir.2003); *see also U.S. Parole Comm'n v. Geraghty,* 445 U.S. 388, 400, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (explaining that the Court's "cases demonstrate the flexible character of the Art. III mootness doctrine"). Where a court retains the ability to " 'fashion some form of meaningful relief' " between the parties, an appeal is not moot, and the court retains jurisdiction. *Dream Palace v. County of Maricopa,* 384 F.3d 990, 1000 (9th Cir.2004) (quoting *In re Pattullo,* 271 F.3d 898, 901 (9th Cir.2001) (order)).

[3] Here, although Flint filed his lawsuit prior to his graduation, we must consider whether Flint's 2004 graduation from the University of Montana renders his cause of action seeking declaratory and injunctive relief against defendants moot. *See Harper ex rel. Harper v. Poway Unified* *824 *Sch. Dist.,* —— U.S. ——, 127 S.Ct. 1484, 167 L.Ed.2d 225 (2007); *Clark v. City of Lakewood,* 259 F.3d 996, 1006 (9th Cir.2001) ("Mootness inquiries ... require courts to look to changing circumstances that arise after the complaint is filed...."). Generally, once a student graduates, he no longer has a live case or controversy justifying declaratory and injunctive relief against a school's action or policy, and his case is therefore moot. *See Doe v. Madison Sch. Dist. No. 321,* 177 F.3d 789, 798 (9th Cir.1999) (en banc). When a student's record contains negative information derived from allegedly unconstitutional school regulations, however, that information may jeopardize the student's future employment

or college career. *Hatter v. L.A. City High Sch. Dist.,* 452 F.2d 673, 674 (9th Cir.1971). So long as a former student's record contains evidence of disciplinary sanctions, and the former student seeks "an order requiring school officials to expunge from school records all mention of the disciplinary action," the action is not moot. *Id.*

Here, Flint's amended complaint sought such an order of expungement. Flint sued for (1) a declaration that ASUM's limitation on campaign expenditures violated his free speech rights, (2) an injunction preventing ASUM from removing him from his elected position on the ASUM Senate, and (3) an injunction ordering ASUM to remove from his record "all findings, proceedings, recommendations, and actions taken as a result of" the election code violations. Consequently, despite Flint's graduation from the University in 2004, his controversy remains "live" because of his third claim for relief. Given that mootness, unlike standing, is a flexible justiciability doctrine, *see Jacobus,* 338 F.3d at 1104, we retain the ability to grant relief in a legally significant way —to wit, ordering the expungement from Flint's record all evidence of his 2003 censure and the 2004 denial of his ASUM Senate seat. Such expungement is certainly a ' "form of meaningful relief.' " *Dream Palace,* 384 F.3d at 1000 (quoting *Pattullo,* 271 F.3d at 901). If we were to determine that Flint's First Amendment rights were violated, declaratory relief would require the University to expunge any and all records of Flint's censure and Senate seat denial; therefore, we hold that Flint's case is not rendered moot by his graduation.[3]

## B.

**[4]** **[5]** Having determined that Flint's claims are not moot, we now consider whether defendants are entitled to immunity under the Eleventh Amendment. The Eleventh Amendment limits § 1983 claims such as Flint's. In *Will v. Michigan Department of State Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the Supreme Court held that "States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes" are not "persons" under § 1983. Moreover, *Will* clarified that "a **\*825** suit against a state official in his or her official capacity .... is no different from a suit against the State itself." *Id.* at 71, 109 S.Ct. 2304. We have held that a state university is an arm of the state entitled to Eleventh Amendment immunity. *See, e.g., Armstrong v. Meyers,* 964 F.2d 948, 949–50 (9th Cir.1992) (per curiam). Therefore, state officials sued in their official capacities, including university officials, are not "persons"

within the meaning of § 1983 and are therefore generally entitled to Eleventh Amendment immunity.

**[6]** *Will* recognized one vital exception to this general rule: When sued for prospective injunctive relief, a state official in his official capacity *is* considered a "person" for § 1983 purposes. *Will,* 491 U.S. at 71 n. 10, 109 S.Ct. 2304 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.' " (quoting *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985))). This exception recognizes the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), that a suit for prospective injunctive relief provides a narrow, but well-established, exception to Eleventh Amendment immunity. *See Rounds v. Or. State Bd. of Higher Educ.,* 166 F.3d 1032, 1036 (9th Cir.1999) ("*Ex Parte Young* provided a narrow exception to Eleventh Amendment immunity for certain suits seeking declaratory and injunctive relief against unconstitutional actions taken by state officers in their official capacities."); *Doe v. Lawrence Livermore Nat'l Lab.,* 131 F.3d 836, 840 (9th Cir.1997) ("[T]he Eleventh Amendment allows only prospective injunctive relief to prevent an ongoing violation of federal law.").

**[7]** Flint seeks declaratory and injunctive relief as related to past violations, namely, ASUM's allegedly unconstitutional infringement of his right to freedom of speech. However, as in *Doe v. Lawrence Livermore National Laboratory,* the relief Flint seeks is not so limited. In *Doe,* a contract university employee sought damages and reinstatement for breach of contract and a § 1983 violation after an alleged wrongful discharge. *Id.* at 837. The district court dismissed both claims as barred by the Eleventh Amendment, but we reversed the dismissal of the § 1983 claim, holding that reinstatement constitutes prospective injunctive relief because a wrongful discharge is a continuing violation. *Id.* at 841. Here, the injunctions Flint seeks as related to past violations serve to expunge from University records the 2003 censure and 2004 denial of his Senate seat, which actions may cause Flint harm. Thus, the injunctions sought are not limited merely to past violations: they serve the purpose of preventing present and future harm to Flint. Therefore, they cannot be characterized solely as retroactive injunctive relief and are not barred by the Eleventh Amendment.[4]

221 Ed. Law Rep. 514, 07 Cal. Daily Op. Serv. 6274, 2007 Daily Journal D.A.R. 8268

## III.

Satisfied that this case presents a live legal controversy and that the Eleventh Amendment does not bar Flint's suit against defendants, we turn to the merits of Flint's claims. Because Flint appeals from the district court's order granting summary judgment in favor of defendants, we review de novo, viewing the facts in a **\*826** light most favorable to Flint and drawing all reasonable inferences in his favor. *Scheuring v. Traylor Bros.,* 476 F.3d 781, 784 (9th Cir.2007). Because neither party disputes the relevant facts, our analysis is focused on application of the correct legal principles to the facts before us. *Arakaki v. Hawaii,* 314 F.3d 1091, 1094 (9th Cir.2002).

## A.

The "speech" at issue in this case takes the form of a student candidate's spending during the election cycle for ASUM office. Because campaign expenditures implicate a student candidate's ability to convey his or her message to the University student body, the expenditures necessarily constitute "speech" and thus qualify for First Amendment protection. *See Austin v. Mich. Chamber of Commerce,* 494 U.S. 652, 657, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990) ("Certainly, the use of funds to support a political candidate is 'speech'...."); *Buckley v. Valeo,* 424 U.S. 1, 19–20, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). There is no dispute in this case that *Buckley* and its progeny apply to the limited extent that they classify the student campaign expenditures as "speech" worthy of First Amendment protection.

 **[8]**  **[9]**  That ASUM campaign expenditures constitute speech is not, however, the end of the matter. The speech at issue occurred in the University of Montana student election system, and, subject to constitutional limitations, government has the power to control speech in its school election system to preserve the character of that system. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). "The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). In *Cornelius,* the Supreme Court reaffirmed that when examining government speech limitations, we are to examine the nature of the restriction: "[T]he Court has adopted a forum analysis as

a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." 473 U.S. at 800, 105 S.Ct. 3439.[5]

Here, both parties eschew forum analysis as the proper framework within which to analyze Flint's claim that the campaign expenditure limitation violates the First Amendment: Flint points to *Buckley* while defendants point to *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). We disagree on the one point upon which the parties agree: their contention that traditional First Amendment analysis is inapplicable here. To demonstrate why we disagree, we briefly address each party's contention.

## \*827 B.

### 1.

 **[10]**  On the one hand, Flint vigorously asserts that student spending as part of the ASUM election is "political speech" that may be regulated only subject to strict scrutiny. Flint equates the ASUM student government to state and national government: "The role of the ASUM officers is no less important to society than is that of the Montana state government." Based on his equation of ASUM student leaders to elected political officials, Flint contends that *Buckley* is controlling and mandates that the ASUM campaign expenditure limitations be struck down as an unconstitutional limitation on speech.[6]

Flint's arguments are unpersuasive. We may not simply ignore the facts that the campaign expenditure limitations in this case involved election to *student government* and that the expenditures occurred mostly, if not exclusively, on a *university campus.* The educational context of a university, the specific educational purpose of ASUM student government, and the numerous other limits placed upon student campaigning distinguish the campaign expenditure limitations in this case from those in cases such as *Buckley,* which involved campaigns for national political office. Furthermore, while ASUM undoubtedly has an impact on students at the University and has certain powers to distribute funds among student groups, it simply does not follow that ASUM is akin to a political government or that the ASUM election is the equivalent of a congressional race. The ubiquity with which political government is present to control facets

221 Ed. Law Rep. 514, 07 Cal. Daily Op. Serv. 6274, 2007 Daily Journal D.A.R. 8268

of our lives is not—thank Heavens!—replicated by student government in students' lives.

The University uses ASUM primarily as an educational tool —a means to educate students on principles of representative government, parliamentary procedure, political compromise, and leadership. In contrast to participation in state or national politics, participation in ASUM student elections is limited to ASUM-enrolled University students—students must maintain at least a 2.0 grade point average to run for office and only students are allowed to vote in the election. Unlike state and national governments, ASUM is a creature of the Board of Regents, whose policy calls for ASUM's Constitution and conditions the validity of the constitution on the University president's approval. Indeed, ASUM's entire operation is subject to the Board of Regents' policies and campus policies.

Thus, given the nature of this student organization and the environment in which it exists and operates, ASUM student officeholders are not the equivalent of elected political officeholders. As the Eleventh Circuit explained in a case dealing with similar campaign limitations for student government, "this is a university, whose primary purpose is *education,* not electioneering. Constitutional protections must be analyzed with due regard to that educational purpose, an approach that has been consistently adopted by the courts." *Ala. Student Party v. Student Gov't Ass'n of the Univ. of Ala.,* 867 F.2d 1344, 1346 (11th Cir.1989). We should not apply the principles of *Buckley* without first considering **\*828** whether the university setting affects our First Amendment analysis. *See Widmar,* 454 U.S. at 267 n. 5, 102 S.Ct. 269. [7]

## 2.

**[11]**   We likewise disagree with defendants' position, and that of the district court, that the university setting dictates that we must defer to all reasonable decisions imposed on student speech during the election process rather than first engaging in a forum analysis. Relying on passages in *Widmar* that public universities have the right to determine "who may teach, what may be taught, how it shall be taught, and who may be admitted to study" and the right to "make academic judgments as to how best to allocate scarce resources," defendants assert that absent a showing of unreasonableness, the spending limits are *per se* constitutional because ASUM is an educational tool, and the University desires that leadership opportunities be available to as many students as

possible. 454 U.S. at 276, 102 S.Ct. 269 (internal quotation marks omitted). We should defer, defendants contend, to their judgment in reasonably regulating speech regardless whether the regulation advances the purpose of the forum the University has provided for the speech.

**[12]**   We do not read the Supreme Court's cases to require such deference without first scrutinizing more carefully the nature of the student election forum and the government's interest in limiting speech within that forum. Although the Supreme Court in *Widmar* discussed the unique setting of a university campus, it also stressed that its "cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities." 454 U.S. at 268–69, 102 S.Ct. 269. "The University's institutional mission, which it describes as providing a *secular* education to its students, does not exempt its actions from constitutional scrutiny." *Id.* at 268, 102 S.Ct. 269 (internal quotation marks and citation omitted). The Court looked to the nature of the property, explaining that the university in *Widmar* had "created a forum generally open for use by student groups" and therefore the university had "assumed an obligation to justify its discriminations and exclusions under applicable constitutional norms." *Id.* at 267, 102 S.Ct. 269.

The Supreme Court has applied forum analysis in other, similar cases involving speech limitations on a university campus. In *Rosenberger v. Rector & Visitors of University of Virginia,* 515 U.S. 819, 828–30, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), the Supreme Court characterized a university student fund responsible for monetary reimbursements to student groups as a limited public forum. The Court then analyzed the student fund's denial of distributions to a university student religious group as viewpoint discrimination and subjected the denial to traditional First Amendment scrutiny. *Id.* at 830–37, 115 S.Ct. 2510. [8] Likewise, in **\*829** *Board of Regents of University of Wisconsin System v. Southworth,* 529 U.S. 217, 229–35, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000), the Supreme Court ruled that a university activity fee charged to students, which fee was used to facilitate extracurricular student speech, was constitutional so long as the university's funding support was viewpoint neutral.

In sum, we conclude that the constitutionality of the campaign expenditure limitation depends on the nature of the forum and whether the limitation on speech is a legitimate exercise of government power in preserving the character of the forum. [9]

IV.

A.

Although the student campaign expenditures constitute speech protected by the **830 First Amendment, "[e]ven protected speech is not equally permissible in all places and at all times." *Cornelius,* 473 U.S. at 799, 105 S.Ct. 3439. Indeed, the Supreme Court has made clear:

> Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities.... [T]he Government "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated...."

*Id.* at 799–800, 105 S.Ct. 3439 (citation omitted) (quoting *Greer v. Spock,* 424 U.S. 828, 836, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976)); *see also Faith Ctr. Church Evangelistic Ministries v. Glover,* 480 F.3d 891, 906–07 (9th Cir.2007). Accordingly, we apply a forum analysis to determine when the government has legitimate interests in restricting the use of a forum to certain intended purposes that outweigh a speaker's interest in using the forum for a different purposes. *Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439; *Faith Ctr.,* 480 F.3d at 907. "Forum analysis has traditionally divided government property into three categories: public fora, designated public fora, and nonpublic fora. Once the forum is identified, we determine whether restrictions on speech are justified by the requisite standard." *Faith Ctr.,* 480 F.3d at 907 (citation omitted).

[13] [14] On one end of the fora spectrum lies the traditional public forum, "places which by long tradition ... have been devoted to assembly and debate." *Perry,* 460 U.S. at 45, 103 S.Ct. 948; *accord Ark. Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 677, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). Next on the spectrum is the so-called designated public forum, which exists "[w]hen the government intentionally dedicates its property to expressive conduct." *Faith Ctr.,* 480 F.3d at 907. A designated public forum cannot exist in the absence of specific action on the part of the government. *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439 ("The government does not create a public forum by inaction or by permitting limited discourse, but only

by intentionally opening a nontraditional public forum for public discourse."). A content-based restriction on speech in a public or designated public forum is subject to strict scrutiny, requiring the state to show a compelling interest in the restriction that is drawn narrowly to meet that interest. *Perry,* 460 U.S. at 45, 103 S.Ct. 948. A content-neutral time, place, and manner restriction is permissible so long as it is "narrowly tailored to serve a significant government interest, and leave[s] open ample alternative channels of communication." *Id.; Faith Ctr.,* 480 F.3d at 907.

[15] At the opposite end of the fora spectrum is the non-public forum. The non-public forum is "[a]ny public property that is not by tradition or designation a forum for public communication." *Faith Ctr.,* 480 F.3d at 907. We subject speech restrictions in a non-public forum to less-exacting judicial scrutiny: "[A]s long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view," the government may preserve the forum for its intended purposes. *Perry,* 460 U.S. at 46, 103 S.Ct. 948.

[16] The government is not left with only the two options of maintaining a non-public forum or creating a designated public forum; if the government chooses to open a non-public forum, the First Amendment allows the government to open the non-public forum for limited purposes. **831 The "limited public forum is a sub-category of a designated public forum that 'refer[s] to a type of nonpublic forum that the government has intentionally opened to certain groups or to certain topics.' " *Hopper v. City of Pasco,* 241 F.3d 1067, 1074 (9th Cir.2001) (alteration in original) (quoting *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.,* 196 F.3d 958, 965 (9th Cir.1999)); *see also Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510 ("The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics."). But "[o]nce [a government] has opened a limited forum, ... [it] must respect the lawful boundaries its has itself set." *Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510. Specifically, the government "may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,' " *id.* (quoting *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439), "nor may [the government] discriminate against speech on the basis of its viewpoint," *id.; see also Faith Ctr.,* 480 F.3d at 907; *Cogswell v. City of Seattle,* 347 F.3d 809, 814 (9th Cir.2003).

**B.**

[17]    We conclude that the ASUM student election constitutes a limited public forum. While "the campus of a public university, at least for its students, possesses many of the characteristics of a public forum," *Widmar,* 454 U.S. at 267 n. 5, 102 S.Ct. 269, the forum in this case is not the University of Montana campus. Rather, because Flint challenges the limitations on speech within the confines of the ASUM election, whether the speech is delivered on campus or off, the relevant forum is the ASUM election itself, with its accompanying rules and regulations.[10]    *See Cornelius,* 473 U.S. at 801, 105 S.Ct. 3439 ("[I]n defining the forum we have focused on the access sought by the speaker."); *DiLoreto,* 196 F.3d at 965 ("The relevant forum is defined by the access sought by the speaker."). Although the ASUM election "is a forum more in a metaphysical than in a spatial or geographic sense," the forum analysis outlined above is equally applicable. *Rosenberger,* 515 U.S. at 830, 115 S.Ct. 2510; *see supra* note 5.

The ASUM election is not a traditional public forum: unlike parks and streets, it has not "by long tradition or by government fiat" been "devoted to assembly and debate." *Perry,* 460 U.S. at 45, 103 S.Ct. 948; *see also Forbes,* 523 U.S. at 678, 118 S.Ct. 1633 ("The Court has rejected the view that the traditional public forum status extends beyond its historic confines....").

The ASUM election also is not a designated public forum. "To create a forum of this type, the government must intend to make the property generally available to a class of speakers." *Forbes,* 523 U.S. at 678, 118 S.Ct. 1633 (internal quotation marks and citation omitted). "[G]overnment does not create a public forum by inaction or by permitting *limited* discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439 (emphasis added); *see also Planned Parenthood of S. Nev., Inc. v. Clark County Sch. Dist.,* 941 F.2d 817, 822 & n. 5 (9th Cir.1991) (en banc).

 *832    Here, the ASUM election provides for the selection of students to govern student affairs; the election does not provide University installations for outsiders to showcase ideas in general.[11]    Thus, the ASUM election exists to allow campaigns for student office and to elect student representatives to ASUM leadership positions in order to provide student candidates a valuable educational experience.

The ASUM Bylaws define campaigning "as any activity which directly or indirectly promotes the candidacy of one or more individuals for an office," including a candidate's personal appearances, the posting or publishing of advertisements, distribution of literature, lobbying voters, and the buying of votes with money, gifts, or alcohol. ASUM Bylaws art. V, § 2.A. While the Bylaws do not limit the *content* of campaign speech, the Bylaws certainly do not permit students or the general public to use the ASUM election system indiscriminately. *See Perry,* 460 U.S. at 47, 103 S.Ct. 948.

Thus, a careful review of the ASUM Constitution and the ASUM Bylaws shows the University's purpose of opening a limited public forum, in the form of the ASUM elections. *See Faith Ctr.,* 480 F.3d at 908 n. 8 ("A limited public forum is a sub-category of the designated public forum, where the government opens a nonpublic forum but reserves access to it for only certain groups or categories of speech."); *Hopper,* 241 F.3d at 1074 (same); *DiLoreto,* 196 F.3d at 965 (same); *see also Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510; *Ala. Student Party,* 867 F.2d at 1353 (Tjoflat, J., dissenting) (noting that regulations governing campaigns for student government at a university created a limited public forum). For example, a student's ability to participate in the forum as a candidate is selective and the standards are clear. To run for office, a student must be registered for seven or more credits during the fall and spring semesters, pay a student activity fee, and maintain at least a 2.0 cumulative grade point average. ASUM Const. art. 7, § 1. Only students registered for at least one credit are allowed to vote in the ASUM election. *Id.*

Furthermore, unmistakably clear standards govern campaigning within the forum. Under the ASUM Bylaws, campaign materials may be displayed only after the official campaigning period begins. *Id.* § 2.B. The Bylaws prohibit any door-to-door campaigning in University residence halls or family housing. Campaign speech may occur in a classroom only with the consent of the professor. *Id.* § 2.E. Posters may be placed in residence halls only with the approval of the residence hall office and in the University Center only with the approval of the University Center office. *Id.* § 2.F.2, 3. On the University campus itself, campaign materials may be posted only on kiosks. *Id.* § 2.F.4. And, of course, student candidates are not allowed to spend more than $100 promoting their campaign. There is nothing in the ASUM  *833   Constitution or Bylaws, or the record before us, to suggest that these limitations, save the expenditure limitation, do not apply equally to all who participate in a

221 Ed. Law Rep. 514, 07 Cal. Daily Op. Serv. 6274, 2007 Daily Journal D.A.R. 8268

student campaign, candidates and noncandidates alike. There is also no dispute that the University, through ASUM, applies these policies consistently. The spending limits have been in place since 1970, and Defendant Gale Price, who ran on a ticket with Flint in the 2003 election, was censured along with Flint for violating the spending limits. *See Hopper,* 241 F.3d at 1076 ("[C]onsistency in application is the hallmark of any policy designed to preserve the non-public status of a forum.").

In summary, the restrictions on who may participate as a candidate or voter, and the regulations of the manner in which the campaign is conducted, together demonstrate that the ASUM election constitutes a limited public forum. This forum exists solely to allow campaigns for ASUM student office and the election of student representatives, thereby providing an educational experience for the student candidates and student voters.

## C.

We now apply this framework to analyze the constitutionality of the campaign expenditure limitation. We must analyze whether the expenditure limitation is viewpoint neutral and reasonable given the purposes of the forum. *Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510; *Faith Ctr.,* 480 F.3d at 907; *Cogswell,* 347 F.3d at 814. Because government "must respect the lawful boundaries it has itself set" in opening a limited public forum, any restriction on speech which is not viewpoint neutral or is unreasonable, fails constitutional scrutiny. *Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510.

### 1.

**[18]** Viewpoint neutrality is the requirement that government not favor one speaker's message over another's regarding the same topic. When "government has excluded perspectives on a subject matter otherwise permitted by the forum," the government is discriminating on the basis of viewpoint. *Faith Ctr.,* 480 F.3d at 912. If certain speech "fall[s] within an acceptable subject matter otherwise included in the forum, the State may not legitimately exclude it from the forum based on the viewpoint of the speaker." *Cogswell,* 347 F.3d at 815. The Supreme Court has been clear that viewpoint discrimination occurs when the government "denies access to a speaker *solely* to suppress the point of view he espouses on an otherwise includible subject." *Cornelius,*

473 U.S. at 806, 105 S.Ct. 3439 (emphasis added); *see also Sammartano v. First Judicial Dist. Court,* 303 F.3d 959, 971 (9th Cir.2002) (recognizing that "where the government is plainly motivated by the nature of the message rather than the limitations of the forum or a specific risk within that forum, it is regulating a viewpoint"). "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger,* 515 U.S. at 828, 115 S.Ct. 2510.

**[19]** There is no dispute in this case that the spending limit applies equally to all ASUM student candidates, as do all other campaign restrictions. The district court was presented no evidence showing that the University, through the spending limit, is attempting to suppress a particular point of view in the context of the ASUM election. Conversely, as evidenced by Gale Price's censure, the record demonstrates that the spending limit is applied equally to all student candidates, regardless of their views.

**\*834** This case stands in contrast to *Rosenberger* and *Good News Club v. Milford Central School,* 533 U.S. 98, 107–08, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001), both of which involved viewpoint discrimination in a limited public forum. In *Rosenberger,* the Supreme Court found that by excluding funding to a student religious group solely because the religious group promoted a particular religious perspective, the university was discriminating in a limited public forum on the basis of that group's viewpoint. 515 U.S. at 829–37, 115 S.Ct. 2510. Examining this holding in *Faith Center,* we explained that, "[b]ecause other student publications were free to discuss the topic of religion from a myriad of views other than the prohibited perspective, the University had discriminated on the basis of viewpoint." 480 F.3d at 913. Similarly, in *Good News Club,* the Supreme Court found viewpoint discrimination where a public school excluded a Christian club from meeting on the school's grounds while permitting nonreligious groups to meet at the school. 533 U.S. at 107–09, 121 S.Ct. 2093. The religious club sought only to "address a subject otherwise permitted [in] the [limited public forum], the teaching of morals and character, from a religious standpoint." *Id.* at 109, 121 S.Ct. 2093. Thus, exclusion of the religious group from the forum amounted to impermissible viewpoint discrimination.

Here, no evidence suggests that the University's desire to limit student candidate spending results from a desire to suppress any student's viewpoint or that the limitation in any way suppresses a particular candidate's viewpoint. The $100 limit does not apply solely to vegetarians, pacifists and Marxists,

221 Ed. Law Rep. 514, 07 Cal. Daily Op. Serv. 6274, 2007 Daily Journal D.A.R. 8268

but not to meat-eaters, bellicists and fascists. Neither does the limit apply to candidates who might wish to abolish student government or at least intercollegiate athletics, but not to servile apple-polishers of the status quo or "jocks." Thus, the campaign expenditure limitation does not constitute viewpoint discrimination.

Flint's contentions do not persuade us to hold otherwise. Flint argues that the campaign expenditure limitation constitutes viewpoint discrimination because the limitation "[a]llow[s] noncandidate students, student associations and outside groups ... to speak with unlimited volume while limiting candidate speech."

The candidate/non-candidate distinction, however, is based on the *status* of the speaker, not on the speaker's viewpoint. The Supreme Court has held that in a non-public (or limited public) forum the government may "make distinctions in access on the basis of subject matter and *speaker identity.*" *Perry,* 460 U.S. at 49, 103 S.Ct. 948 (holding that allowing different access based on the status of one union as the exclusive representative for the school district was not viewpoint discrimination because it distinguished based upon status, not particular views) (emphasis added); *see also Ariz. Right to Life Political Action Comm. v. Bayless,* 320 F.3d 1002, 1009–10 (9th Cir.2003) (noting that a statute restricting the political speech of Political Action Committees but not candidates or other participants did not discriminate by viewpoint). Here, the spending limit is directed at the student candidates because they are the focus of the forum's purpose. Whether such focus is reasonable to achieve that purpose is our next inquiry.

### 2.

[20]   We are also satisfied that the candidate spending limit is reasonable. The reasonableness inquiry "focuses on whether the limitation is consistent with preserving the property [here the ASUM election] for the purpose to which it is dedicated." *DiLoreto,* 196 F.3d at 967; *see also Perry,* 460 U.S. at 50–51, 103 S.Ct. 948. Reasonableness **\*835** is not the legal equivalent of narrow tailoring or least restrictive means; indeed, the government's chosen method to preserve the character of a limited public forum "need not be the most reasonable or the only reasonable limitation." *Cornelius,* 473 U.S. at 808, 105 S.Ct. 3439; *accord Cogswell,* 347 F.3d at 817 ("[T]here is no requirement that a restriction in a limited public forum be narrowly tailored or the government's interest

be compelling for a restriction to be reasonable."). So long as the government can reasonably justify its regulation on speech in the limited public forum in light of the purposes of the forum, the regulation passes constitutional muster.

[21]   Since its inception, ASUM has been subject to the University of Montana's educational mission. ASUM's faculty advisor explained that ASUM exists for "essentially educational purposes." ASUM's Constitution declares that ASUM is "organized exclusively for educational and nonprofit purposes." ASUM Const. art. II, § 1. The election of student representatives to ASUM leadership positions is designed to help further the educational purpose of ASUM. The evidence before us clearly shows that the University views the spending limitation as vital to maintain the character of ASUM and its election process as an educational tool, rather than an ordinary political exercise. ASUM's senior faculty advisor explained that the spending limit was adopted in the revised ASUM Constitution of 1969–1970 "as a measure intended to defend ASUM against being steered away from its properly educational goals." The "primary intent" of the spending limits is "to prevent student government's being diverted by interests other than ones educational." It is thus obvious that the purpose of imposing the spending limit on student candidates is to serve pedagogical interests in educating student leaders at the University.

We find that the spending limits reasonably serve this pedagogical aim. ASUM exists to teach students responsible leadership and behavior. Imposing limits on candidate spending requires student candidates to focus on desirable qualities such as the art of persuasion, public speaking, and answering questions face-to-face with one's potential constituents. Students are forced to campaign personally, wearing out their shoe-leather rather than wearing out a parent's—or an activist organization's—pocketbook. Our conclusion is supported by the declaration of Gale Price, former ASUM President:

> Unlimited spending in ASUM elections also would change the nature of the election process as a learning experience. The spending limits mean that students have to figure out no-cost or low-cost ways of campaigning. They have to plan ahead to figure out their strategy, rather

221 Ed. Law Rep. 514, 07 Cal. Daily Op. Serv. 6274, 2007 Daily Journal D.A.R. 8268

than just dumping a lot of money into advertising materials at the last minute. They have to make decisions about allocating their resources effectively. Without spending limits, the well-off students would not have to face these constraints or make these kinds of decisions in the course of running for ASUM.

The spending limitation is thus consistent with the purpose of the limited public forum in providing student leaders an educational experience as they campaign for, and are elected to, student government. *See DiLoreto,* 196 F.3d at 967.[12]

Furthermore, it is reasonable for the University to confine this spending limitation to student candidates. Because the **\*836** purpose of ASUM is to provide an educational experience to those students who actively participate in the organization, it is reasonable for the University to limit the campaign expenditure limitation to student candidates. In *Perry,* where several teacher unions received different levels of access to a limited public forum, the Supreme Court explained that "[t]he differential access provided [the teacher unions] is reasonable because it is wholly consistent with the district's legitimate interest in 'preserv[ing] the property ... for the use to which it is lawfully dedicated.'" *460 U.S. at 50–51, 103 S.Ct. 948* (alterations in original) (quoting *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 129–30, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981)). Here too,

applying the spending limitation only to candidates helps preserve the nature of the ASUM election as an educational experience for those students actively participating therein. Even if not the best or most effective means of providing the student candidates the educational experience that the University seeks to provide through the ASUM elections, we are confident the spending limits reasonably serve the purpose of the forum. *See Cornelius,* 473 U.S. at 808, 105 S.Ct. 3439. In a limited public forum, the First Amendment requires nothing more.

## V.

By creating a student election process, the University of Montana has opened a limited public forum dedicated to allow campaigning for and election to leadership positions in student government. The University's purpose in opening such a forum is to provide student candidates and student voters a certain type of educational experience. We hold that imposing an expenditure limitation on student candidates is viewpoint neutral and serves to effectuate the purpose of the ASUM elections. We therefore affirm the district court's summary judgment in favor of defendants.

**AFFIRMED.**

**All Citations**

488 F.3d 816, 221 Ed. Law Rep. 514, 07 Cal. Daily Op. Serv. 6274, 2007 Daily Journal D.A.R. 8268

## Footnotes

1   Under a strict scrutiny analysis, government is required to show that its regulation of speech "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)

2   Under a rational relationship analysis, government may regulate speech "as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* at 46, 103 S.Ct. 948.

3   This case is distinguishable from *Students for a Conservative America v. Greenwood,* 378 F.3d 1129 (9th Cir.2004). There, we found the expungement exception inapplicable despite the students' request for expungement because the university did not keep records of election code violations. *Id.* at 1131. There was also no evidence in that case that the students were censured. In contrast, Flint was censured by ASUM, a school organization, in 2003 and denied his Senate seat in 2004 as is memorialized in ASUM Senate Meeting Minutes of April 28, 2004. Further evidence includes correspondence memorializing Flint's violation of the spending limit in 2004 from Kyle Engelson on behalf of the ASUM Senate. Furthermore, neither in its briefing nor during oral argument has the University rebutted Flint's assertion that it keeps records of Flint's 2003 censure and 2004 Senate seat denial.

221 Ed. Law Rep. 514, 07 Cal. Daily Op. Serv. 6274, 2007 Daily Journal D.A.R. 8268

4    Because we ultimately hold that ASUM's campaign expenditure limitations do not violate the First Amendment and therefore affirm the district court's grant of summary judgment to all defendants, we need not consider defendants' argument that the student defendants are not state actors.

5    That the ASUM student election system "is a forum more in a metaphysical than in a spatial or geographic sense" does not affect our analysis because the Supreme Court has made clear that forum analysis is equally applicable to both spatial and metaphysical fora. *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 830, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *see also Cornelius,* 473 U.S. at 800–02, 105 S.Ct. 3439 (rejecting contention "that a First Amendment forum necessarily consists of tangible government property" in applying forum analysis to a charitable contribution program); *Perry,* 460 U.S. at 46–47, 103 S.Ct. 948 (applying forum analysis to a school mail system) As more fully explained below, when the government opens a forum, such as a student election, the government retains the ability, within constitutional bounds, to limit the use of that forum to its intended purposes.

6    In *Buckley,* the Supreme Court struck down portions of the Federal Election Campaign Act of 1971 that limited campaign expenditures on behalf of candidates in federal election campaigns on the ground that such limitations violated the First Amendment. 424 U.S. at 58–59, 96 S.Ct. 612. The Court held that the governmental interests advanced in support of expenditure limitations would need to satisfy strict scrutiny, and did not do so. *See id.* at 44–45, 96 S.Ct. 612.

7    In *Welker v. Cicerone,* 174 F.Supp.2d 1055, 1065 (C.D.Cal.2001), a district court in our circuit addressed a similar campaign expenditure limitation on a university campus and held that *Buckley* was controlling because the court found no difference between a student election and a political election: "The court sees no reason to distinguish between applying *Buckley* to state political elections and political elections at state universities." We see the several differences detailed above between ASUM's elections and state and national political elections and therefore have no trouble making such a distinction.

8    Of further relevance in *Rosenberger* is the Court's clarification of *Widmar.* Specifically, the Court explained that *Widmar's* language regarding a university's freedom to make judgments as to allocation of scarce resources, language relied on by defendants here, is applicable to the university's own speech, but not to restrictions of third-party speech on a university campus:

> [In *Widmar* ], in the course of striking down a public university's exclusion of religious groups from use of school facilities made available to all other student groups, we stated: "Nor do we question the right of the University to make academic judgments as to how best to allocate scarce resources." 454 U.S. at 270, 102 S.Ct. 269. The quoted language in *Widmar* was but a proper recognition of the principle that *when the State is the speaker, it may make content based choices.* ... It does not follow, however, and we did not suggest in *Widmar,* that viewpoint-based restrictions are proper when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers.

> 515 U.S. at 833–34, 115 S.Ct. 2510 (emphasis added). We are presented in this case not with the speech of the University of Montana but with the speech of students involved in campaigning for student government. Here, it is Flint's spending of his own money that was regulated, not University funds or subsidies to Flint. Thus, contrary to defendants' assertions, *Widmar's* reference to broad deference is not determinative.

9    Given that the speech at issue in this case is not "school-sponsored," *see supra* note 8, we need not consider whether the principles of *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), apply with full force in a university setting—a question neither we, *see Brown v. Li,* 308 F.3d 939, 957 (9th Cir.2002) (Reinhardt, J., concurring in part and dissenting in part), nor the Supreme Court, *Hazelwood,* 484 U.S. at 273 n. 7, 108 S.Ct. 562, have definitively answered. Our sister circuits are split on the question. *Compare Kincaid v. Gibson,* 236 F.3d 342, 352 (6th Cir.2001) (en banc), *and Student Gov't Ass'n v. Bd. of Trs. of Univ. of Mass.,* 868 F.2d 473, 480 n. 6 (1st Cir.1989) ("*Hazelwood* ... is not applicable to college newspapers."), *with Hosty v. Carter,* 412 F.3d 731, 734–38 (7th Cir.2005) (en banc) (applying *Hazelwood* to university context), *and Ala. Student Party v. Student Gov't Ass'n of the Univ. of Ala.,* 867 F.2d 1344, 1346–47 (11th Cir.1989) (same). *Hazelwood* addressed whether a high school was required affirmatively to promote particular speech by allowing the speech's inclusion in a school newspaper. 484 U.S. at 266–74, 108 S.Ct. 562. Here, we are presented with student campaign speech in a forum opened by the University. This is a scenario in which the University is not sponsoring, as in *Hazelwood,* any of the candidates' speech but is *allowing* the campaign-related speech. We note that *Hazelwood* reinforces the conclusion that we must analyze the ASUM expenditure limitations within the confines of traditional forum analysis. In *Hazelwood,* the Supreme Court first determined that the high school student newspaper at issue was not a public forum for expression and concluded that in the specific setting of a high school, the school could "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273, 108 S.Ct. 562.

221 Ed. Law Rep. 514, 07 Cal. Daily Op. Serv. 6274, 2007 Daily Journal D.A.R. 8268

Here, the University seeks to avoid the threshold question—namely, what type of forum is the ASUM election—and asks us to defer to its reasonable, educational related regulations. As shown, neither the Supreme Court's nor this court's precedents permit such avoidance.

10   While the spending limit is found in the ASUM Bylaws, the limitation is nonetheless one imposed by the government on the forum. The University, as required by Board of Regents policy, has established ASUM as the associated student organization on the campus. Neither party disputes that the forum and the associated limitations are attributable to the University.

11   This is in contrast to *Widmar,* where the state university had "created a forum generally open for use by student groups," 454 U.S. at 267, 102 S.Ct. 269, by "routinely provid[ing] University facilities for the meetings of registered organizations," *id.* at 265, 102 S.Ct. 269. The ASUM election is akin, rather, to the forum in *Perry.* There, the Supreme Court rejected the contention that a school mail system was a designated public forum because "there [was] no indication in the record that the school mailboxes and interschool delivery system are open for use by the general public." 460 U.S. at 47, 103 S.Ct. 948; *see also Forbes,* 523 U.S. at 680, 118 S.Ct. 1633 (holding that a candidate debate was not a designated public forum because the station broadcasting the debate "reserved eligibility for participation in the debate to candidates" and made "determinations as to which of the eligible candidates would participate in the debate").

12   Flint contends that the expenditure limitation teaches students "that the First Amendment doesn't protect political speech [and] how not to conduct elections in a free society." Aside from its obvious hyperbole, this argument is not persuasive. So long as the purported educational goal of the expenditure limitation—here, a lesson in strategy, campaigning, and leadership—is reasonably capable of fruition, any additional "lessons" that students like Flint might learn do not affect the reasonableness, and thus the constitutionality, of ASUM's regulations. Furthermore, nothing in the First Amendment requires universities to set up student elections to mimic exactly political elections and political fund-raising. It is beyond dispute that government may impose reasonable, viewpoint neutral restrictions even on pure political speech in limited public forums. *See Ark. Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 678–83, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998); *Cogswell,* 347 F.3d at 814–18 (finding voter pamphlets a limited public forum and holding that a limitation on candidate's statements in voter pamphlets is viewpoint neutral and reasonable in light of the purpose of the forum).

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Doe v. Purdue University, N.D.Ind., November 15, 2017

173 F.Supp.3d 586
United States District Court,
S.D. Ohio, Western Division.

John DOE I and John Doe II, Plaintiffs,

v.

UNIVERSITY OF CINCINNATI, et al., Defendants.

Case No. 1:15-CV-681
|
Signed March 23, 2016

**Synopsis**

**Background:** Male former undergraduate and law students at state university, who were charged in separate incidents with violating university's code of conduct by sexually assaulting female students, brought action against university and university officials, alleging under § 1983 that administrative review committee (ACR) procedures were grossly inadequate to protect their due process rights and that they were discriminated against on basis of their gender, in violation of Title IX. Defendants moved to dismiss for lack of subject matter jurisdiction and for failure to state claim.

**Holdings:** The District Court, Sandra S. Beckwith, J., held that:

[1] Eleventh Amendment barred claim for declaratory relief against university and officials in their official capacities;

[2] law student's graduation did not render his claims moot;

[3] alleged procedural defects in students' first disciplinary hearings were harmless;

[4] allegedly inadequate sexual assault training provided to staff members and pressure allegedly exerted on universities by Department of Education fell short of creating reasonable inference that ACR panels were biased;

[5] ACRs' acceptance of victim impact statements before finding that students violated code of conduct did not violate procedural due process;

[6] officials were entitled to qualified immunity from due process claim; and

[7] students failed to show that defendants' actions in connection with disciplinary process were motivated by gender bias, as would violate Title IX.

Motion granted.

West Headnotes (40)

**[1]** **Federal Courts**
🔑 Higher education; colleges and universities

State university was arm of the state, and thus Eleventh Amendment barred former university students' claim for declaratory relief against university and individual university employees, in their official capacities, in students' § 1983 action alleging that they were denied due process in connection with disciplinary proceedings. U.S. Const. Amends. 11, 14; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[2]** **Federal Courts**
🔑 Suits Against States; Eleventh Amendment and Sovereign Immunity

**Federal Courts**
🔑 Arms of the state in general

**Federal Courts**
🔑 Agencies, officers, and public employees

Eleventh Amendment bars suits for money damages against states, arms of the state, and state employees in their official capacities. U.S. Const. Amend. 11.

1 Cases that cite this headnote

**[3]** **Federal Courts**
🔑 Pleadings and motions

Party moving to dismiss for lack of subject matter jurisdiction is generally not permitted to raise new arguments in its reply brief. Fed. R. Civ. P. 12(b)(1).

**[4]** **Federal Courts**
🔑 Mootness

**Federal Courts**
🔑 Sua sponte determination

Federal courts lack subject matter jurisdiction to adjudicate moot claims, and courts may sua sponte raise the question of their own subject matter jurisdiction.

**[5]** **Federal Courts**
🔑 Education

Student's graduation from state university's law school did not render moot his Title IX claims for alleged past gender discrimination in connection with disciplinary proceedings on charge that he sexually assaulted female student, or his § 1983 due process claims alleging past due process violations, since student was not seeking reinstatement as form of injunctive relief. 42 U.S.C.A. § 1983; Education Amendments of 1972 § 901 et seq., 20 U.S.C.A. § 1681 et seq.

**[6]** **Constitutional Law**
🔑 Discipline, suspension, or expulsion

**Education**
🔑 Proceedings and review

State university student faced with expulsion or other discipline for violating school rules is entitled to due process before he can be deprived of his interest in continuing his education. U.S. Const. Amend. 14.

**[7]** **Constitutional Law**
🔑 Disciplinary proceedings

**Education**
🔑 Proceedings and review

In due process context, there are no precise parameters for the amount of process state university student faced with expulsion or other discipline for violating school rules is due before discipline can be imposed; minimum requirements are that student must be given some kind of notice and afforded some kind of hearing. U.S. Const. Amend. 14.

2 Cases that cite this headnote

**[8]** **Constitutional Law**
🔑 Disciplinary proceedings

**Education**
🔑 Proceedings and review

To satisfy due process, state university student faced with expulsion or other discipline for violating school rules generally must be provided an explanation of the evidence against him and an opportunity to present his side of the story; beyond that, the type of notice and hearing will vary and be judged for sufficiency based on context in which the dispute arose. U.S. Const. Amend. 14.

**[9]** **Constitutional Law**
🔑 Disciplinary proceedings

Schools are not required to employ procedures used in criminal trials in order to satisfy due process with respect to disciplinary proceedings. U.S. Const. Amend. 14.

1 Cases that cite this headnote

**[10]** **Constitutional Law**
🔑 Disciplinary proceedings

**Education**
🔑 Proceedings and review

Alleged procedural defects in male state university students' first disciplinary hearings before administrative review committee (ACR), arising from charges that students violated university's code of conduct by sexually assaulting female students, were harmless, and thus could not form basis of students' § 1983 due process claim; students' appeals were sustained and they both received new hearings. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[11]** **Constitutional Law**

🔑 Disciplinary proceedings

In procedural due process context, school disciplinary boards must of course be impartial, but they are entitled to a presumption of honesty and impartiality absent a showing of actual bias. U.S. Const. Amend. 14.

4 Cases that cite this headnote

[12]  Civil Rights
🔑 Education

To satisfy procedural due process, alleged bias of school disciplinary board must be evident from the record and not based on inference and speculation. U.S. Const. Amend. 14.

3 Cases that cite this headnote

[13]  Constitutional Law
🔑 Disciplinary proceedings

Education
🔑 Proceedings and review

State university student alleging procedural due process violations in connection with disciplinary proceedings must allege facts sufficient to overcome presumption of honesty and impartiality, such as statements by board members or university officials indicating bias or a pattern of decision-making suggesting that gender was an influence. U.S. Const. Amend. 14.

9 Cases that cite this headnote

[14]  Constitutional Law
🔑 Disciplinary proceedings

Education
🔑 Proceedings and review

Allegedly inadequate sexual assault training provided to state university staff members and pressure allegedly exerted on universities by Department of Education to intensify their response to sexual assault complaints fell short of creating reasonable inference that administrative review committee (ACR) panels in male university students' disciplinary proceedings, arising from charges that they violated university's code of conduct by sexually

assaulting female students, were biased, as would support students' § 1983 procedural due process claim. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

[15]  Constitutional Law
🔑 Disciplinary proceedings

Education
🔑 Proceedings and review

Acceptance of hearsay evidence by administrative review committees (ACR) which presided over male state university students' disciplinary proceedings, arising from charges that they violated university's code of conduct by sexually assaulting female students, without permitting students to "effectively" cross-examine witnesses, did not violate students' procedural due process rights; students failed to explain how additional cross-examination of hearsay witnesses would have lowered risk that students would have been erroneously disciplined. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

[16]  Constitutional Law
🔑 Disciplinary proceedings

In procedural due process context, there is no prohibition against the use of hearsay evidence in school disciplinary hearings. U.S. Const. Amend. 14.

3 Cases that cite this headnote

[17]  Constitutional Law
🔑 Disciplinary proceedings

Education
🔑 Proceedings and review

Administrative review committees' (ACR) acceptance of victim impact statements before finding in disciplinary proceedings that male state university students violated university's code of conduct by sexually assaulting female students did not violate students' procedural due process rights; ARCs were not bound by formal

rules of evidence or rules of criminal procedure. U.S. Const. Amend. 14.

**[18]** **Constitutional Law**
🔑 Disciplinary proceedings
**Education**
🔑 Proceedings and review

Male state university students' bare allegation in their complaint that administrative review committee (ACR) improperly applied student code of conduct's definition of "consent," in finding that students had violated code by sexually assaulting female students, failed to state § 1983 claim for violation of their procedural due process rights. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[19]** **Constitutional Law**
🔑 Disciplinary proceedings

Allegation that a state university's disciplinary board violated its own policies and procedures in connection with a student's disciplinary proceedings does not state claim for procedural due process violation. U.S. Const. Amend. 14.

4 Cases that cite this headnote

**[20]** **Administrative Law and Procedure**
🔑 Erroneous or unreasonable construction; conflict with rule or statute

Federal courts generally must defer to a state agency's interpretation of its own rules and regulations absent a compelling demonstration that it is wrong.

**[21]** **Constitutional Law**
🔑 Disciplinary proceedings
**Education**
🔑 Proceedings and review

Administrative review committee (ACR) did not violate male state university students' procedural due process rights by requiring students to submit written questions to panel chair, rather

than cross-examining adverse witnesses, in disciplinary proceedings arising from charges that they violated university's student code of conduct by sexually assaulting female students. U.S. Const. Amend. 14.

**[22]** **Constitutional Law**
🔑 Disciplinary proceedings
**Education**
🔑 Proceedings and review

Male state university students were not entitled to assistance of attorney or advisor at disciplinary proceedings arising from charges that they violated university's student code of conduct by sexually assaulting female students, and thus administrative review committee's (ACR) refusal to permit students' advisors from participating in hearing did not violate procedural due process, absent evidence that university presented its case with assistance of attorney or that rules were unusually complex. U.S. Const. Amend. 14.

**[23]** **Constitutional Law**
🔑 Procedural due process in general

Due Process Clause sets only the floor or lowest level of procedures acceptable. U.S. Const. Amend. 14.

**[24]** **Civil Rights**
🔑 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Public official is entitled to "qualified immunity," and thus shielded from suit under § 1983 for his actions, if his conduct does not violate a clearly established statutory or constitutional right of which a reasonable official would have known. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[25]** **Civil Rights**
🔑 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

In order for qualified immunity to shield official from suit under § 1983, contours of right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

[26]   **Civil Rights**

👉 Good faith and reasonableness;  knowledge and clarity of law;  motive and intent, in general

Official is only entitled to qualified immunity from suit under § 1983 for actions taken in objective good faith within the scope of his duties. 42 U.S.C.A. § 1983.

[27]   **Civil Rights**

👉 Good faith and reasonableness;  knowledge and clarity of law;  motive and intent, in general

If a violation of a constitutional right can be made out based on a favorable view of the pleadings, court must determine whether the right at stake was clearly established, for qualified immunity purposes in § 1983 action. 42 U.S.C.A. § 1983.

[28]   **Civil Rights**

👉 Good faith and reasonableness;  knowledge and clarity of law;  motive and intent, in general

In determining whether a constitutional right is "clearly established," for qualified immunity purposes in § 1983 action brought in the Sixth Circuit, court must find binding decisions from the Supreme Court, the Sixth Circuit Court of Appeals, or finally, decisions of other circuit courts. 42 U.S.C.A. § 1983.

[29]   **Civil Rights**

👉 Good faith and reasonableness;  knowledge and clarity of law;  motive and intent, in general

It is only the extraordinary case that will require a reviewing court to look beyond Supreme Court and Sixth Circuit decisions to determine whether a right is clearly established, for qualified immunity purposes in § 1983 action. 42 U.S.C.A. § 1983.

[30]   **Civil Rights**

👉 Defenses;  immunity and good faith

Questions of whether right alleged to have been violated is clearly established, and whether official reasonably could have believed that his conduct was consistent with claimed right, are ones of law for the court, in analyzing issue of qualified immunity in § 1983 action. 42 U.S.C.A. § 1983.

[31]   **Federal Civil Procedure**

👉 Civil rights cases in general

If genuine issues of material fact exist as to whether an official committed the acts that would violate a clearly established right, then dismissal of § 1983 claim based on qualified immunity is improper at summary judgment stage. 42 U.S.C.A. § 1983; Fed. R. Civ. P. 56.

[32]   **Civil Rights**

👉 Defenses;  immunity and good faith

When a defendant raises qualified immunity as a defense in § 1983 action, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

[33]   **Civil Rights**

👉 Schools

State university and university officials were entitled to qualified immunity from § 1983 procedural due process claims brought by male former students, who were charged with violating university's code of conduct by sexually assaulting female students, alleging that they did not receive adequate procedural protections at their disciplinary hearings; it was not clearly established that students were entitled to individual procedural protections they claimed, including assistance of advisor and cross-examination of witnesses. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[34]** **Civil Rights**

👉 Sex Discrimination

Title IX gender discrimination claims apparently may be sorted into four broad categories: erroneous outcome, selective enforcement, deliberate indifference, and archaic assumptions. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a).

**[35]** **Civil Rights**

👉 Sex Discrimination

In an "erroneous outcome" gender discrimination case under Title IX, the plaintiff contends that the outcome of the disciplinary proceeding was erroneous due to gender bias. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a).

7 Cases that cite this headnote

**[36]** **Civil Rights**

👉 Sex Discrimination

In a "selective enforcement" gender discrimination case brought against a university under Title IX, the plaintiff alleges that the university treated a similarly-situated member of the opposite sex more favorably than the plaintiff. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a).

1 Cases that cite this headnote

**[37]** **Civil Rights**

👉 Sex Discrimination

In a "deliberate indifference" gender discrimination case brought against a university under Title IX, the plaintiff alleges that a university official who had authority to implement corrective measures had actual notice of but was deliberately indifferent to misconduct directed at the plaintiff. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a).

**[38]** **Civil Rights**

👉 Sexual harassment; sexually hostile environment

Title IX gender discrimination claim under deliberate indifference theory seems for the most part to be limited to sexual harassment cases. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a).

1 Cases that cite this headnote

**[39]** **Civil Rights**

👉 Sex Discrimination

In an "archaic assumptions" gender discrimination case brought against a university under Title IX, the plaintiff contends that the university's actions were founded on archaic assumptions about men and women. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a).

1 Cases that cite this headnote

**[40]** **Civil Rights**

👉 Discrimination against males

Male students who were subject to disciplinary action after being charged in separate incidents with violating state university's student code of conduct by sexually assaulting female students failed to establish that university's actions, including barring students from accessing certain campus buildings during pendency of their hearings, not permitting cross-examination of witnesses, and denying students' request for advisor, were motivated by gender bias, as would support Title IX gender discrimination claim; at worst, university's actions were biased in favor of alleged victims of sexual assault and against students accused of sexual assault. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a); 34 C.F.R. § 668.46(b)(11)(v).

12 Cases that cite this headnote

**Attorneys and Law Firms**

**\*591** Joshua A. Engel, Engel & Martin, LLC, Mason, OH, for Plaintiffs.

Rosemary Doreen Canton, Evan T. Priestle, Taft Stettinius & Hollister, LLP, Cincinnati, OH, for Defendants.

ORDER

Sandra S. Beckwith, Senior United States District Judge

This matter is before the Court on the motion to dismiss filed by Defendants University of Cincinnati, Daniel Cummins, Denine M. Rocco, and Debra Merchant. Doc. No. 11. For the reasons that follow, Defendants' motion to dismiss is well-taken and is **GRANTED**.

I. Background

Plaintiffs John Doe I and John Doe II were charged in separate incidents with violating the University of Cincinnati's ("UC") Student Code of Conduct by sexually assaulting a female student. After hearings before the Administrative Review Committee ("ARC"), Doe I and Doe II were found "responsible" for the charged violation. Doe I received a three-year suspension but ultimately transferred to another educational institution. Doe II was placed on disciplinary probation and banned from several buildings on campus for a one-year period. Doe II was also required to submit a seven-page research paper. Doe II, however, was allowed to remain enrolled in school; he completed his post-graduate degree and has graduated from UC.

Doe I and Doe II claim that the ARC hearing procedures were grossly inadequate to protect their right to due process. Doe I and Doe II also allege that where claims of sexual assault are concerned, the ARC hearing procedures are skewed in favor of the female complainant and against the male respondent with the purpose of producing outcomes allegedly favored by the U.S. Department of Education so as to preserve UC's federal funding. Doe I and Doe II allege, therefore, that Defendants have violated their right to due process and have discriminated against them on the basis of gender **\*592** in violation of Title IX of the Education Amendments Act of 1972.

For purposes of the instant motion to dismiss, the Court accepts the following facts from the complaint as being true.

A. John Doe I

In March 2014, Doe I was a junior at UC's Blue Ash campus. On March 9, 2014, Doe I left a party held near campus with Jane Roe I and Jane Roe II. Doe I went with Roe I and Roe II to their dormitory room at Daniels Hall. Doe I claims that Roe I and Roe II were intoxicated and had been smoking marijuana. Roe I claimed that she fell asleep and awoke to find Doe I attempting to have sexual intercourse with her. Roe I claimed that she told Doe I "no" and then fled the room. Doe I then allegedly got into bed with Roe II and had intercourse with her while she was passed out. Doe I denies that he sexually assaulted Roe I and Roe II.

Doe I claims that Roe I and Roe II gave inconsistent statements about this incident to UC administrative officials and to the UC Police. For instance, Doe I alleges that Roe I gave inconsistent statements about whether she had smoked marijuana that night. Additionally, Roe I told the UC police that she changed clothes in front of Doe I and then Doe I got into bed with her but later gave a statement saying that she fell asleep and awoke to find Doe I on top of her. Roe II allegedly denied being intoxicated in her complaint to UC but later stated that she could not remember significant events before she passed out. Roe II also told the UC Police that she rated her intoxication level as "8 of 10." Additionally, Roe II allegedly gave inconsistent statements about whether she passed out before or after Doe I penetrated her.

Doe I claims that he cooperated with the police investigation and that there was substantial evidence that exonerated him. For instance, despite Roe I's claim that she did not know how Doe I got into her dormitory, and Roe II's claim that dormitory staff let Doe I into the building even though he did not have identification, security camera video shows that Roe I waited while Roe II signed Doe I into the dorm. Additionally, although Roe II said during the ARC hearing that she had passed out and did not remember walking back to the dorm because she was "so high and intoxicated," neither Roe I nor Roe II appear intoxicated in the surveillance video. Additionally, forensic evidence showed that Roe I and Roe II sent text messages during the time they supposedly were passed out. In later messages, they joked about the case. Another female student who was present at the time denied witnessing any illegal conduct. Doe I believes that rape kits

submitted to the crime lab for analysis support his version of the events.

Doe I alleges that high-placed UC officials tried to interfere with the criminal investigation. An email from the UC Police Chief to UC's general counsel expressed concern that "we are allowed to conduct a thorough and complete investigation without any appearance of influence." Complaint ¶ 58(a) (emphasis in original omitted). Doe I also alleges that UC detectives became frustrated that the UC's general counsel was trying to steer, obstruct, and impede their investigation.

Doe I alleges that Defendant Dan Cummins, who is UC's Assistant Dean of Students and Director of the Office of Judicial Affairs, instituted disciplinary proceedings against him without investigating whether the allegations of sexual assault against him were credible. Cummins notified Doe I of the charges by letter on March 12, 2014. Cummins and Doe I had an in-person meeting on March 28, 2014 to discuss the allegations. Doe I denied the allegations but otherwise exercised his right to remain silent. Cummins asked Doe I to sign a form stating that he had received the evidence **\*593** supporting the allegation although he was not actually provided with any evidence during the meeting.

Cummins scheduled an ARC disciplinary hearing before actually interviewing any witnesses. Cummins initially scheduled the hearing for April 7, 2014 but later moved it to May 2, 2014. On April 28, 2014, Cummins issued a written report finding as a "fact" that Doe I had engaged in sexual activity with Roe I and Roe II without their consent. Doe I claims that Cummins's report had a number of significant omissions:

1. It did not include a review of any of the physical evidence obtained by UC police.

2. It did not include Doe I's statements to the UC police.

3. It did not include a statement from an Ohio University student who witnessed Roe I and Roe II being "pretty flirtatious" with Doe I and said that Roe I and Roe II "basically dragged" Doe I back to their dorm.

4. Cummins did not attempt to obtain from the UC Police any evidence that tended to exonerate him, such as the surveillance tape and text messages.

Doe I claims that UC made no attempt to provide an impartial hearing panel and that the hearing convened on May 2, 2014

was a "kangaroo court." Doe I alleges, for instance, that prior to the hearing, committee member Carol Tong-Mack had been copied on emails requesting academic accommodations for Roe I because she "had recently been the victim of a crime." Roe I also copied Tong-Mack on an email to another professor in which she stated that she had been sexually assaulted in her dorm room. Doe I alleges that after receiving these emails, it was inappropriate for Tong-Mack to remain on the hearing panel.

Doe I claims that Cummins and/or UC denied him of a number of procedural protections during the ARC hearing:

1. UC never responded to requests from Doe I's attorney to have the UC police investigator present at the hearing.

2. UC only provided Doe I a heavily redacted copy of the investigative file.

3. UC did not provide the results of the rape kit analysis or of the SANE examinations. [1]

4. Cummins did not allow Doe I to record the hearing.

5. The hearing committee chair would not permit Doe I to impeach a witness, Roe I's boyfriend, who lacked firsthand knowledge of the incident.

6. The hearing committee chair did not permit Doe I to show the surveillance video.

7. The hearing committee chair would not accept the UC police report into evidence.

8. The hearing committee chair would not accept the text messages into evidence.

9. The hearing committee chair would not accept the rape kit analysis or the SANE examinations into evidence.

10. The hearing committee chair refused to ask witnesses written questions submitted by Doe I.

11. The hearing committee chair refused Doe I's request to obtain the presence of the UC police officers.

**\*594** 12. The hearing committee refused to consider a binder of evidence Doe I submitted on his behalf.

Doe I alleges on information and belief that Cummins orchestrated the hearing committee's actions since the hearing committee chair left the room on a number of occasions, stating that he had to consult with Cummins. The ARC

committee found that Doe I violated the Student Code of Conduct with respect to one of the students. Doe I states that he left before the conclusion of the hearing regarding the second student since it was clear to him that he would not be afforded due process.

Less than a week later, UC determined that substantial procedural errors had occurred during Doe I's hearing and ordered that a new hearing take place. The new hearing was held on May 18-19, 2015. While not a "kangaroo court," Doe I alleges that he was still denied significant procedural protections during the second hearing:

1. The hearing committee considered Cummins's alleged biased investigative report.

2. The hearing committee was never advised that the complainant had the burden of proof and that Doe I was innocent until proven guilty.

3. The hearing committee refused to ask the complainants a number of written questions submitted by Doe I designed to highlight inconsistencies in their statements and to discover the extent of their alcohol and drug use on the night in question.

4. UC denied Doe I permission to make his own recording of the hearing.

5. UC failed to provide him with the assistance of a university advocate to the same extent as the complainants.

6. The hearing committee heard "impact statements" from the complainants before determining whether Doe I was guilty of violating the Student Code of Conduct.

7. UC failed to provide Doe I with clarification of the rules of evidence that would be utilized during the hearing.

8. UC failed to provide the hearing committee with information concerning the academic accommodations extended to the complainants. Doe I contends that such information might have affected the committee's assessment of their credibility.

The hearing committee found Doe I "responsible" for violating the Code of Conduct with regard to Roe II but "not responsible" for a violation regarding Roe I. The University Appeal Administrator rejected Doe I's appeal, including Doe I's contention that the panel erroneously assigned the

burden of proof and/or failed to afford him the presumption of innocence. Specifically, the Appeal Administrator wrote, "Neither party has the burden of proof. Instead, the ARC uses the hearing to investigate what happened and then makes a finding based on a preponderance of the evidence." Complaint ¶ 81(b). Defendant Rocco affirmed this decision. Because the ARC's decision was affirmed, Doe I now faces a three-year suspension from UC.

### B. John Doe II

Doe II is a former law student at UC. He has graduated from the law school. In March 2014, Defendant Cummins apparently received a complaint from Jane Roe III that she had been sexually assaulted by Doe II at an off-campus location. Cummins filed a report with the UC Police, allegedly against Roe III's wishes, and then sent Doe II a notice that he had been accused of violating the Student Code of Conduct. When Doe II protested that the alleged incident occurred outside of the jurisdictional bounds of the Code of Conduct-within 2,600 feet of campus-Cummins **\*595** invoked a provision of the Code in which UC will assert jurisdiction over incidents outside of the 2,600 foot radius "when the student, in the university's sole judgment, poses an obvious threat of serious harm to any member of the university community." Complaint ¶ 87. Doe II's allegations otherwise are similar to Doe I's allegations.

Doe II complains that UC extended accommodations to Roe III and otherwise pre-judged his guilt on the complaint by treating her as a victim. For instance, the complaint notes, Cummins contacted Roe III's thesis advisor to request accommodations for her because she "has recently been the victim of behavior that violates our sexual harassment policy." Cummins allegedly sent this email before he notified Doe II of the allegations. UC also provided Roe III with a job at the UC Women's Center. Additionally, UC banned Doe II from entering a number of campus buildings based solely on the allegation that he had violated the Code of Conduct. Finally, Cummins allegedly prepared a report on the alleged incident without conducting any investigation into the matter and then denied Doe II access to his report.

Cummins ultimately scheduled Doe II's ARC hearing for April 22, 2014. Doe II's advisor, however, had a conflict with that date but Cummins refused to reschedule the hearing. As a result, Doe II's advisor had to leave the hearing early.

Doe II claims that the ARC panel committed a number of other alleged procedural errors:

1. The panel heard a victim impact statement before determining whether a violation had occurred.

2. The panel did not apply the definition of consent provided by UC's Title IX policy.

3. The panel permitted a witness to make legal conclusions, such as that Doe II had "raped" Roe III and "assaulted" her.

4. Panel members pre-judged the conclusion as indicated by the notes they took during the hearing.

5. The panel did not have adequate definitions of "consent" and "intoxication" and did not provide Doe II an adequate opportunity to prepare for a claim of nonconsensual sexual contact due to intoxication.

6. The panel permitted the complainant to argue that Doe II did not obtain consent through each stage of the encounter although the Code of Conduct does not explicitly impose that requirement.

7. Doe II was not permitted to effectively cross-examine witnesses because questions had to be submitted in writing and no follow-up was possible.

8. Doe II was not given effective assistance of an attorney or advisor because the advisor was not permitted to participate in the hearing.

9. The panel relied on unreliable hearsay testimony.

10. Roe III claimed during the hearing that she was too intoxicated to consent but the panel did not receive any evidence to show that she was "physically incapacitated such that the person cannot understand the fact, nature, or extent of the sexual situation."

The panel found Doe II guilty of violating the Code of Conduct. However, like Doe I, Doe II's appeal was sustained and he was granted a new hearing. The second hearing took place in October 2014. According Doe II, the second hearing was infected with many if not most of the procedural defects of his first hearing. In addition, however, during her impact statement, Roe III told Doe II that he was a "rapist" and that he "was going to Hell." Roe III then called the proceeding "a joke" and "stormed out of the hearing." **\*596** Thus, Doe II was unable to cross-examine her.

The panel again found Doe II guilty of violating the Student Code of Conduct. He was not permitted to appeal this decision. As stated above, Doe II was placed on disciplinary probation and required to complete and submit a seven-page research paper. Although Doe II has since graduated from UC, he states that he "may" have difficulty obtaining employment due to the finding of responsibility. Additionally, Doe II fears that his disciplinary record may affect his eligibility to become an attorney in other states.

C. Alleged Gender Discrimination

Plaintiffs both allege that UC's disciplinary system, insofar as it concerns claims of sexual assault, is rigged against male students accused of sexual misconduct. Plaintiffs contend that UC's handling of sexual assault complaints is influenced by a "Dear Colleagues" letter issued by the Department of Education. According to the complaint, the Dear Colleagues letter caused colleges and universities to reduce the procedural protections previously afforded to students accused of sexual misconduct because of an implicit or explicit threat of a federal investigation into institutions who fail to comply with the requirements of the letter as well as the loss of federal funding. Additionally, Plaintiffs allege that the training on sexual assault provided to UC's faculty and staff causes them to be biased against males accused of sexual misconduct and predisposes them to finding males guilty of misconduct. Plaintiffs allege that their allegations are supported by statistics showing that "it is nearly impossible for a student to be found not responsible."

II. The Parties and the Claims

A. The Parties

As indicated above, the Plaintiffs are John Doe I and John Doe II. John Doe I was a junior at UC's Blue Ash campus but transferred to another institution after he was suspended from UC. John Doe II was a law student who has graduated from UC since the imposition of the disciplinary probation.

Defendant University of Cincinnati is a public university created by the Ohio legislature.

Defendant Daniel Cummins is UC's Assistant Dean of Students and Director of the Office of University Judicial affairs. Cummins is allegedly responsible for administrating the Student Code of Conduct and Judicial System. Plaintiffs sue Cummins in his official capacity for declaratory and injunctive relief and in his personal capacity for damages.

Defendant Debra Merchant is UC's Vice President of Student Affairs. Merchant is also allegedly responsible for administrating the Student Code of Conduct and Judicial System. Plaintiffs sue Merchant in her official capacity for declaratory and injunctive relief and in her personal capacity for damages.

Defendant Denine Rocco is an assistant Vice President and Dean of Students for UC. Rocco is allegedly responsible for administrating the Student Code of Conduct and Judicial System. Plaintiffs sue Rocco in her official capacity for declaratory and injunctive relief and in her personal capacity for damages.

## B. The Claims

Count I seeks a declaratory judgment under 42 U.S.C. § 1983 that Defendants violated Plaintiffs' right to due process under both the federal and state constitutions with the procedures employed during their ARC hearings.

Count II is a claim for money damages pursuant to 42 U.S.C. § 1983 against Defendants Cummins, Merchant, and Rocco **\*597** in their individual capacities for allegedly violating Plaintiffs' right to due process.

Count III seeks a declaratory judgment that UC violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq., because Plaintiffs' gender was a motivating factor in the manner in which the allegations against them were investigated and adjudicated, and in the discipline they received.

Count IV seeks money damages against UC for its alleged violations of Title IX.

Count V seeks an injunction against Cummins, Merchant, and Rocco in their official capacities which would prohibit them from imposing or reporting any disciplinary action taken against Plaintiffs under the Student Code of Conduct.

## III. Defendants' Motion to Dismiss

Defendants now move to dismiss Plaintiffs' complaint pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Defendants contend that Plaintiffs' claim for a declaratory judgment in Count I is barred by Eleventh Amendment sovereign immunity. Defendants contend that Doe II's claims in Counts I, III, and V are barred on res judicata grounds. Defendants argue that Counts I and II fail to state claims for relief essentially because the complaint indicates that Plaintiffs received all of the process to which they were entitled. Defendants also argue that the individual defendants are entitled to qualified immunity as to the claims against them in their individual capacities. Defendants contend that Plaintiffs' Title IX claims in Counts III and IV should be dismissed because the complaint does not allege facts showing that Plaintiffs were discriminated against on the basis of gender. Finally, Defendants argue that Count V should be dismissed because injunctive relief is not cognizable as a stand-alone claim.

Defendants' motion has been fully briefed and is ready for disposition. The Court will address the issues in the order presented.

## A. Eleventh Amendment Sovereign Immunity

 **[1]**   **[2]**   The Eleventh Amendment bars suits for money damages against States, arms of the State, and state employees in their official capacities. Rodgers v. Banks, 344 F.3d 587, 594 (6th Cir.2003). The Eleventh Amendment also bars suits for declaratory relief against the State. McCormick v. Miami Univ., 693 F.3d 654, 661 (6th Cir.2012). The University of Cincinnati is a public university, and, therefore, is considered an arm of the State of Ohio. Johnson v. University of Cincinnati, 215 F.3d 561, 571 (6th Cir.2000). Consequently, the Eleventh Amendment bars Plaintiffs' claim for declaratory relief against UC and the individual Defendants in their official capacities. See id. The Eleventh Amendment, however, does not bar Plaintiffs' claim for declaratory relief against the individual Defendants in their personal capacities. Id.

Accordingly, to the extent that Count I seeks declaratory relief against UC and the individual Defendants in their official capacities, Defendants' motion to dismiss will be granted. Defendants, however, are not entitled to dismissal of Count

I on Eleventh Amendment grounds to the extent it seeks declaratory relief against the individual Defendants in their personal capacities.

### B. Res Judicata

Doe I and Doe II filed substantially the same complaint with the same causes of action against UC and Defendant Cummins in the Hamilton County Court of Common Pleas in January 2015. Doc. No. 11-1. Defendants in that case moved to dismiss Doe II's claims under Counts I, III and V on the grounds of mootness because he had graduated from UC and thus was no longer subject to the Student Code of Conduct. Doc. No. 11-3. In February **\*598** 2015, Judge Dinkelacker entered an order granting Defendants' motion to dismiss Counts I, III, and V of Doe II's complaint. Judge Dinkelacker agreed with Defendants that Doe II's graduation from law school mooted his claims and that he otherwise had only pled speculative future consequences resulting from the disciplinary proceedings. Accordingly, Judge Dinkelacker dismissed Counts I, III, and V of Doe II's complaint. Doc. No. 11-2.

In their present motion to dismiss, Defendants argue that Judge Dinkelacker's dismissal of Doe II's Counts I, III, V in state court operates as res judicata, and more specifically, issue preclusion, against the same claims in this case. In opposition, Plaintiff contends that the parties later entered into a stipulation to dismiss Doe II's state court complaint without prejudice. See Doc. No. 14, at 22-24 (citing attached Exhibit A (stipulation of dismissal and judgment entry granting dismissal without prejudice)). [2] Then, confusingly, in their reply brief Defendants agree that Judge Dinkelacker's entry of dismissal *does not* have res judicata effect in this case (Doc. No. 15, at 5), but they then ask the Court to adopt his reasoning and conclude that Doe II's claims in Counts I, III, and V are moot due to his graduation. Id.

**[3]** **[4]** Defendants have now apparently waived their res judicata argument. Defendants' argument in their reply brief that Doe II's Counts I, III, and V are moot, as opposed to barred by issue preclusion, is new. A party is generally not permitted to raise new arguments in its reply brief. Engineering & Mfg. Services, LLC v. Ashton, 387 Fed.Appx. 575, 583 (6th Cir.2010). On the other hand, federal courts lack subject matter jurisdiction to adjudicate moot claims, Church of Scientology of Cal. v. United States, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992), and courts may sua sponte

raise the question of their own subject matter jurisdiction. Ford v. Hamilton Inv., Inc., 29 F.3d 255, 257 (6th Cir.1994).

**[5]** The Court, however, is not persuaded that Doe II's graduation from UC renders his claims in Counts I, III, and V moot. In Yoder v. University of Louisville, 526 Fed.Appx. 537 (6th Cir.2013), the Court held that the plaintiff's graduation from nursing school mooted her claim for injunctive relief in the form of reinstatement to the school. Id. at 543. The Court, however, went on to consider the plaintiff's legal claim that the individual defendants violated her right to due process when they originally dismissed the plaintiff from school for academic reasons. The Court also considered whether defendants were entitled to qualified immunity on that claim Id. at 549–50. In other words, implicit in Yoder is the conclusion that the plaintiff's graduation from school does not moot a claim for a past due process violation.

In this case, Doe II is not seeking reinstatement as a form of injunctive relief. Consequently, there is no question of mootness of his claims in that regard. Expungement of Doe II's disciplinary record, which is a claim suggested in his claim for injunctive relief, would not be moot as a result of his graduation. Flint v. Dennison, 488 F.3d 816, 825 (9th Cir.2007). Yoder indicates that Doe II's graduation does not moot a claim against the individual defendants for damages for alleged past due process violations. Similarly, Doe II's **\*599** graduation does not moot his Title IX claims for alleged past gender discrimination.

Accordingly, the Court concludes that Doe II's graduation from UC does not moot any of his claims.

### C. Rule 12(b)(6) Standard of Review

A motion to dismiss for failure to state a claim operates to test the sufficiency of the complaint. The court must construe the complaint in the light most favorable to Plaintiff, and accept as true all well-pleaded factual allegations. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Roth Steel Products v. Sharon Steel Corp., 705 F.2d 134, 155 (6th Cir.1983). The court need not accept as true legal conclusions or unwarranted factual inferences. Lewis v. ACB Business Servs., Inc., 135 F.3d 389, 405 (6th Cir.1998).

The complaint, however, must contain more than labels, conclusions, and formulaic recitations of the elements of the claim. Sensations, Inc. v. City of Grand Rapids, 526 F.3d 291,

295 (6th Cir.2008) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The factual allegations of the complaint must be sufficient to raise the right to relief above the speculative level. Id. Nevertheless, the complaint is still only required to contain a short, plain statement of the claim indicating that the pleader is entitled to relief. Id. (citing Erickson v. Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007)). Specific facts are not necessary and the pleader is only required to give fair notice of the claim and the grounds upon which it rests. Id. To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted). Mere conclusions, however, are not entitled to the assumption of truth. Id. at 678–89, 129 S.Ct. 1937. A claim is facially plausible if it contains content which allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. at 678, 129 S.Ct. 1937. Plausibility is not the same as probability, but the complaint must plead more than a possibility that the defendant has acted unlawfully. Id. If the complaint pleads conduct which is only consistent with the defendant's liability, it fails to state a plausible claim for relief. Id.

### D. Alleged Due Process Violations

Defendants argue that Counts I and II fail to state claims for due process violations. Count I alleges that Defendants violated Plaintiffs' right to due process in the following ways:

1. conducting biased investigations, the results of which were provided to ARC hearing panels.

2. using hearsay evidence in ARC hearings without an effective opportunity for cross-examination.

3. hearing impact statements from alleged victims before an adjudication of guilt.

4. failure to apply UC's Title IX policies and legal terms correctly.

5. failure to permit effective cross-examination of witnesses.

6. denial of effective assistance of an attorney or advisor.

7. failure to afford them the presumption of innocence.

8. pre-judging the outcome of their hearings. [3]

Complaint ¶ 132.

Defendants contend that in the context of student disciplinary actions, due process only requires notice of the charges, an **\*600** explanation of the evidence supporting the charges, and an opportunity to respond. Defendants argue that Plaintiffs received these minimum protections in this case. Additionally, Defendants cite cases indicating that assigning the burden of proof to the accused student does not violate due process, that students are not entitled to representation, that students are not entitled to direct cross-examination of witnesses, that students are not entitled to discovery and other procedural protections required in criminal proceedings, that Plaintiffs had more than adequate time to prepare for their hearings, and that Plaintiffs' mere allegations of bias are insufficient to show that their hearings were unfair.

Plaintiffs, however, argue that in determining whether they were afforded due process, it is improper to break down UC's process into its constituent parts, compare them to a checklist of procedures, and conclude that they were afforded adequate due process in their disciplinary proceedings. Plaintiffs contend, rather, that the Court must examine UC's process in a holistic manner to determine whether their right to due process was protected. Plaintiffs argue that on the whole UC's disciplinary procedures did not provide them adequate due process.

**[6] [7] [8] [9]** A student faced with expulsion or other discipline for violating school rules is entitled to due process before he can be deprived of his interest in continuing his education. There are, however, no precise parameters for the amount of process the student is due before the discipline can be imposed. The minimum requirements are that the student "must be given *some* kind of notice and afforded *some* kind of hearing." Goss v. Lopez, 419 U.S. 565, 579, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (emphasis on original). This generally means that the student must be provided an explanation of the evidence against him and an opportunity to present his side of the story. Id. at 581, 95 S.Ct. 729. Beyond that, "[t]he type of notice and hearing will vary and be judged for sufficiency based on context in which the dispute arose." Flaim v. Medical College of Ohio, 418 F.3d 629, 634 (6th Cir.2005). It is clear, nevertheless, that schools are not required to employ procedures used in criminal trials in order to satisfy due process. Id. at 635, 635 n. 1. While Plaintiffs contend that the Court must view the adequacy of UC's procedures as a whole,

the Court notes for instance that in Flaim the Court of Appeals addressed the alleged procedural defects in the disciplinary hearing seriatim and then assessed the benefits the additional procedures would supposedly provide in reducing the risk of an erroneous expulsion versus the additional burdens it would impose on the school to provide them. Id. at 643. Moreover, if the case law shows that Plaintiffs were not entitled to various procedural protections on an individual basis-and it does-then it follows that Plaintiffs were not denied due process because UC did not utilize some vague admixture of the missing procedures during their hearings. [4]

*601 [10] The Court concludes that to the extent that Plaintiffs base their due process claims on alleged defects in their first hearings, those alleged errors were harmless because their appeals were sustained and they both received new hearings. Cf. Harper v. Lee, 938 F.2d 104, 105–06 (8th Cir.1991) (administrative reversal and grant of new disciplinary hearing preserved inmate's due process rights and cured any procedural defects in the first hearing). Accordingly, the Court focuses its due process analysis on Plaintiffs' second hearings. It is nevertheless useful to compare the alleged procedural defects of Plaintiffs' first hearings with their second hearings because the absence of allegations that the same or similar defects occurred during the second hearings suggests that these alleged errors were not repeated. For instance, Doe I alleges that during his first hearing the ARC panel would not accept his evidence, such as the surveillance videos, text messages between Roe I and Roe II, and the rape kit analysis and SANE examinations. Complaint ¶ 71. Doe I, however, does not allege that the panel would not accept this evidence in his second hearing. See Complaint ¶ 78. The Court infers, therefore, that Doe I was permitted to present this evidence at the second hearing.

Plaintiffs allege that UC was biased against them and that the ARC panel members were pre-disposed to finding them responsible for the alleged misconduct. The complaint places particular emphasis on pressure allegedly exerted on UC and other universities by the Department of Education to find students accused of sexual misconduct guilty under a threat of a federal investigation and the withholding of federal funding. The complaint also cites training materials that allegedly presume that sexual assault complainants are truthful and that elevate the rights of the complainants over the due process rights of the accused. In this way, the complaint suggests, ARC hearing members are inculcated to find a student accused of sexual misconduct guilty.

[11] [12] [13] School disciplinary boards must of course be impartial, Heyne v. Metropolitan Nashville Pub. Sch., 655 F.3d 556, 567 (6th Cir.2011), but they are entitled to a presumption of honesty and impartiality absent a showing of actual bias. Atria v. Vanderbilt Univ., 142 Fed.Appx. 246, 256 (6th Cir.2005). Generally, the alleged bias of the disciplinary board must be evident from the record and not based on inference and speculation. Nash v. Auburn Univ., 812 F.2d 655, 665 (11th Cir.1987). A plaintiff must allege facts sufficient to overcome this presumption, such as statements by board members or university officials indicating bias or a pattern of decision-making suggesting that gender was an influence. Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 251 (2nd Cir.1995). Thus, for instance, in Gomes v. University of Maine Sys., 365 F.Supp.2d 6, 31–32 (D.Me.2005), the fact that the hearing board chair participated in sexual assault victim advocacy programs did not demonstrate that she was biased against the plaintiff in his sexual misconduct disciplinary hearing. As the district court sharply observed in that case, "There is not exactly a constituency in favor of sexual assault, and it is difficult to imagine a proper member of the Hearing Committee not firmly against it. It is another matter altogether to assert that, because someone is against sexual assault, she would be unable to be a fair and *602 neutral judge as to whether a sexual assault had happened in the first place." Id.

[14] Similarly, Plaintiffs' allegations concerning the sexual assault training provided to UC staff members and pressure allegedly exerted on universities by the Department of Education to intensify their response to sexual assault complaints fall short of creating a reasonable inference that the ARC panels in Plaintiffs' cases were biased. It should be a laudable goal for a university to raise the awareness of its faculty and staff to sexual assault and to increase its sensitivity to the particular problems that victims of sexual violence experience in coming forward to make complaints. Plaintiffs do not cite any authority for the repeated implication in their complaint that a university must balance its sexual assault training with training on the due process rights of the accused in order to avoid a claim that its disciplinary procedures are biased. Moreover, it is not reasonable to infer that UC has a practice of railroading students accused of sexual misconduct simply to appease the Department of Education and preserve its federal funding. [5] Plaintiffs' mere belief that Defendants acted with such ulterior motives [6] is insufficient to state a claim for relief. Center for Bio–Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 377 (6th Cir.2011)("These vague and conclusory allegations

of nefarious intent and motivation by officials at the highest levels of the federal government are not well-pleaded, and are therefore insufficient to 'plausibly suggest an entitlement to relief.' "); Moss v. U.S. Secret Serv., 572 F.3d 962, 970 (9th Cir.2009) ("The bald allegation of impermissible motive... standing alone, is conclusory and is therefore not entitled to an assumption of truth."). Finally, Plaintiffs' statistical allegations, discussed further below, do not reasonably reflect a pattern of decision-making indicative of bias against men.

[15] [16] Plaintiffs next complain that UC permitted the use of hearsay evidence without providing an opportunity for an effective cross-examination of the witness. There is, however, no prohibition against the use of hearsay evidence in school disciplinary hearings. Newsome v. Batavia Local Sch. Dist., 842 F.2d 920, 926 (6th Cir.1988). And, given that there is no general due process right to cross-examine witnesses in school disciplinary hearings, Flaim, 418 F.3d at 641, it follows that Defendants in this case did not violate Plaintiffs due process rights by accepting hearsay evidence without permitting Plaintiffs to "effectively" cross-examine the witness. It is important to note that Plaintiffs do not allege that Defendants prevented them from cross-examining the hearsay witness at all, they have not indicated in their complaint the nature of the hearsay evidence presented, and they failed to explain how additional cross-examination of the hearsay witness would have lowered the risk that they would have been erroneously disciplined.

[17] Plaintiffs next assert that the ARC Panel erred by accepting victim impact statements before finding that they had violated the Student Code of Conduct. This is essentially an attack on the type of evidence the panel elected to admit. School *603 disciplinary boards, however, are not bound by formal rules of evidence or rules of criminal procedure. Flaim, 418 F.3d at 635. Moreover, the Court's own research has not discovered any cases indicating that a disciplinary board is restrained from the types of evidence it may consider or in the order or mode of the presentation of evidence. Thus, in this case, Plaintiffs fail to state a claim for a due process violation based on the ARC Panel's decision to hear victim impact statements before adjudicating Plaintiffs responsible for violating the Student Code of Conduct. Bifurcating the proceedings into different phases, such as a guilt phase and a punishment phase, adds more layers of complexity, and thus more time and expense, to the disciplinary process. Plaintiffs' brief does not explain how a requirement to bifurcate the procedures, as is implicit in this claim, would reduce the probability that they would have been erroneously

disciplined. Again, school disciplinary proceedings are not required to adopt all of the formalities of a criminal trial. Id. at 640 ("Full-scale adversarial hearings in school disciplinary proceedings have never been required by the Due Process Clause[.]"); Gorman v. University of R.I., 837 F.2d 7, 16 (1st Cir.1988)("[O]n review, the courts ought not to extol form over substance, and impose on educational institutions all the procedural requirements of a common law criminal trial.").

[18] [19] [20] Plaintiffs next complain that the ARC Panel applied the Student Code of Conduct improperly. In particular, Plaintiffs contend that the Panel applied the definition of consent improperly. However, an allegation that the disciplinary board violated its own policies and procedures does not state a claim for a due process violation. Heyne v. Metropolitan Nashville Pub. Sch., 655 F.3d 556, 569 (6th Cir.2011); Webb v. McCullough, 828 F.2d 1151, 1159 (6th Cir.1987); see also Levitt v. University of Tex. at El Paso, 759 F.2d 1224, 1230 (5th Cir.1985)("There is not a violation of due process every time a university or other government entity violates its own rules."). Moreover, as a general principle, federal courts must defer to a state agency's interpretation of its own rules and regulations absent a compelling demonstration that it is wrong. Smith v. Babcock, 19 F.3d 257, 260–61 (6th Cir.1994). In this case, Plaintiffs' bare allegations that the ARC Panel misinterpreted the Student Code of Conduct are insufficient to state a due process violation.

[21] Next, Plaintiffs complain that they were denied an effective opportunity to cross-examine witnesses because they had to submit their questions to the ARC Panel chair in written form and had no opportunity to ask follow-up questions. Inasmuch as students do not have a general right to cross-examine adverse witnesses in school disciplinary proceedings, see supra at 22–23, it follows that Plaintiffs' due process rights were not violated because they were required to submit written questions to the panel chair. Nash v. Auburn Univ., 812 F.2d 655, 664 (11th Cir.1987) (no due process violation where students were able to submit written questions to hearing officer to ask witness).

[22] Plaintiffs next assert that they were denied effective assistance of an attorney or advisor. Plaintiffs, however, were entitled to the assistance of an attorney only if the ARC Panel presented its case through an attorney or the rules governing the hearing were unusually complex. Flaim, 418 F.3d at 640. Plaintiffs do not allege that Defendants presented their case with the assistance of an attorney or that the

rules were unusually complex. It follows, therefore, that if Plaintiffs were not entitled to the assistance of an attorney, they were not denied effective assistance of an advocate because their advisors **\*604** were not permitted to participate in the hearing.

Plaintiffs next allege that Defendants violated their right to due process by failing to give them the presumption of innocence and by failing to assign the burden of proving a violation of the Code of Conduct to the complaining student. The facts alleged in the complaint show that the ARC Panel functioned as a board of inquiry and determined what happened based on a preponderance of the evidence without assigning the burden of proof to either party. Complaint ¶ 31(f). Nevertheless, even assuming that the ARC Panel placed the burden of proof on Plaintiffs as they claim, they have not stated a due process violation. As Defendants correctly argue in their brief, "[o]utside the criminal law area, where special concerns attend, the locus of the burden of persuasion is normally not an issue of federal constitutional moment." Lavine v. Milne, 424 U.S. 577, 585, 96 S.Ct. 1010, 47 L.Ed.2d 249 (1976).

Finally, Plaintiffs allege that an ARC Panel has never found a student not responsible for a violation of the Student Code of Conduct. Plaintiffs, however, have not explained how the results of prior ARC Panel hearings involving different students can constitute a violation of their due process rights in their respective hearings. Neither can the Court conceive of an argument that would lead to such a conclusion. To the extent that this constitutes a stand-alone claim for a due process violation, it fails as a matter of law.

[23] In summary, Plaintiffs' complaint indicates that they were charged with violations of the Student Code of Conduct. They received notice of the charges. Even if Plaintiffs' first hearings were riddled with procedural errors as they claim, they both appealed and were granted new hearings. Thus, any due process violations from the first hearings were cured. During their second hearings, Plaintiffs were able to present their own evidence and version of the events. They were not permitted assistance of counsel but the ARC Panel did not utilize an attorney to present its case either. Plaintiffs were able to submit written questions to witnesses in lieu of direct cross-examination. Thus, Plaintiffs' complaint, viewed against the backdrop of existing case law on student disciplinary hearings, shows that they received all the process that they were due. Although not specifically stated in their complaint, Plaintiffs clearly believe that they were entitled to

all of the procedural protections of a criminal trial. As already stated, however, universities are not required to conduct disciplinary proceedings like criminal trials in order to satisfy the Due Process Clause. Although providing Plaintiffs in this case with additional procedural safeguards may have been preferable, "[t]he Due Process Clause...sets only the floor or lowest level of procedures acceptable." Flaim, 418 F.3d at 636. Plaintiffs' complaint shows that the procedures used in their disciplinary hearings met the minimum requirements of due process. Accordingly, Defendants are entitled to dismissal of Plaintiffs' due process claims.

## D. Qualified Immunity

Even if the Court were to conclude that the complaint states claims for violations of the Due Process Clause, the factual allegations show that the individual Defendants are entitled to qualified immunity from suit on these claims.

[24] [25] [26] A public official is entitled to qualified immunity and thus shielded from suit under § 1983, for his actions if his conduct does not violate a clearly established statutory or constitutional right of which a reasonable official would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The contours of the right must be sufficiently **\*605** clear that a reasonable official would understand that what he was doing violates that right. Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The official, however, is only entitled to qualified immunity for actions taken in objective good faith within the scope of his duties. Id. at 819 n. 34.

[27] Determining a public official's entitlement to qualified immunity presents a two-step inquiry. First, the court must determine, judged in the light most favorable to the party asserting the injury, whether the facts alleged show that the officer's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If no constitutional right would have been violated on the facts alleged, the inquiry stops and the officer will be entitled to qualified immunity. Id. If a violation can be made out based on a favorable view of the pleadings, the court must determine whether the right at stake was clearly established. Id.

[28] [29] [30] [31] In determining whether a constitutional right is clearly established, the court must find binding decisions from the U.S. Supreme Court, the Sixth

Circuit Court of Appeals, or finally, decisions of other circuit courts. Walton v. City of Southfield, 995 F.2d 1331, 1336 (6th Cir.1993) (citing Daugherty v. Campbell, 935 F.2d 780, 784 (6th Cir.1991)); Summar v. Bennett, 157 F.3d 1054, 1058 (6th Cir.1998). It is only the extraordinary case that will require a reviewing court to look beyond Supreme Court and Sixth Circuit decisions. Walton, 995 F.2d at 1336. The questions of whether the right alleged to have been violated is clearly established and whether the official reasonably could have believed that his conduct was consistent with the right the plaintiff claims was violated, are ones of law for the court. Id. However, if genuine issues of material fact exist as to whether the official committed the acts that would violate a clearly established right, then dismissal of the claim is improper. Id.; see also Jackson v. Hoylman, 933 F.2d 401, 403 (6th Cir.1991) (affirming district court's denial of summary judgment on the issue of qualified immunity where the parties' factual account of the incident differed).

[32] When a defendant raises qualified immunity as a defense, as the Defendants have done in this case, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. Everson v. Leis, 556 F.3d 484, 494 (6th Cir.2009).

[33] In this case, although as a general rule it was clearly established that students are entitled to due process before they can be expelled from school, it has not been clearly established that Plaintiffs were entitled to all of the procedural protections they claim were missing from their disciplinary hearings. In fact, the case law generally points the other way —it was clearly established that Plaintiffs were not entitled to the individual procedural protections they claim.

As Flaim indicates, Plaintiffs were not entitled to the assistance of counsel or an advisor nor were they entitled to cross-examine witnesses. [7] It was not clearly established that Plaintiffs were entitled to the presumption of innocence. Similarly, it was not clearly established that Plaintiffs **606 could not be assigned the burden of proof. Lavine, rather, clearly establishes that assignment of the burden of proof in non-criminal matters does not even implicate the Constitution. It was not clearly established that school boards cannot rely on hearsay evidence in disciplinary hearings. Again, the opposite is true-rules of evidence do not apply and hearsay is acceptable. It was not clearly established that school boards are restricted in the modes and order of presentation of evidence. The opposite is again true-disciplinary boards are not bound by any particular rules

of procedure. Considered as a whole, and in light of the applicable case law, a reasonable public official in the position of the individual Defendants would not have known that the procedures used in Plaintiffs' disciplinary hearings violated their due process rights. Accordingly, Defendants are entitled to qualified immunity on Plaintiffs' due process claims.

E. Title IX

Plaintiffs both claim that UC discriminated against them on the basis of gender in violation of Title IX of the Education Amendments of 1972. Title IX prohibits educational institutions that receive federal funds from discriminating against students on the basis of gender. 20 U.S.C. § 1681(a).

[34] [35] [36] [37] [38] [39] Title IX discrimination claims apparently may be sorted into four broad categories: "erroneous outcome," "selective enforcement," "deliberate indifference," and "archaic assumptions." Mallory v. Ohio Univ., 76 Fed.Appx. 634, 638–39 (6th Cir.2003). In an "erroneous outcome" case, the plaintiff contends that the outcome of the disciplinary proceeding was erroneous due to gender bias. Id. at 639. In a "selective enforcement case," the plaintiff alleges that the university treated a similarly-situated member of the opposite sex more favorably than the plaintiff. Id. at 640. In a "deliberate indifference" case, the plaintiff alleges that a university official who had authority to implement corrective measures had actual notice of but was deliberately indifferent to misconduct directed at the plaintiff. Id. A "deliberate indifference" claim seems for the most part to be limited to sexual harassment cases. See id. (stating that the "deliberate indifference" standard applies where the plaintiff seeks to hold the university liable for sexual harassment); Doe v. University of the South, 687 F.Supp.2d 744, 757–58 (E.D.Tenn.2009) ("The 'deliberate indifference' must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it."); but see Wells v. Xavier Univ., 7 F.Supp.3d 746, 751–52 (S.D.Ohio 2014) (Spiegel, J.) (holding that plaintiff stated a Title IX deliberate indifference claim based on allegations that university permitted disciplinary hearing to go forward despite being aware that claims that plaintiff sexually assaulted student were unfounded). Finally, in an "archaic assumptions" case, the plaintiff contends that the university's actions were founded on archaic assumptions about men and women. Sterrett v. Cowan, 85 F.Supp.3d 916, 936 (E.D.Mich.2015).

**[40]** Plaintiffs' complaint touches on all of these Title IX sub-categories, but this appears principally to be an "erroneous outcome" case. The complaint is dominated with allegations that UC's disciplinary process, at least in cases of allegations of sexual misconduct, is driven by outside influences and training that biases the system against males accused of sexual assault and in favor of women complainants. But, under any theory, Plaintiffs must still allege facts sufficient to conclude that UC's conduct was motivated by gender bias. Mallory, 76 Fed.Appx. at 638. The Court concludes that Plaintiffs have not alleged facts showing that the results of their disciplinary proceedings were motivated by gender bias. Rather, at worst **\*607** UC's actions were biased in favor of alleged victims of sexual assault and against students accused of sexual assault. However, this is not the same as gender bias because sexual assault victims can be either male or female. Sahm v. Miami Univ., 110 F.Supp.3d 774, 778–79 (S.D.Ohio 2015) (Dlott, J.).

First, many of the actions taken by UC which Plaintiffs claim are indicative of gender bias complied with Title IX guidance issued by the Department of Education. For instance, Plaintiffs complain that the Jane Roes were given accommodations for their class schedules and assignments. Plaintiffs also complain that UC barred them from accessing certain campus buildings during the pendency of their hearings. But, as UC points out, federal regulations and Title IX guidance indicates that UC was required to take those interim measures once it received notice of the complaints from the Jane Does. See 34 C.F.R. § 668.46(b)(11)(v); see also United States Department of Education, Questions and Answers on Title IX and Sexual Violence, at 32 (Apr. 29, 2014) ("The school should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow the complainant to change academic and extracurricular activities or his or her living, transportation, dining, and working activities as appropriate.") available at www2.ed.gov/about/offices/list/ocr/ docs/qa-201404-title-ix.pdf (visited Feb. 24, 2106). In other words, actions taken by UC to comply with guidance to implement Title IX cannot have been in violation of Title IX.

Second, Plaintiffs' complaint alleges, in a conclusory fashion, that many of UC's alleged due process violations, such as the rule not permitting cross-examination and the denial of the right to counsel or an advisor, are the result of gender bias. In Yu v. Vassar College, 97 F.Supp.3d 448, 460–81 (S.D.N.Y.2015), the district judge thoroughly dissected

most if not all of these kinds of claims and concluded that the plaintiff failed to show how the alleged procedural errors were motivated by gender bias. Similarly, in this case, Plaintiffs' complaint does not, for instance, allege facts linking UC's decision to limit cross-examination to gender bias. Consequently, the complaint fails to create a reasonable inference that the disciplinary hearing procedures adopted by UC were motivated by a desire to discriminate against male students.

Third, Plaintiffs' complaint cites statistics which purport to show that UC discriminates against males in investigating and imposing discipline for sexual misconduct. Specifically, according to the complaint, the statistics show that only males have been investigated and disciplined for sexual misconduct by UC. These statistics, however, fail to show that UC has a pattern or practice of discriminating against males in sexual misconduct cases. In order for the statistical evidence to be meaningful, it must eliminate the most likely non-discriminatory reason for the disparity. Bender v. Hecht's Dept. Stores, 455 F.3d 612, 622 (6th Cir.2006). There are, however, at least two related non-discriminatory reasons for the disparity between males and females in sexual misconduct disciplinary cases: 1) UC has only received complaints of male-on-female sexual assault;[8] **\*608** and 2) males are less likely than females to report sexual assaults.[9] See Complaint ¶¶ 119, 120. Plaintiffs statistics do not eliminate or attempt to account for these reasons and, consequently, do not tend to show that UC's disciplinary system discriminates against males in cases involving sexual misconduct. Moreover, since recovery under Title IX under a disparate impact theory is not permitted, Plaintiffs' cannot state a claim by alleging that UC's otherwise gender-neutral disciplinary procedures disproportionately affect men. Horner v. Kentucky High Sch. Ath. Ass'n, 206 F.3d 685, 692 (6th Cir.2000).

Yusuf v. Vassar College, 35 F.3d 709, 716 (2nd Cir.1994), held that the plaintiff's allegation that "males invariably lose when charged with sexual harassment at Vassar" was sufficient on a Rule 12(b)(6) motion to link the outcome of the plaintiff's disciplinary hearing to gender discrimination. Plaintiffs in this case makes the same allegation-males charged with sexual misconduct invariably are found responsible for the violation. The Court, however, concludes that this bare allegation is insufficient to plausibly infer that the results of Plaintiffs' disciplinary hearings were affected by gender discrimination. First, as already discussed, the statistical evidence cited by Plaintiff does not eliminate other likely causes for the disparity between males and females in disciplinary cases.

Second, and relatedly, *Yusuf* disregarded the issues of sample size and whether the alleged disparity in treatment between men and women was statistically significant, id. which is contrary to Sixth Circuit case law. Bender, 455 F.3d at 612; Barnes v. GenCorp, Inc., 896 F.2d 1457, 1466 (6th Cir.1990). Third, and importantly, as UC correctly points out, Plaintiffs' own complaint demonstrates that males are not invariably found responsible when charged with sexual misconduct violations-the ARC panel acquitted Doe I of the charge related to Jane Roe I. Accordingly, for all of those reasons, Plaintiffs' allegation that males invariably lose in sexual misconduct disciplinary hearings is insufficient to plausibly infer gender discrimination affected their hearings.

In summary, the facts alleged in the complaint, even accepted as being true, do not create a plausible inference that UC discriminated against Plaintiffs on the basis of gender in violation of Title IX in their respective disciplinary hearings. Accordingly, UC is entitled to dismissal of Plaintiffs' Title IX claims.

Conclusion

For the reasons stated above, Defendants' motion to dismiss is well-taken and is **GRANTED.** The complaint is **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED**

**All Citations**

173 F.Supp.3d 586, 335 Ed. Law Rep. 845

Footnotes

1    A sexual assault nurse examiner, or SANE, "is a registered nurse that has special training to conduct sexual assault examinations on children and adults." McCormick v. Parker, 571 Fed.Appx. 683, 685 n. 1 (10th Cir.2014).

2    The Court notes that Exhibit A submitted by Plaintiffs are state court docket entries showing dismissal of *Doe I*'s claims without prejudice. However, review of the state court docket also reflects entries dismissing Doe II's claims without prejudice. See http://www.courtclerk.org/case_summary.asp?sec=history&casenumber=A1406907 (visited February 11, 2016); Armengau v. Cline, 7 Fed.Appx. 336, 344 (6th Cir.2001)(court may take judicial notice of public records in considering a Rule 12(b) motion).

3    Regarding this last allegation, the complaint actually states that Defendants violated Plaintiffs' right to due process because "An ARC Hearing Panel has never failed to recommend that a student be found responsible and significant discipline imposed." Complaint ¶ 132(h). The Court is unsure how the past results of other students' disciplinary hearings can by itself constitute a violation of Plaintiffs' due process rights. In the context of the entire complaint, however, the Court interprets this allegation to mean that Plaintiffs received a hearing in name only and that outcome of their hearings was a foregone conclusion.

4    For instance, suppose that UC does not permit any cross-examination at all, but does allow each student to be represented by counsel. Does the addition of counsel offset the loss of the ability to cross-examine witnesses in Plaintiffs' due process calculus? What if UC were to deny cross-examination, but exclude hearsay? Under Plaintiffs' holistic theory of procedural due process, there would be almost no way that UC could anticipate whether its disciplinary hearing procedures comport with due process.

5    The Court specifically declines to follow Wells v. Xavier Univ., 7 F. Supp.2d 746 (S.D.Ohio 2014). In that case, the district court concluded that the mere allegation that the university allowed a defective hearing to go forward in order to demonstrate to the Department of Education that it was taking sexual assault complaints seriously stated a Title IX violation. Id. That decision seems contrary to Twombly and Iqbal's admonition that conclusory allegations are insufficient to state a claim for relief.

6    See, e.g., Complaint ¶¶ 34, 35, 111(a)

7    Flaim states that due process might require the right to cross-examine a witness where credibility is an important issue. Although credibility of witnesses was clearly an issue in Plaintiffs' disciplinary hearings, no case from the U.S. Supreme Court or the Sixth Circuit has clearly established the right to cross-examine witnesses even where credibility is an issue. Flaim, therefore, does not clearly establish the right to cross-examine witnesses in cases like Plaintiffs'.

8    Paragraph 119 of the complaint recites that publicly available records show that since 2011, UC has investigated nine cases of sexual assault. In all nine cases, the respondent, or accused, was male. The gender of complainant, or alleged victim, could only be identified in eight of the cases. In all eight of those cases, the complainant was female. Paragraph 120 of the complaint recites national statistics indicating that males are victims of sexual assault at roughly the same

335 Ed. Law Rep. 845

prevalence as women and speculates that UC should have investigated more cases involving male victims of sexual assault than it actually has.

9    Loree Cook-Daniels, <u>Female Perpetrators and Male Victims of Sexual Assault: Why They Are So Invisible</u> (2011) (reporting that "male sexual assault victims are far less likely than female sexual assault victims to report the crime against them"), available for download through a title search at forge-forward.org (visited Feb. 19, 2016).

---

**End of Document** <span style="float:right">© 2019 Thomson Reuters. No claim to original U.S. Government Works.</span>