# United States Court of Appeals
# for the Fifth Circuit

United States Courts
Southern District of Texas
FILED
January 24, 2023
Nathan Ochsner, Clerk of Court

United States Court of Appeals
Fifth Circuit
**FILED**
August 9, 2022
Lyle W. Cayce
Clerk

No. 21-20185

AUSTIN VAN OVERDAM,

*Plaintiff—Appellant,*

*versus*

TEXAS A&M UNIVERSITY; MICHAEL K. YOUNG, *in his official capacity*; ALYSSA LEFFALL, *in her official capacity*; KYLE MCCRACKEN, *in his official capacity*; DUSTIN GRABSCH, *in his official capacity*; JACLYN UPSHAW-BROWN, *in her official capacity*; DAYNA FORD, *in her official capacity*; KRISTEN HARRELL, *in her official capacity*; C. J. WOODS, *in his official capacity*,

*Defendants—Appellees.*

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CV-2011

Before HIGGINSON, WILLETT, and HO, *Circuit Judges.*
PER CURIAM:

  This case comes to us on interlocutory appeal under 28 U.S.C. § 1292(b). The outcome turns on two controlling questions of law. First, what is the proper pleading standard for a Title IX challenge to a university's disciplinary proceeding? Second, does constitutional due process require that students accused of sexual assault be permitted the opportunity for

attorney-led direct cross-examination of their accusers during university disciplinary proceedings? We analyze each question in turn. Applying the answers to the present case, we affirm.

## I.

Austin Van Overdam and Hannah Shaw were sophomores at Texas A&M University when they met in 2015 through an online dating application. During their one and only interaction, Van Overdam and Shaw engaged in intercourse ("Act 1"), sodomy ("Act 2"), and fellatio ("Act 3")—in that order. Roughly eight months later, Shaw filed a complaint against Van Overdam for sexual abuse, inappropriate sexual contact, and dating violence in violation of the University's policies. Shaw alleged the following: The first sexual act was consensual; but Van Overdam held her down by her wrists when she refused to consent to the second act and sodomized her against her will; she then performed fellatio on Van Overdam out of fear because she "could tell that was what he wanted from his body language," before leaving his apartment. Texas A&M provided Van Overdam notice of Shaw's allegations and scheduled a live disciplinary hearing to evaluate the evidence and witness testimony.

Van Overdam's hearing proceeded pursuant to Texas A&M policy. Both Van Overdam and Shaw attended the hearing in person. A neutral chairperson and panel comprised of three university administrators presided. Van Overdam's attorney was present throughout the proceeding. After Shaw described her allegations in detail, Van Overdam and his attorney were not permitted to cross-examine her directly. Instead, they were allowed to submit an unlimited number of written questions to the panel for it to ask Shaw in both parties' presence, subject to the panel's determinations on relevancy and non-harassment. Van Overdam declined to submit any questions. He did, however, seek to enter unspecified evidence regarding

Shaw's mental health and prior sexual history. Neither was permitted. Van Overdam also alleges that the panel stopped Shaw from testifying about her sexual history.

The panel ultimately found Van Overdam responsible for violating Texas A&M's policy as to Act 2, but not responsible as to Act 3. Van Overdam was suspended for a semester before returning to his studies and the varsity swim team. He graduated from Texas A&M in 2019.

In 2018, Van Overdam sued Texas A&M and several university administrators for sex discrimination under Title IX and deprivation of constitutional due process under 42 U.S.C. § 1983. He based his Title IX claim on two well-recognized theories of liability within the university disciplinary context: (1) erroneous outcome and (2) selective enforcement. *See Klocke v. Univ. of Tex. at Arlington*, 938 F.3d 204, 210 (5th Cir. 2019); *accord Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2nd Cir. 1994). Put simply, Van Overdam alleges that the University erroneously found him responsible for Act 2, and selectively enforced its sexual assault policies against him because of his gender. As for Van Overdam's constitutional claim, he argues that the University's refusal to permit his attorney to directly cross-examine Shaw violated his right to due process.

The district court ultimately granted defendants' motion to dismiss as to Van Overdam's Title IX erroneous outcome and § 1983 due process claims. Thus, only Van Overdam's Title IX selective enforcement claim was allowed to proceed—which the court found to "barely clear[] the pleading hurdle." Van Overdam filed a motion for reconsideration, which the district court denied. The district court then certified its rulings for interlocutory appeal under 28 U.S.C. § 1292(b), on the grounds that they turn on two controlling questions of law. And this court granted Van Overdam's leave to appeal from the interlocutory orders.

No. 21-20185

## II.

Under § 1292(b), our court reviews de novo any controlling legal questions raised by a district court's certified orders. *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996); *McMillan v. Amazon.com, Inc.*, 983 F.3d 194, 198 (5th Cir. 2020). Our jurisdiction "is not confined to the precise question[s] certified by the lower court," but is "nonetheless confined to the particular order[s] appealed from." *Hernandez v. Results Staffing, Inc.*, 907 F.3d 354, 363 (5th Cir. 2018) (cleaned up) (quoting *United States v. Stanley*, 483 U.S. 669, 677 (1987)).

We identify two controlling questions of law raised by the district court's certified orders. First, what is the proper pleading standard for a Title IX claim challenging a university's disciplinary proceeding? Second, does constitutional due process require that students accused of sexual assault be permitted the opportunity for attorney-led direct cross-examination of their accusers during university disciplinary proceedings? We address each question below.

### A.

Title IX provides that: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

Two frameworks have emerged for analyzing Title IX challenges to university disciplinary proceedings. The first is commonly referred to as the "*Yusuf* framework," which describes four theories of liability: (1) erroneous outcome; (2) selective enforcement; (3) archaic assumptions; and (4) deliberate indifference. *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018); *Yusuf*, 35 F.3d at 715. "Plaintiffs attacking a university disciplinary proceeding on grounds of gender bias can be expected to fall generally

within" one or more of these categories. *Yusuf*, 35 F.3d at 715. This framework has been applied by circuit courts for decades, including this one. *See, e.g., Klocke*, 938 F.3d at 210; *Doe v. Univ. of Dayton*, 766 F. App'x 275, 284 (6th Cir. 2019); *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 74 (1st Cir. 2019); *Robinson v. Wutoh*, 788 F. App'x 738, 738-39 (D.C. Cir. 2019); *Doe v. Valencia Coll.*, 903 F.3d 1220, 1236 (11th Cir. 2018); *Doe v. Baum*, 903 F.3d 575, 585 (6th Cir. 2018); *Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 90-91 (1st Cir. 2018); *Plummer v. Univ. of Houston*, 860 F.3d 767, 777-78 (5th Cir. 2017).

Under *Yusuf* and its progeny, a plaintiff who, like Van Overdam, alleges an erroneous outcome, "must point to particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and "a causal connection between the flawed outcome and gender bias." *Klocke*, 938 F.3d at 210 (cleaned up) (quoting *Yusuf*, 35 F.3d at 715); *accord Miami Univ.*, 882 F.3d at 592.

The second framework was articulated more recently by the Seventh Circuit in *Doe v. Purdue University*, 928 F.3d 652, 667 (7th Cir. 2019). There, the court noted that while "[s]ome circuits use formal doctrinal tests to identify general bias in the context of university discipline. . . . [w]e see no need to superimpose doctrinal tests on the statute." *Id.* (citing *Yusuf*, 35 F.3d at 715). Under *Purdue*, the *Yusuf* categories continue to "describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student." *Id.* But, regardless of a plaintiff's particular theory of Title IX liability, the critical question remains the same: "do the alleged facts, if true, raise a plausible inference that the university discriminated against [the plaintiff] on the basis of sex?" *Id.* at 667-68 (cleaned up).

No. 21-20185

Like many plaintiffs before him, Van Overdam pleaded his Title IX claim based on the *Yusuf* framework—as an "erroneous outcome" cause of action and a "selective enforcement" cause of action. Applying *Yusuf*, the district court concluded that Van Overdam had not plausibly pleaded an erroneous outcome and "barely cleared the pleading hurdle" regarding selective enforcement.

Van Overdam asks us to adopt the *Purdue* standard. Texas A&M argues that the district court did not err in applying *Yusuf*—and, indeed, that both the district court and this court are bound to do so by Fifth Circuit precedent. It is true that we have previously applied *Yusuf* to analyze Title IX claims in the university context. *See Klocke*, 938 F.3d at 210; *Plummer*, 860 F.3d at 777–78. It is also true that we have never expressly considered *Purdue* in any Title IX opinion. So while we have applied the *Yusuf* framework, we have never expressly adopted it.

We see no meaningful tension between *Yusuf* and *Purdue*, as Texas A&M itself acknowledged during oral argument. Many of our sister circuits have made the same observation—including in *Purdue* itself. *See* 928 F.3d at 667–68. *See also Sheppard v. Visitors of Virginia State Univ.*, 993 F.3d 230, 236 (4th Cir. 2021) ("In adopting [*Purdue*'s] approach, however, we find no inherent problems with the erroneous outcome and selective enforcement theories identified in *Yusuf*. In fact, either theory, with sufficient facts, may suffice to state a plausible claim. We merely emphasize that the text of Title IX prohibits all discrimination on the basis of sex."); *Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021) ("We think [*Purdue*'s] approach better accords with the text and analytical framework of Title IX. But we recognize that evidence of an erroneous outcome or selective enforcement are means by which a plaintiff might show that sex was a motivating factor in a university's disciplinary decision."); *Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3rd Cir. 2020) (explaining that the court's adoption of *Purdue* does not alter

6

No. 21-20185

the fact that "parties are free to characterize their claims however they wish").

*Purdue* is surely correct that we are governed by the standard set forth in the text of Title IX—prohibiting discrimination on the basis of sex. *Yusuf* is likewise correct that there are different fact patterns that could very well state a claim of sex discrimination under Title IX.

Accordingly, we apply here the following standard, consistent with *Purdue* and *Yusuf:* Do the alleged facts, if true, raise a plausible inference that Texas A&M or its administrators discriminated against Van Overdam on the basis of sex? We find they do not.

### B.

To demonstrate gender bias, Van Overdam argues that the University's findings—i.e., that he was responsible for Act 2 but not Act 3— are internally inconsistent. We disagree. Despite Van Overdam's mischaracterizations to the contrary, finding that Van Overdam was "not responsible" for Act 3 is not remotely equivalent to finding Act 3 was "consensual." Under Texas A&M's policies, a student may be found not responsible for a nonconsensual sexual act if a reasonable person would have misunderstood the accuser's actions to constitute consent. *See Title IX at Texas A&M: Glossary of Terms*, Tex. A&M Univ., https://titleix.tamu.edu/about/glossary (last visited July 25, 2022). A reasonable person could have recognized Shaw's lack of consent as to Act 2, while misunderstanding her lack of consent as to Act 3.

Van Overdam's other arguments fare no better. He repeatedly claims that bias can be inferred from the University's informing Shaw that she would not need to have an attorney present at the disciplinary hearing, because it failed to make a similar representation to Van Overdam. But Shaw was not accused of violating the University's policies—only Van Overdam

was. If anything, that the University did not dissuade Van Overdam from having legal representation belies the notion that it sought to violate his rights.

Finally, Van Overdam argues that the disciplinary panel excluded his unspecified evidence of Shaw's prior sexual history and mental health out of gender bias. But the federal rules of evidence and rape-shield laws routinely bar defendants from offering evidence of a victim's prior sexual activity or topics deemed harassing or irrelevant. *E.g.*, FED. R. EVID. 402; FED. R. EVID. 412; TEX. R. EVID. 412; *Capps v. Collins*, 900 F.2d 58, 60–61 (5th Cir. 1990). If these restrictions are generally *mandated* in criminal trials—where protections for criminal defendants are at their peak—how can they reasonably be used to infer gender bias when applied in a university disciplinary proceeding? In reality, what Van Overdam bemoans as the panel "treat[ing] the accusing student with kid gloves," was merely the panel extending a basic level of respect to an alleged victim of sexual assault that our laws demand in a variety of contexts.

In sum, we conclude that Van Overdam fails to raise a plausible inference that Texas A&M discriminated against him on the basis of sex.

### III.

We now consider the district court's dismissal of Van Overdam's due process claim. As discussed, this ruling turns on the following question: Does constitutional due process require that students accused of sexual assault be granted the opportunity for attorney-led direct cross-examination of their accusers during university disciplinary proceedings? We find that it does not.

### A.

As an initial matter, Texas A&M argues that this court lacks jurisdiction over Van Overdam's due process claim because he has graduated—which, in its view, precludes any form of relief. We disagree. So long as a plaintiff alleges a cognizable liberty interest (*e.g.*, continued reputational harm that may impede future employment), courts have regularly entertained due process challenges to university proceedings after the student has graduated. *See, e.g., Doe v. Univ. of Arkansas-Fayetteville*, 974 F.3d 858, 866 (8th Cir. 2020) (analyzing a former student's due process challenge because his disciplinary record may "interfere with his ability to pursue graduate studies"); *Flint v. Dennison*, 488 F.3d 816, 824 (9th Cir. 2007) ("So long as a former student's record contains evidence of disciplinary sanctions, and the former student seeks 'an order requiring school officials to expunge from school records all mention of the disciplinary action,' the action is not moot.") (quoting *Hatter v. L.A. City High Sch. Dist.*, 452 F.2d 673, 674 (9th Cir.1971)); *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1075 (S.D. Ohio 2017) (analyzing plaintiff's due process challenge "even though he had already graduated"); *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 598 (S.D. Ohio 2016) (explaining that a former student's lawsuit seeking expungement of his academic disciplinary record "would not be moot as a result of his graduation").

Van Overdam alleges a cognizable liberty interest in seeking to restore his reputation and clear his student disciplinary record. So the district court did not err in exercising jurisdiction over Van Overdam's due process claim.

### B.

In *Walsh v. Hodge*, our court analyzed "The Right to Confront One's Accuser in a University Proceeding." 975 F.3d 475, 483 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1693 (2021). There, we found a university had violated a

professor's due process rights by adjudicating sexual harassment allegations against him without hearing live testimony from the accusing student. *Id.* at 484–85. Instead, the accused professor only received "snippets of quotes" with no "opportunity to test [his accuser's] credibility." *Id.* at 485.

In *Walsh*, we observed that a university could have *avoided* a due process violation by doing precisely what Texas A&M did here: "the Committee or its representative should have directly questioned [the accusing student], after which Walsh should have been permitted to submit questions to the Committee to propound to [her]." *Id.* "In this respect, we agree with the position taken by the First Circuit 'that due process in the university disciplinary setting requires some opportunity for real-time cross-examination, even if only through a hearing panel.'" *Id.* (quoting *Haidak*, 933 F.3d at 69). Notably, the court "stop[ped] short of requiring that the questioning of a complaining witness be done by the accused party, as we have no reason to believe that questioning by a neutral party is so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation." *Id.* (cleaned up).

Van Overdam makes two arguments for distinguishing *Walsh*. First, he says that *Walsh* involved accusations of sexual harassment, rather than a quasi-criminal accusation of sexual assault. But Van Overdam was merely suspended for a semester before being permitted to resume his studies and extra-curricular activities, so he acknowledges that his interest is limited to the impact of Texas A&M's findings on his reputation. This is undoubtedly a legitimate interest. But it does not serve to distinguish *Walsh*, which similarly involved reputational harm. *Walsh*, 975 F.3d at 483. Moreover, *Walsh* broadly addressed what "due process in the university disciplinary setting requires." *Id.* at 485 (quotations omitted). It also relied on out-of-circuit authority involving disciplinary adjudication of sexual assault allegations against a student. *Id.*

No. 21-20185

Next, Van Overdam argues that Walsh "asked for the right to ask the questions himself," while Van Overdam merely sought to have his attorney do so. This argument misstates the facts of *Walsh*: Walsh did not assert the right to question his accuser. *Id.* at 485 n.31.

Applying *Walsh* to the present case, we conclude that Texas A&M did not violate Van Overdam's due process rights. Van Overdam received advanced notice of Shaw's allegations against him. He was permitted to call witnesses and submit relevant, non-harassing evidence of his innocence to a neutral panel of administrators. He was represented by counsel throughout the entirety of his disciplinary proceeding. He had the benefit of listening to Shaw's description of the allegations directly. And he and his attorney had the opportunity to submit an unlimited number of questions to the disciplinary panel.

\* \* \*

We affirm.